[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14194
_____

D.C. Docket No. 0:16-cv-61511-WJZ

CAROL WILDING,
STANLEY RIFKEN,
SHARON CRAWFORD,
WILLIAM SCOTT FRANZ,
DAVID PULASKI,
MARY JASMINE WELCH,
JOSE ALBERTO GONZALEZ,
JANE ELLEN PLATTNER,
KIM MARIE HOULE,
et al.,

                                        Plaintiffs - Appellants,

versus

DNC SERVICES CORPORATION,
DEBORAH WASSERMAN SCHULTZ,

                                        Defendants - Appellees.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 28, 2019)

Before JORDAN, GRANT and HULL, Circuit Judges.

JORDAN, Circuit Judge:

In his classic treatise on the United States and its political system, Alexis de Tocqueville famously remarked that "[t]here is almost no political question in the United States that is not resolved sooner or later into a judicial question." Alexis de Tocqueville, Democracy in America, Vol. I, at 257 (U. Chicago Press 2000) [1835]. This case, which pits a political party against some of its supporters, confirms de Tocqueville's reputation as an astute observer of American life.

The plaintiffs in this putative class action are donors to the Democratic National Committee, donors to the 2016 presidential campaign of Senator Bernie Sanders, and voters affiliated with the Democratic Party in various states. The defendants are the DNC and its former chairwoman (and current U.S. Representative) Deborah Wasserman Schultz. The plaintiffs essentially allege that during the 2016 Democratic presidential primaries the DNC and Ms. Wasserman Schultz improperly tipped the scales in favor of former Secretary of State Hillary Clinton, who was challenging Senator Sanders for the Democratic presidential nomination.

In their complaint against the DNC and Ms. Wasserman Schultz, the plaintiffs asserted a number of common-law and statutory claims, including fraud, negligent misrepresentation, and unjust enrichment. The district court dismissed

all of their claims for lack of Article III standing, *see Wilding v. DNC Services Corp.*, 2017 WL 6345492 (S.D. Fla. 2017), and the plaintiffs appealed.

# I

We set out the facts as alleged in the operative complaint, and accept them as true for purposes of our discussion.  *See Wood v. Moss*, 572 U.S. 744, 755 n.5 (2014).

# A

The Democratic Party charter states that its chair "shall exercise impartiality and evenhandedness as between the Presidential candidates and campaigns," and is "responsible for ensuring" that the DNC's national officers and staff also "maintain impartiality and evenhandedness during the Democratic Party Presidential nominating process."  First Amended Complaint at ¶ 159.

From September of 2015 through May of 2016, Ms. Wasserman Schultz and Holly Shulman, the DNC's spokesperson, made public statements promising that the DNC would conduct a neutral and impartial primary process. First, on September 3, 2015, Ms. Wasserman Schultz was quoted in a *Politico* article as saying that she was committed to running a "neutral primary process."  Second, in *Daily Beast*  and *Daily Mail Online* articles appearing in September and October of 2015, Ms. Shulman was quoted as saying that the DNC "runs an impartial primary

process[.]" Third, in May of 2016, Ms. Wasserman Schultz told CNN and the Associated Press that she and the DNC remained neutral in the primary process. *See id.* at ¶ 160(a)–(d).

## B

These statements of impartiality, according to the complaint, were false. The DNC was allegedly "biased in favor of one candidate—[Secretary] Clinton [ ]—from the beginning and throughout the process.  The DNC devoted its considerable resources to supporting [Secretary] Clinton above any of the other Democratic candidates." *Id.* at ¶ 161.  And "[t]hrough its public claims of being neutral and impartial, the DNC actively concealed its bias from its own donors as well as donors to the campaigns of [Secretary] Clinton's rivals, including [Senator] Sanders[.]" *Id.*

In June of 2016, someone using the name "Guccifer 2.0" published a number of DNC documents on a publicly accessible website. *See id.* at ¶ 165. The DNC claimed that those documents had been obtained by Russian government hackers who had penetrated its computer network.  *See id.* at ¶¶ 163–64. Among the documents was a two-page memorandum (marked "confidential" and dated May 26, 2015) written to the DNC regarding the 2016 Republican presidential candidates.  *See id.* at ¶ 166. This memorandum stated that the DNC's goals in the coming months were to "frame the Republican field and the eventual nominee

early and to provide a contrast between the GOP field and HRC [Secretary Clinton]." *Id.* at ¶¶ 166–67. The memorandum also suggested a strategy to "muddy the waters around ethics, transparency, and campaign finance attacks on [Senator Clinton]." *Id.* at ¶ 167. At the time this memorandum was purportedly written, the field for the Democratic presidential nomination included Secretary Clinton and Senator Sanders (who had announced his candidacy in April of 2015), and there was "widespread speculation" that a number of others (e.g., Senator Elizabeth Warren) would soon enter the race. *Id.* at ¶ 168.

This memorandum, the plaintiffs claim, was not the only document showing the DNC's favoritism towards Secretary Clinton. Other documents obtained by hackers included research apparently prepared by DNC staff and Secretary Clinton's campaign staff relating to Secretary Clinton's vulnerabilities, potential attacks, and policy positions, as well as "opposition research on the other Democratic candidates." *Id.* at ¶ 170. In sum, the complaint alleges that, "in spite of" the Democratic Party's charter and multiple public statements, the "DNC devoted its resources to propelling [Secretary] Clinton's candidacy ahead of all of her rivals, even if it meant working directly against the interests of Democratic Party members, including [Senator] Sanders' supporters." *Id.* at ¶ 171.

## C

A number of the named plaintiffs made donations to the DNC in 2015 and 2016.  Some of these plaintiffs donated money after at least some of the statements of impartiality made by Ms. Wasserman Schultz and Ms. Shulman and before the hacked documents were published in June of 2016.  For example, Emma Young made donations to the DNC in December of 2015 and January of 2016, and Phyllis Criddle made donations to the DNC in May of 2016.  *See id.* at ¶¶ 105, 109.  All of the plaintiffs who donated money to the DNC or the Sanders campaign expressly alleged that they relied on the defendants' false statements and omissions "to their injury."  *Id.* at ¶¶ 188, 195.

Senator Sanders endorsed Secretary Clinton as the Democratic Party's presidential nominee on July 12, 2016.  This allegation is not in the complaint, but we take judicial notice of this undisputed historical and political fact under Federal Rule of Evidence 201(b) (providing that a court "may judicially notice a fact that is not subject to reasonable debate").  *See Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997) (en banc) (explaining that a court can judicially notice "matters of political history, such as who was president in 1958").

## D

The plaintiffs filed suit against the DNC and Ms. Wasserman Schultz, invoking jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). They asserted six state-law claims on behalf of three proposed classes: donors to the DNC (the DNC donor class); donors to the Sanders campaign (the Sanders donor class); and voters who registered as Democrats (the Democratic voter class). Both of the proposed donor classes alleged fraud (Count I), negligent misrepresentation (Count II), and violations of the District of Columbia Consumer Protection Procedures Act (CPPA), D.C. Code § 28-3904, which prohibits various unfair or deceptive trade practices (Count III). The proposed DNC donor class also alleged unjust enrichment (Count IV) and negligence (Count VI), the latter based on the DNC's alleged failure to provide donors with a secure computer system and network for the storing of their personal and financial information. And the proposed voter class separately alleged breach of fiduciary duty (Count V). The plaintiffs sought various forms of relief, including compensatory and punitive damages, attorney's fees and costs, and a judgment declaring illegal and enjoining the defendants' alleged violations of the Democratic Party charter.

The DNC and Ms. Wasserman Schultz moved to dismiss the claims, arguing both that the plaintiffs lacked Article III standing and that they failed to state claims for relief. *See* Fed. R. Civ. P. 12(b)(1) & (6). The district court dismissed

all six claims.  It concluded that the plaintiffs had not satisfied the injury-in-fact element of Article III standing as to their negligence claim, the causation element as to their fraud, negligent misrepresentation, CPPA, and unjust enrichment claims, and the redressability element as to their fiduciary duty claim.[1]

## II

We begin with the claims of the DNC donor class and the Sanders donor class for fraud, negligent misrepresentation, violations of the CPPA, and unjust enrichment.  All of these claims are based on the theory that the plaintiffs in these classes were harmed financially by the allegedly false statements concerning the DNC's impartiality and neutrality in the Democratic primary process.  We first address standing.

## A

Our review of the district court's rulings on standing is plenary.  *See Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 705 (11th Cir. 2014); *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir. 2005).  As explained below, we conclude that some of the named plaintiffs representing the DNC donor class have

---

[1] The plaintiffs do not challenge the district court's dismissal of their negligence claim for lack of Article III standing.  That claim is therefore abandoned, and we do not express any views on it. *See Access Now, Inc. v. Southwest Airlines Co.,* 385 F.3d 1324, 1330 (11th Cir. 2004).

adequately alleged standing, but that no named plaintiffs representing the Sanders donor class have done so.

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies," and "[s]tanding to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quotation marks omitted). To have standing, plaintiffs must therefore establish that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*

The three elements of Article III standing—injury, causation, and redressability—must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). *See also 31 Foster Children v. Bush*, 329 F.3d 1255, 1263 (11th Cir. 2003) ("How much evidence is necessary to satisfy [the standing requirement] depends on the stage of litigation at which the standing challenge is made."). At the "pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Bennett v. Spear*, 520 U.S. 154, 168 (1997) (citation omitted). *See also Moody v. Warden*, 887 F.3d 1281, 1286 (11th Cir. 2018).

"At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). *See also id.* at 1650 (standing must exist "for each claim and . . . for each form of relief that is sought"). Where, as here, the plaintiffs seek to proceed as a class, only one named plaintiff for each proposed class needs to have standing for a particular claim to advance. In other words, if "we have at least one individual plaintiff who has demonstrated standing," we do not need to "consider whether the other . . . plaintiffs have standing to maintain the suit." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977). *See also Griffin v. Dugger*, 823 F.3d 1476, 1483 (11th Cir. 1987) (explaining that "a claim can[ ] be asserted on behalf of a class [if] at least one named plaintiff" has standing).

The plaintiffs, as noted, are asserting only state-law claims. But we have held that Article III's standing requirements apply to state-law claims brought in federal court. *See Nicklaw v. Citimortgage, Inc.*, 839 F.3d 998, 1002–03 (11th Cir. 2016) (holding that the plaintiff lacked standing to assert claims under New York law because he did not allege that he sustained a concrete injury). *Accord Hagy v. Demers & Adams*, 882 F.3d 616, 624 (6th Cir. 2016); *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 933–35 (8th Cir. 2012); *Cantwell v. City of Long Beach*, 241 F.3d 674, 683–84 (9th Cir. 2001); 13B Charles A. Wright, Arthur

R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3531.14, at 298

(3d ed. 2019 supp.); 15 Moore's Federal Practice § 101.33, at 101-36.5 (3d ed.

2019).  So the plaintiffs must satisfy Article III with respect to their claims.

## B

At least some of the named plaintiffs representing the DNC donor class and

the Sanders donor class have sufficiently alleged injury-in-fact for their fraud,

negligent misrepresentation, CPPA, and unjust enrichment claims.  The named

plaintiffs for the DNC donor class plaintiffs and the Sanders donor class allege that

they suffered a financial loss resulting from their donations to the DNC and to the

Sanders campaign.  *See* First Amended Complaint at ¶¶ 2–109, 176–77.  Such

economic harm is a well-established injury for purposes of Article III standing.

*See, e.g., Chevron Corp. v. Donzinger*, 833 F.3d 74, 120 (2d Cir. 2016) ("Any

monetary loss suffered by the plaintiff satisfies the injury-in-fact element.").  The

alleged economic injury is also concrete and particularized, *see Lujan*, 504 U.S. at

560, because all named plaintiffs for the DNC donor class and the Sanders donor

class alleged that they donated a specific amount of money and suffered a

corresponding loss.  Indeed, the complaint lists the precise dollar amount of each

named plaintiff's donation(s).  *See Sweigert v. Perez*, 334 F. Supp. 3d 36, 42

(D.D.C. 2018) (holding, in a similar case against the DNC and some of its officials,

that the plaintiff's "alleged loss of $30 [made as a donation to the Sanders

campaign] is indeed sufficiently concrete, particularized, and actual to satisfy the injury-in-fact requirement of standing").

Causation is next. To satisfy Article III's causation requirement, the named plaintiffs must allege that their injuries are "connect[ed] with the conduct of which [they] complain." *Trump v. Hawai'i*, 138 S. Ct. 2392, 2416 (2018). *See also Duke Power Co. v. Envtl. Study Grp.*, 438 U.S. 59, 75 n.20 (1978) (explaining that Article III standing "require[s] no more than a showing that there is a substantial likelihood" of causation) (quotation marks omitted). Significantly, "[p]roximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003). A plaintiff therefore need not show (or, as here, allege) that "the defendant's actions are the very last step in the chain of causation." *Bennett*, 520 U.S. at 168–69. *See also Moody*, 887 F.3d at 1285 (explaining that we "must not confuse weakness on the merits with absence of Article III standing") (citation and quotation marks omitted).

The named plaintiffs for the DNC donor class sufficiently pled causation. First, they alleged that Ms. Wasserman Schultz and Ms. Shulman made several public (and allegedly false) statements between September of 2015 and May of 2016 affirming that the DNC would run the Democratic presidential primary process in an impartial way.  These statements, as set forth in the complaint, were disseminated by prominent national media outlets.  Second, some of the named plaintiffs representing the DNC donor class (Ms. Young and Ms. Criddle) alleged that they made direct donations to the DNC after some of the purportedly false statements were made and before the hacked documents were published.  And they expressly alleged that they relied on the false statements to their detriment.  Given these allegations, a fair inference is that at least some of the named plaintiffs representing the DNC donor class donated money to the DNC based on the allegedly false statements made by Ms. Wasserman Schultz and Ms. Shulman.  *See Bennett*, 520 U.S. at 168.  Stated differently, "[b]ecause Article III 'requires no more than *de facto* causality,' traceability is satisfied here."  *Dept. of Commerce v. New York*, 139 S.Ct. 2551, 2566 (2019) (citation omitted).  *See also Mann v. Bahi*, 251 F. Supp. 3d 112, 119–20 (D.D.C. 2017) (holding that plaintiffs had standing to bring a CPPA claim because they alleged that the defendants made certain misrepresentations, that they relied on those misrepresentations, and that they suffered injury in the form of sub-par nursing services).

The same cannot be said for the named plaintiffs representing the Sanders donor class.  The critical question is whether the plaintiffs' injuries are fairly traceable to the defendants' allegedly false statements, and on that question there are just too many unknowns.  Although they too alleged that they relied on the false statements to their detriment, not a single named plaintiff who contributed money to the Sanders campaign set out the dates (exact or approximate) of his or her donations. We do not know why the complaint omits the dates of all donations to the Sanders campaign, but the silence makes it impossible to know whether any named plaintiffs representing the Sanders donor class made their donations before or after the false statements were made, or before or after the publication of the hacked documents in June of 2016, or before or after Senator Sanders endorsed Secretary Clinton in July of 2016.  These details matter.  If, for example, those who donated money to the Sanders campaign did so before the false statements were made, the statements could not have caused them financial injury.  *See Sweigert*, 334 F. Supp. 3d at 43 (explaining in a similar case that causation was not adequately pled because the complaint was devoid of allegations that the plaintiff donated money in reliance on anything the DNC or its officials said or did).

That leaves redressability for the DNC donor class with respect to their claims.  At least some of the named plaintiffs representing the DNC donor class have satisfied that element. To have Article III standing, a plaintiff need not

demonstrate anything "more than . . . a substantial likelihood" of redressability. *Duke Power Co.*, 438 U.S. at 79.  *See also Made in the USA Found. v. United States*, 242 F.3d 1300, 1310–11 (11th Cir. 2001) (explaining that even partial relief suffices for redressability).  The economic injuries here consist of the monetary donations made to the DNC based on the allegedly false statements about its impartiality during the presidential primary process.  If the plaintiffs were to prevail on their claims, they could obtain money damages in the form of full or partial refunds of their donations.  Such relief would sufficiently redress their alleged economic harm for purposes of standing.  *See, e.g., Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) ("Plaintiffs allege a monetary injury and an award of compensatory damages would redress that injury."); *America's Cmty. Bankers v. FDIC*, 200 F.3d 822, 828–29 (D.C. Cir. 2000) (holding, in a suit challenging certain past FDIC bank assessments as improper, that receiving a refund of those assessments or a credit against future assessments would provide the plaintiffs with redress).

### III

Because of its rulings on standing, the district court did not reach the defendants' Rule 12(b)(6) arguments that the claims in the complaint were substantively insufficient.  The defendants press those arguments on appeal as an alternative basis for affirmance.

We may affirm the district court's order of dismissal on any ground supported by the record. *See Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010). Exercising de novo review, *see Eagle Hosp. Physicians, LLC. v. SRG Consulting, Inc.*, 561 F.3d 1298, 1303 (11th Cir. 2009), we hold that the fraud, negligent misrepresentation, CPPA, and unjust enrichment claims of the DNC donor class fail on the merits.[2]

Before addressing the claims, we confront the issue of the applicable law. The complaint is silent on what law governs each of the common-law claims, but in their reply brief the plaintiffs apply Florida law to their claims for fraud, negligent misrepresentation, and unjust enrichment. *See* Reply Br. for Appellants at 18–20 (citing Florida cases). Where necessary, we will do the same. *Cf. Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1208 (11th Cir. 2018) ("Under our precedents, a party waives its opportunity to rely on non-forum law where it fails to timely provide—typically in its complaint or the first motion in response when choice-of-law matters—the sources of non-forum law on which it seeks to rely.").

---

[2] The plaintiffs argue that the defendants were barred from making Rule 12(b)(6) arguments because they had earlier filed a motion to dismiss for insufficient service of process under Rule 12(b)(5). The district court disagreed, construing that first-in-time motion as a motion to quash service of process. We agree with the district court's characterization of the defendants' motions. We therefore conclude that nothing barred the defendants from making their Rule 12(b)(6) arguments, and nothing prevents us from considering the sufficiency of the plaintiffs' claims.

**A**

Plaintiffs alleging fraud must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Rule 9(b)'s heightened pleading standard applies to negligent misrepresentation claims" asserted under Florida law because such claims sound in fraud. *See Lamm v. State Street Bank & Trust*, 749 F.3d 938, 951 (11th Cir. 2014). *See also Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1511 (11th Cir. 1993) (Cox, J., concurring in the result) ("Historically, in Florida an action for negligent misrepresentation sounds in fraud rather than negligence.").

"[P]ursuant to Rule 9(b), a plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place and person responsible for the statement; (3) the content and manner in which these statements misled [him]; and (4) what the defendants gained by the alleged fraud." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (quotation marks omitted). A bare allegation of reliance on alleged misrepresentations, bereft of any additional detail, will not suffice under Rule 9(b). *See* 5A Charles A. Wright, Arthur R. Miller, & A. Benjamin Spencer, Federal Practice & Procedure § 1297, at 46 (4th ed. 2018) ("[S]imply alleg[ing] the technical elements of fraud without providing . . . underlying supporting details will not satisfy the rule's pleading-with-particularity requirement.").

The named plaintiffs representing the DNC donor class have not satisfied Rule 9(b)'s pleading requirements. Specifically, they have failed to allege with particularity the manner in which they relied on the defendants' statements. For example, they did not allege on which of the statements they relied. *See* Recording of Oral Argument, Dec. 11, 2018, at 16:45–17:00 ("We did not allege . . . specific reliance on any given statement by any of our clients."). So, although the general allegation of reliance is not fatal to the Article III standing of the DNC donor class, it falls short of Rule 9(b)'s heightened pleading standard. *See, e.g., Recreational Design & Constr., Inc. v. Wiss, Janney, Elstner Assocs., Inc.*, 820 F. Supp. 2d 1293, 1303–04 (S.D. Fla. 2011) (dismissing a claim for negligent misrepresentation because, among other things, the allegation that the plaintiff "suffered pecuniary damages in justifiable reliance" on the defendants' false statements was conclusory and lacked factual support). The claims for fraud and negligent misrepresentation are therefore dismissed.

## B

Whether a plaintiff has Article III standing is a question distinct from whether she has a statutory cause of action. *See Lexmark,* 572 U.S. at 126–28. We conclude, for a number of reasons, that the CPPA claim of the DNC donor class fails the plausibility standard set out in cases like *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007).

As noted, the CPPA prohibits various unfair or deceptive trade practices. *See* D.C. Code § 28-3904 ("It shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived or damaged thereby[.]").  It allows a "consumer [to] bring an action seeking relief from the use of a trade practice in violation of a law of the District [of Columbia]." D.C. Code § 28-3905(k)(1)(A).  A "consumer," in turn, is a person who "does or would purchase . . . or receive consumer goods or services." D.C. Code § 28-3901(a)(2)(A).  *See also Price v. Indep. Fed. Sav. Bank*, 110 A.3d 567, 574 (D.C. 2015) ("[I]n order to obtain redress under the CPPA, [the plaintiffs] must be 'consumers,' defined as 'a person who . . . does or would purchase . . . or receive consumer goods or services.'") (quoting § 28-3901(a)(2)(A)).  As a result, "the CPPA does not cover all consumer transactions, and instead only covers trade practices arising out of consumer-merchant relationships." *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015).

The named plaintiffs representing the DNC donor class made their donations directly to the DNC, which is a non-profit corporation.  *See* First Amended Complaint at ¶¶ 103–09, 153.  Because there are no allegations that any of them purchased or received any consumer goods or services, they are not "consumers" under the CPPA.   *See Silvious v. Coca-Cola Co.*, 893 F. Supp. 2d 233, 236 (D.D.C. 2012) (prisoner who had not purchased Coca-Cola was not a "consumer"

under the CPPA and could not sue the soft-drink's manufacturer for fraudulent labeling); *Slaby v. Fairbridge*, 3 F. Supp. 2d 22, 27 (D.D.C. 1998) (person whose research proposals were rejected by a federal agency was not a "consumer" under the CPPA because her claim did not arise out of the purchase or receipt of consumer goods or services).

We note, as well, that the DNC is not subject to liability under the CPPA for the conduct set out in the complaint.  As the plaintiffs alleged, the DNC is a non-profit entity, and the CPPA limits the liability of non-profit organizations: "An action brought . . . against a non-profit organization shall not be based on membership in such organization, membership services, training or credentialing services, . . . or any other transaction, interaction, or dispute not arising from the purchase or sale of consumer goods or services in the ordinary course of business." D.C. Code § 28-3905(k)(5).  In the words of the D.C. Circuit, "the available evidence suggests that the D.C. Council acted specifically to shield non-profit organizations from statutory liability for membership-related disputes."  *In re APA Assessment Fee Litig.*, 766 F.3d 39, 53 (D.C. Cir. 2014).  Here the complaint frames a dispute between the DNC and some of its supporters concerning organizational behavior.  Because there are no allegations that the DNC acted as a

merchant or sold or provided consumer goods and services to the plaintiffs, the CPPA claim fails.[3]

## C

The elements of an unjust enrichment claim in Florida are "a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004). "In Florida, a claim for unjust enrichment is an equitable claim based on a legal fiction which implies a contract as a matter of law even though the parties to such an implied contract never indicated by deed or word that an agreement existed between them." *14th & Heinberg, LLC v. Terhaar & Cronley Gen. Contractors, Inc.*, 43 So. 3d 877, 880 (Fla. Dist. Ct. App. 2010) (citation omitted).

The DNC and Ms. Wasserman Schultz argue that the unjust enrichment claim of the DNC donor class fails because the complaint does not allege facts which imply a contract as a matter of law, which they say is required in Florida.

---

[3] The plaintiffs argue that the members of the Sanders donor class are "consumers" within the meaning of the CPPA because they made their contributions to the Sanders campaign through ActBlue, a political action committee which charges a 3.95% fee for processing services on each donation. *See* Reply Br. for Appellants at 22–23. We do not address this argument because, as we have explained, the named plaintiffs representing the Sanders donor class lack Article III standing.

They also contend that contributions to political campaigns are not contracts, express or implied, and assert that courts have rejected similar unjust enrichment claims. *See* Br. for Appellees at 29–30 (citing *IberiaBank v. Coconut 41, LLC*, 984 F. Supp. 2d 1283, 1296 (M.D. Fla. 2013), *aff'd*, 589 F. App'x 479 (11th Cir. 2014), and *Found. for Developmentally Disabled, Inc. v. Step by Step Early Childhood Educ. & Therapy Ctr.*, 29 So. 3d 1221, 1227 (Fla. Dist. Ct. App. 2010)).

Instead of responding to these arguments, and addressing the cases cited by the defendants, the plaintiffs merely set out the elements of an unjust enrichment claim and say—without any elaboration—that they have alleged these elements. *See* Reply Br. for Appellants at 23–24. That conclusory assertion, "without supporting arguments and authority," *Sappuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014), is the same response that the plaintiffs submitted in the district court, *see* D.E. 48 at 15, and fails to address the defendants' arguments.

We agree with the defendants that the plaintiffs in the DNC donor class have failed to state a claim for unjust enrichment. Under Rule 8, a complaint must allege sufficient underlying facts to make a claim plausible, and the mere formulaic recitation of elements or legal conclusions will not suffice. *See, e.g., Twombly*, 550 U.S. at 555–56. And that pleading standard applies to state-law claims litigated in federal court. *See Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1259–60 (11th Cir. 2015). The unjust

enrichment claim here contains no factual allegations explaining (a) why Florida
law would deem it necessary or appropriate to imply a contract between the DNC
and those who contributed money to it, or (b) why it would be inequitable for the
DNC to retain the donations made by the members of the DNC donor class.  For
example, we do not know if the named plaintiffs in the DNC donor class gave
money to the DNC to assist with a Democratic presidential primary they believed
would be impartial, or to support Democratic candidates running for other offices
throughout the country, or to fund projects and policies advanced by the DNC.
Why the members of the DNC donor class donated money is, in this context,
important.  Had the plaintiffs in the DNC donor class alleged that they gave money
to the DNC in order to support an impartial presidential primary, then we would be
better able to evaluate whether it is plausible that a contract could or should be
implied under Florida law, and whether the DNC's retention of the donations was
inequitable.   Absent  any  allegations  as  to  the  reasons  for  their  donations,  the
plaintiffs have not made out a plausible unjust enrichment claim under Florida law.

## IV

The plaintiffs in the Democratic voter class separately alleged a breach of
fiduciary duty by the DNC and Ms. Wasserman Schultz.  As we explain, these
plaintiffs have failed to allege an injury-in-fact sufficient to confer Article III
standing.

None of the plaintiffs in the Democratic voter class allege that they made monetary contributions to the DNC. *See* First Amended Complaint at ¶¶ 110–51, 178. So, unlike the claims asserted on behalf of the DNC and Sanders donor classes, the fiduciary duty claim does not involve an allegation of direct (or even indirect) economic harm. *Cf. Fleming v. Charles Schwab Corp.*, 878 F.3d 1146, 1151 (9th Cir. 2017) (holding that investor's allegation of higher execution prices for trades established injury-in-fact for a breach of fiduciary duty claim).

In their brief, the plaintiffs assert that "[v]iolations of common law rights protected by the common law of torts and restitution are sufficient for standing purposes." Br. for Appellants at 13 (quoting *United States v. Real Property, All Furnishings Known as Bridwell's Grocery*, 195 F.3d 819, 821 (6th Cir. 1999)). There is admittedly some support for the notion that the mere violation of a state-law right satisfies Article III even in the absence of an identifiable injury. *See FMC Corp. v. Boesky*, 852 F.2d 981, 993 (7th Cir. 1988) (plurality opinion: "Properly pleaded violations of state-created rights . . . must suffice to satisfy Article III's injury requirement."). But our precedent is to the contrary. We require plaintiffs asserting violations of state-created rights to demonstrate a concrete injury; the defendant's violation of those rights is not enough. *See Nicklaw*, 839 F.3d at 1002–03. *Cf. Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 569 (2d Cir. 2016) ("[A] breach of fiduciary duty

under ERISA in and of itself does not constitute an injury in fact sufficient for constitutional standing.") (citation omitted).

The plaintiffs in the Democratic voter class do not allege any injury resulting from the defendants' alleged breaches of their fiduciary duty. The complaint says only that the plaintiffs in the Democratic voter class were "proximately damaged" by the alleged breaches. *See* First Amended Complaint at ¶ 215. Indeed, the plaintiffs conceded at oral argument that the complaint does not specify any resulting injuries. *See* Recording of Oral Argument, Dec. 11, 2018, at 2:20–2:45 ("The complaint does not, with respect to the fiduciary duty claim, spell out the nature of the damages."). That concession, which confirms the complaint's deficiencies, is fatal to the standing of the plaintiffs in the Democratic voter class. *Cf. DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1302 (11th Cir. 2008) (Florida Democratic voter who claimed that the DNC would violate his Article II and Fourteenth Amendment rights by not seating delegates from Florida at the Democratic National Convention failed to plead the invasion of a legally protected right because, among other things, he failed to allege that he had cast a ballot in the Florida Democratic Primary).[4]

---

[4] Given our conclusion that the plaintiffs in the Democratic voter class did not adequately allege injury-in-fact, we need not and do not address the redressability concerns articulated by the district court. *See Wilding*, 2017 WL 6345492, at *6.

When pressed at oral argument to clarify the nature of their injuries, the plaintiffs suggested two possible ones: a reduction in the "value" of the DNC, and harm to the "viability" of the Democratic Party as a participant in national politics. *See* Recording of Oral Argument, Dec. 11, 2018, at 5:15–7:45.  But even assuming that those injuries would suffice, their articulation comes too late.  The plaintiffs' complaint must contain "general factual allegations of injury resulting from the defendant[s]'conduct," *Bennett*, 520 U.S. at 168, and that complaint cannot be supplemented at oral argument.  Where, as here, a complaint is facially deficient, a court "lacks the power to create jurisdiction by embellishing a deficient allegation of injury."  *Bochese*, 405 F.3d at 976.

Part of the problem is caused by the complaint's complete failure to say anything at all about the source, nature, or scope of the alleged fiduciary duty. Under District of Columbia law, on which the plaintiffs rely, a fiduciary duty requires circumstances such that a "relationship of trust may properly be implied." *Kemp v. Eiland*, 139 F. Supp. 3d 329, 343 (D.D.C. 2013).  All the complaint alleges is that the DNC and Ms. Wasserman Schultz "had a fiduciary duty" to the plaintiffs in the Democratic voter class.  *See* First Amended Complaint at ¶ 213.

"Although standing in no way depends on the merits of the plaintiffs' contention that particular conduct is illegal, it often turns on the nature and source of the claim alleged."  *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (citation

26

omitted).  *See* 15 Moore's Federal Practice § 101.33, at 101-36.6 ("State law may create the legal interest in a federal case, as it often does when federal jurisdiction is based on diversity.").   Had the plaintiffs specified in the complaint what the alleged fiduciary duty was, or how it came to be, then maybe it would have been possible to determine without speculation how they were injured by the alleged breaches.   *See Scanlan v. Eisenberg*, 669 F.3d 838, 842 (7th Cir. 2012) ("That Scanlan must suffer an invasion of a legally protected interest is a principle of federal law.  But the nature and extent of Scanlan's interest as a beneficiary of a discretionary trust, and therefore, whether that interest can form the basis of a federal suit, depend on the law that defines the rights of a discretionary beneficiary.").   Although chapter and verse are not required, a blank page by definition will usually not provide enough for a court to plausibly infer a fiduciary relationship in this political party setting.[5]

---

[5] In their reply brief, the plaintiffs try to provide the framework for a fiduciary duty theory under District of Columbia law.  First, the plaintiffs say they were members of the Democratic Party and donated money to the DNC and to the Sanders campaign. Second, they reason that because of their donations, the DNC and Ms. Wasserman Schultz owed them a "duty to ensure a fair and equitable nomination process and not to secretly conspire against Senator Sanders' presidential campaign." Reply Br. for Appellants at 26.  Even if we could consider this new theory, it would not change the result.  The complaint does not allege that registration in the Democratic Party, without more, imposes a fiduciary duty on the DNC or Ms. Wasserman Schultz.  And it does not allege that any of the plaintiffs in the Democratic voter class made any monetary contributions to the DNC.

## V

In their brief, the plaintiffs argue that the district court should have granted them leave to amend the complaint's allegations regarding standing.  We disagree.

The plaintiffs had already amended their complaint once as of right, and district courts are not required to *sua sponte* grant counseled plaintiffs leave to amend their complaint in the absence of a request for such relief.  *See Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc).  The plaintiffs did not seek to amend their complaint a second time to cure any standing or substantive deficiencies, and they did not explain "how the complaint could be amended to save the[ir] claim[s]."  *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1362 (11th Cir. 2006).   We therefore conclude that the district court did not err in dismissing the complaint without *sua sponte* granting the plaintiffs leave to file a second amended complaint.

## VI

We are mindful that there are deep disagreements within (and outside) the Democratic Party about the DNC's alleged conduct during the 2016 primaries. *See, e.g.,* John Baglia, *Legal Solutions to a Political Party National Committee Undermining U.S. Democracy*, 51 John Marshall L. Rev. 107, 108–09, 118–19 (2017).   But federal courts can only adjudicate cognizable claims, and the complaint here fails on a number of jurisdictional and substantive grounds.

The district court's order of dismissal is affirmed, but the case is remanded so that the district court can amend its order consistent with our opinion. The order should dismiss the fraud, negligent misrepresentation, CPPA, and unjust enrichment claims—which fail on the merits—with prejudice, and dismiss the negligence and fiduciary duty claims—which fail for lack of standing—without prejudice.

**AFFIRMED.**