

B | Governance Studies
at BROOKINGS

**NOVEMBER 2019**

# THE DEMOCRACY PLAYBOOK:
## Preventing and Reversing Democratic Backsliding

Norman Eisen,
Andrew Kenealy,
Susan Corke,
Torrey Taussig, and
Alina Polyakova

# Table of Contents

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Section 1: Domestic actors** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    1. Government and political party leaders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A. Strengthening democratic practices and features . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B. Responsible political behavior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        C. Judicial independence and rule of law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    2. Political opposition groups . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        A. Winning an unfair election . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        B. Slowing deterioration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    3. Civil society and independent media . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        A. The role of civil society in democracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        B. Developing leadership teams with high strategic capacity . . . . . . . . . . . . . . . . . 28

        C. Encouraging broad and diverse participation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        D. Establishing defined goals and a clear vision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        E. Utilizing diverse and varied tactics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        F.  The role of independent media in democracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        G. Individual and systemic threats to media actors . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        H. Maintaining and defending independent media . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    4. The private sector . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        A. Democracy and business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        B. Avoiding state capture, co-optation, and corruption . . . . . . . . . . . . . . . . . . . . . . . 37

        C. Corporate best practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        D. Social media companies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    5. Conclusion of section 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**Section 2: International actors and external assistance** ............................ 43

  1. Partnering with domestic CSOs and NGOs..................................... 44

    A. Addressing restrictions on CSOs and NGOs................................ 47

    B. Coordinating and diversifying support...................................... 49

    C. Planning in advance and developing core capacities ...................... 50

  2. Assisting civil resistance and nonviolent movements ........................ 52

    A. Defining civil resistance and nonviolence .................................. 53

    B. Why support civil resistance, and whom to support?....................... 53

    C. Understanding the operating environment .................................. 54

    D. Promoting local ownership .................................................. 55

    E. Providing training and skills development................................... 55

    F. Boosting efforts of independent media ..................................... 57

    G. Ukraine's Orange Revolution: A case study of external support
       to civil resistance movements................................................ 57

  3. Countering disinformation...................................................... 59

  4. Providing foreign government and institutional support ...................... 62

    A. Strengthening pre-accession EU tools....................................... 63

    B. Leveraging post-accession EU tools......................................... 64

    C. Advancing institutional approaches ......................................... 66

    D. Bolstering U.S. diplomatic and economic tools ............................. 67

    E. Better utilizing NATO platforms ............................................ 69

  5. Conclusion of section 2........................................................ 70

**Conclusion** ................................................................... 71

**Endnotes** ..................................................................... 74

**About the Authors**............................................................. 96

**Acknowledgments** ............................................................. 98



*Protesters take part in a demonstration outside the office of the prime minister in Valletta, Malta.*

# THE DEMOCRACY PLAYBOOK:
## Preventing and Reversing Democratic Backsliding

*Norman Eisen, Andrew Kenealy, Susan Corke, Torrey Taussig, and Alina Polyakova*

# Executive Summary

*The Democracy Playbook* sets forth strategies and actions that supporters of liberal democracy can implement to halt and reverse democratic backsliding and make democratic institutions work more effectively for citizens. The strategies are deeply rooted in the evidence: what the scholarship and practice of democracy teach us about what does and does not work. We hope that diverse groups and individuals will find the syntheses herein useful as they design catered, context-specific strategies for contesting and resisting the illiberal toolkit. This playbook is organized into two principal sections: one dealing with actions that domestic actors can take within democracies, including retrenching ones, and the second section addressing the role of international actors in supporting and empowering pro-democracy actors on the ground. Those recommendations are summarized here.

# Section 1: Domestic actors

## 1. GOVERNMENT AND POLITICAL PARTY LEADERS SHOULD:
### (Pages 12–18)

- Be prepared for and invest in protecting against internal and external interference in elections.

- Enact policies that promote and protect broad access to the vote, such as automatic or same-day voter registration.

- Regulate the role of money in politics to retain trust in the democratic system.

- Uphold institutional obligations and use their political power with restraint—but when norms break down, further legal mechanisms should be considered.

- Defend the independence of the judiciary by establishing public procedures for the selection and retention of judges.

- Implement judicial transparency mechanisms.

## 2. POLITICAL OPPOSITION GROUPS SHOULD:
### (Pages 19–25)

- Form networks between other opposition groups, local electoral activists, civil society groups, and, where appropriate, international organizations and actors.

- Create a unified democratic opposition where possible or consider using referenda as an alternative.

- Increase election monitoring capacity and be prepared to use electoral abuse evidence as the basis for reform advocacy.

- Engage new voters by presenting a positive and inclusive vision for the future—not only attacks on illiberalism.

- Forcefully contest each individual illiberal act of non-democratic actors, calibrating the strength of the remedy to the severity of the threat.

## 3. CIVIL SOCIETY AND INDEPENDENT MEDIA SHOULD:
### (Pages 26–35)

**Civil society should:**

- Seek broad, diverse, and large-scale participation in their activities.

- Model organizationally what they seek to achieve in a democracy.

- Establish defined goals, a clear vision, and an actionable agenda.

- Be prepared to use diverse and varied nonviolent tactics to increase the pressure on government and attract more people to participate.

**Independent media should focus their efforts on four key areas:**

- Occupational development and education.

- Professional associations to enable and support individual journalists on a range of issues.

- Media self-scrutiny and development of a robust media criticism community.

- Better internal governance of media outlets.

## 4. THE PRIVATE SECTOR SHOULD:
(Pages 36–41)

- Resist corruption, co-optation, and state capture.

- Aim to do well by doing good, including through activism, philanthropy, and corporate social responsibility.

- Recognize the key role of social media companies, who should:

  - Prioritize digital media literacy.

  - Quickly remove material that violates the law and their codes of conduct policies.

  - Support narrowly tailored government regulations that do not infringe on users' rights to free speech.

  - Intensify cooperation with other platforms to share best practices.

# Section 2: International actors

## 1. INTERNATIONAL ACTORS SHOULD PARTNER WITH DOMESTIC CSOs AND NGOs BY:
(Pages 44–51)

- Going local—enhancing collaboration with local NGOs to balance external support to more well-known and Westernized organizations.

- Building basic capacities of NGOs—especially local ones.

- Coordinating donor support to avoid overwhelming recipient organization bandwidth.

- Responding vigorously to government attacks on NGOs.

- Empowering nontraditional actors in addition to NGOs, such as businesses, individuals, universities, student groups, and think tanks.

- Developing domestic sources of funding and philanthropy, particularly in countries that are at risk of democratic backsliding.

## 2. INTERNATIONAL ACTORS SHOULD ASSIST DOMESTIC CIVIL RESISTANCE AND NONVIOLENT MOVEMENTS BY:
(Pages 52–58)

• Developing clear criteria for providing support.

• Thinking long-term.

• Establishing the local context.

• Promoting domestic ownership of the issues at the national and local level.

• Focusing on training and skills development across civil resistance and movement organizing.

• Helping to boost the efforts of independent media.

## 3. INTERNATIONAL ACTORS SHOULD HELP COUNTER DISINFORMATION BY:
(Pages 59–61)

• Supporting independent media organizations and CSOs working to expose disinformation campaigns.

• Investing in and expanding organizational capabilities for monitoring disinformation campaigns emanating from foreign actors.

• Enhancing communication between democratic governance and social media companies.

• Advancing pro-democracy messaging.

## 4. FOREIGN GOVERNMENTS AND INSTITUTIONS SHOULD PROMOTE DEMOCRACY BY:
(Pages 62–69)

• Leveraging EU structural funds.

• Enhancing support for civil society and the independent media.

• Encouraging NGO-Government relations, when possible.

• Prioritizing governance and democracy issues.

• Advancing institutional channels.

# Introduction

## AN ERA OF AUTHORITARIAN RESURGENCE

Democracies around the world are under stress, their institutions and norms undermined by illiberal actors and their vulnerabilities exploited by external forces bent on weakening democracy's appeal. Prominent illustrations include Turkey's descent into authoritarianism, Poland and Hungary's illiberal turns, Russia's electoral interference in states across the transatlantic community and, of course, events in the United States. Alongside such headline capturing developments, there has also been a longer-term erosion of citizen trust in democratic institutions and elected officials. These democratic setbacks—both attention grabbing and more subtle—have emerged across regions in both transitioning and consolidated democracies.

Global democracy indices assert that the world has entered a new wave of autocratization.[1] In 2019, Freedom House recorded its 13th consecutive year of net decline in political rights and civil liberties.[2] In this time, one in six democracies around the world has failed.[3] In 2019, the Varieties of Democracy Project (V-Dem), the world's largest database on democratic indicators, reported that democratic declines now affect more countries than ever before.[4] While the majority of countries in the world remain democratic, almost one-third of the world's population lives in countries undergoing democratic decline.[5] Unlike previous waves of autocratization, this current retrenchment mainly affects democracies and is occurring through legal transfers of power.[6]

European states—the primary focus of this report—are not immune to these realities. Across the continent, illiberal parties have gained support among citizens who see their governments as unable to meet their economic and security needs, nor adequately addressing concerns associated with migration and globalization. Countries in Central and Eastern Europe that made significant gains in building their new democracies following the Cold War are now experiencing a crisis of illiberalism that is weakening the rule of law, the separation of powers, and the integrity of elections. In older and more entrenched democracies in Western Europe, societies and governments are grappling with how to handle powerful populist and nationalist movements that exude illiberal tendencies.

Champions of the democratic openings across Central and Eastern Europe in the wake of the Cold War are also weakening in their support and standard setting behavior. In the 1990s and early 2000s, the United States and major Western European powers more consistently prioritized and invested in policies of democracy promotion and expansion. Now their inability or unwillingness to uphold democratic norms and institutions internally further complicates democracy-promotion efforts. This shift is giving authoritarian regimes, including Russia and China, more confidence and influence to meddle in the internal affairs and processes of democratic states.

## THE ANATOMY OF ILLIBERAL STATES

Democratic setbacks in Europe today are not driven by overt coup d'états or forceful authoritarian takeovers. Rather, backsliding is occurring through incremental steps and often under a legal façade.[7] It is implemented by illiberal political parties and leaders that have come to power through relatively democratic and electoral processes. Bastions of support for such movements tend to come from rural communities outside national capitals and metropolitan areas and from segments of society that feel left behind by out-of-touch elites.

Once in power, illiberal governments capitalize on popular support to deploy a discernible toolkit and a loosely predictable sequence to chip away at democracy and build an illiberal state. As argued in a related Brookings report, *The Anatomy of Illiberal States*, "Liberal principles—political ideas that espouse the importance of individual liberties, minority rights, and the separation of power across levers of government—and democratic institutions—processes that translate popular will into public policy through legitimate elections—are being pulled apart."[8] At times, their efforts extend beyond attacks on liberal principles to include delegitimizing political opposition, diminishing fundamental political rights to free speech, assembly and media pluralism, and clamping down on civil society—all of which are indispensable for a functioning democracy.

> **This playbook highlights strategies and tactics for pro-democracy actors to not only push back against illiberal and authoritarian-leaning actors, but also to renew the promise and resiliency of democratic institutions.**

## A WINDOW OF OPPORTUNITY

The emergence of self-styled illiberal states across Europe presents a challenge to Western collective action in an era of authoritarian resurgence. Far-right populist parties, many with illiberal tendencies, have gained a toehold or the majority in 23 of 28 EU member states' parliamentary systems. [9] But, these systems still have democratic institutions and robust civil societies, albeit under pressure, that provide avenues for responding. The level of free and fair competition for political power varies across nations, as does the space for free speech and assembly, the rule of law, transparency, and government accountability.[10] The ability of political opposition and civil society to operate gives pro-democracy actors an urgent window of opportunity to push back on illiberal activity before it becomes further entrenched, and in turn, more difficult to undo.

To resist the illiberal toolkit, pro-democracy forces must be empowered with a dynamic playbook of their own. Old tools of democracy support must be adapted to current realities in which citizens now have less trust in mainstream political actors and the media. While democracy as a system of governance maintains widespread appeal, there has been a gap between expectations and delivered benefits. Illiberal politicians have seized on this divide as an opportunity to gain support[11] that will continue as long as citizens remain disillusioned with democracy.

Moving forward, democracy must be shown to work. This playbook highlights strategies and tactics for pro-democracy actors to not only push back against illiberal and authoritarian-leaning actors, but also to renew the promise and resiliency of democratic institutions. To demonstrate that democracy is the best system to meet citizens' needs, supporters will have to revitalize the economic, political, and social pillars that undergird democracy, which have, in many nations, fallen into disrepair.

## A NEW DEMOCRACY PLAYBOOK

The far-reaching consequences of a decade-long run of authoritarian resurgence makes renewing and reenergizing liberal democracy in the trans-Atlantic space all the more necessary. As part of this effort, our report provides strategic insights from social science and historical and contemporary case studies that shed light on how to push back on illiberal forces and strengthen the pillars of liberal democracy. In section 1, we provide a set of insights—drawn from the United States and Europe—to help inform and strengthen the strategies of domestic democratic actors such as:

- The incumbent political establishment;
- The political opposition;
- Civil society and independent media; and
- Private enterprise—including social media enterprises—and ordinary citizens.

Section 2 discusses the indirect role of international institutions and organizations in supporting pro-democracy forces, empowering local actors, and advancing democratic reforms. This report highlights efforts including:

- Partnering with domestic NGOs;
- Assisting civil resistance and nonviolent movements;
- Countering disinformation campaigns; and
- Providing foreign government and institutional support.

We begin each subsection with a summary of its contents. We conclude each subsection with recommendations for further reading on the corresponding topic.

To be clear, no single strategy is a silver bullet to the illiberal challenges at hand; context powerfully shapes the outcomes of particular pro-democracy strategies and tactics. But we believe that it is possible to distill useful strategic frameworks, principles, and lessons learned into a "democracy playbook." We hope that diverse groups and will find this playbook useful as they contest and resist the illiberal toolkit.



## SECTION 1:
## Domestic actors

*By Norman Eisen, Andrew Kenealy, and Susan Corke*

*People attend a protest against the government of Prime Minister Viktor Orbán in Budapest, Hungary.*

I n both ascendant and troubled democracies today, contentious political dynamics are at play across a wide variety of domestic contexts and actors.[12] People and organizations working toward advancing democracy sometimes have structural and other winds at their backs accelerating their progress. At other times, those advocating democracy are fighting their way forward against strong headwinds. Yet negative factors, such as authoritarian strength, need not be decisive.[13] Nor are backsliding democratic regimes—the focus of this report—stable and unalterable.[14]

Recent scholarship on pro-democracy actors and political history shows that the strategies they deploy to pursue their goals matter.[15] Describing his own convictions in that regard, Larry Diamond writes: "I became (and remain to this day) convinced that the failure of democracy is not foreordained, and that within the various social and institutional constraints, actors act, making choices that can doom or possibly sustain democracy."[16] Democracy's fate rests in the hands of people, and securing it begins at home.

This section of our report distills principles of strategic action for how domestic actors can promote democracy in their own nations. We examine scholarship on the roles of governing political parties and actors, political opposition groups, civil society and the independent media, and the business sector. Throughout, we illustrate strategic principles with contemporary and historical examples drawn primarily from Central and Eastern European nations. Although we draw upon academic literature that, at times, assesses activity around the globe, we aim to draw lessons that are especially applicable for actors in nations experiencing, or at risk of, democratic backsliding in Europe and Eurasia.

# 1. Government and political party leaders

**SUMMARY**

Government and political party leaders should:

- **Be prepared for and invest in protecting against internal and external interference in elections**. Elections are the foundation of a democracy yet advances in digital technology have rendered elections increasingly complex and vulnerable to interference. Governments should have a proactive and comprehensive deterrence strategy—with responsible actors in clearly defined roles—that will appropriately punish nations who interfere in democratic elections. Governments and political parties should invest in the people and systems necessary for the technological security of election counting, voter registration machines, and political campaign networks.

- **Enact policies that promote and protect broad access to the vote**, such as automatic or same-day voting.

- **Regulate the role of money in politics to retain trust in the democratic system** through the creation of such mechanisms as public financing of campaigns, disclosure requirements for donations, and limits on the amount of campaign donations.

- **Uphold institutional obligations and use their political power responsibly** through "institutional forbearance" (i.e., politicians should refrain from using the full breadth and scope of their politically allocated power) and through "mutual toleration" (i.e., opposing sides regarding one another as legitimate rivals, but not enemies.) When these norms break down and authoritarian challenges emerge, further legal mechanisms should be considered to sanction extreme behavior.

- **Defend the independence of the judiciary by establishing public procedures** for the selection, appointment, and promotion of judges, for the allocation of cases to judges, as well as codes of ethical behavior that protect the integrity of the judicial decision-making process from undue political pressure, intimidation, and attacks.

- **Implement judicial transparency mechanisms** (e.g., opening up courtrooms, producing publicly available transcriptions of proceedings, and placing cameras in courtrooms).

Those with institutional control of national-level, democratic political systems bear the responsibility to maintain their vibrancy. This section distills best practices that incumbent executive, legislative, judicial, and political party leaders can follow in order to maintain the democratic character of the system within which they operate. These duties manifest in separate but related ways, from policy choices to institutional behavior to political statements.

## A. STRENGTHENING DEMOCRATIC PRACTICES AND FEATURES

In a democracy, political actors are responsible for strengthening democratic practices and features. We highlight three of those features in particular: secure, free, and fair elections; money in politics; and the formation of strong political parties populated by pro-democracy politicians that are appropriately attuned to a diverse grassroots support base.

Secure, free, and fair elections are the foundation of democracy, yet ensuring them is a complicated endeavor. Even in well-established democracies, measures must be taken to guard against partisan efforts to manipulate the vote.[17] Conversely, governments should enact policies that promote broad access to the vote, such as automatic or same-day voter registration.[18]

Elections must also be secured against international interference of the kind practiced by Russia across Europe and in the United States.[19] Protecting against external meddling requires improving the technological security of election counting, voter registration machines, and political campaign networks. It also entails encouraging social media and other news media companies to cooperate with the government in addressing the problem of disinformation.[20] Governments on both sides of the Atlantic must also develop a comprehensive deterrence strategy that will appropriately punish nations who interfere in democratic elections.[21]

Second, the role of money in politics must be properly regulated so as to not elevate special interests over those of the public and foster a lack of trust in the democratic system. To prevent the undue influence of money in democratic politics, political parties should implement small donor matching systems or other mechanisms for the public financing of campaigns, create disclosure requirements for donations, and set limits on the amount of money that can be donated to campaigns. These reforms can lead to positive effects such as the emergence of more political challengers, the reduction of the total cost of campaigns, and even a larger proportion of budgets being devoted to public welfare spending, which work in tandem to strengthen democratic institutions and trust in government.[22]

Finally, political parties must strike the proper balance between central control and grassroots influence. Excessive domination by party bosses has long been viewed as anti-democratic.[23] But too much decentralization of decision-making power in selecting party leaders and candidates may also have perverse effects. One of these effects includes unduly empowering fringe elements who do not represent the opinion or interests of the majority and special interest groups.[24] This may reduce the breadth of party appeal, potentially reducing politicians' incentives to make decisions in the public interest. Recent work has advocated for an approach to political parties that brings establishment political figures and activists closer together and emphasizes the value of critical debate among decisionmakers, with the objective of diversifying political discourse to include alternative perspectives.[25] Such an intermediate approach enables political parties to keep central control in mind while maintaining a diverse base and remaining in touch with the interests of their grassroots supporters.

## B. RESPONSIBLE POLITICAL BEHAVIOR

In addition to helping foster conditions conducive to democratic consolidation and implementing policies that protect democratic practices, officials must also use their political power responsibly in order to safeguard democracy. In practice, politicians who uphold their institutional obligations will respect two particularly important norms of political behavior: "institutional forbearance" and "mutual toleration". In so doing, they can insulate themselves, their parties, and their democracies from would-be authoritarians.[26]

The norm of institutional forbearance holds that politicians should refrain from using the full breadth and scope of their politically allocated power, when doing so would undermine the democratic system.[27] Leading political scientists stress the importance of such restraint for democratic stability and functioning. Institutional forbearance is often a matter of adhering to norms not written into law, such as not packing courts, respecting term limits, and refraining from issuing executive orders to circumvent the decisions of other branches of government.

Important work on cooperation in political systems suggests that politicians who exhibit moderation while seeking the best possible outcome for themselves are making a good strategic bet. Such behavior will help produce repeated cooperation and sustained "playing" over the long-term. Intransigence, on the other hand, incentivizes costly retaliation.[28] Significant historical evidence suggests that excessive retaliation can lead to system breakdown.[29]

Sometimes the solution can be found in strong constitutional protections, but deftly written constitutions (and where available, amendments) alone are insufficient to guarantee democracy. Even the best constitutions include gaps and ambiguities that are subject to competing interpretations. Moreover, constitutions will unavoidably be vulnerable to what legal scholars have dubbed "constitutional hardball".[30] This is the opposite of institutional forbearance and is exceptionally difficult to guard against.[31]

An example of illiberal leaders playing constitutional hardball can be seen in the recent political turmoil in the Czech Republic. The unabashedly illiberal Czech President Milos Zeman has used his limited constitutional powers to their fullest extent in order to support the populist Prime Minister Andrej Babis, who is currently embroiled in a corruption scandal that has prompted the largest Czech protests since the Velvet Revolution.[32] Zeman allowed Babis' proposed government to continue in a caretaker capacity even when he lost a parliamentary vote of no confidence in January 2018, and stated that he would reappoint Babis as prime minister even if he lost another vote of no confidence in November 2018 (a vote that Babis ultimately survived).[33] All of these decisions are technically legal; Zeman has operated within his constitutional authority. However, Zeman's purported alliance with Babis has disregarded generally accepted political norms, particularly the norm of replacing a prime minister after he or she has lost a no-confidence vote.

A second norm crucial to democratic functioning is "mutual toleration", which addresses how political opponents treat one another.[34] Politicians who are mutually tolerant acknowledge

that as long as their opponents follow constitutional rules, they have an equally legitimate claim to run for office. Although there may be significant substantive disagreements between opponents, and they may not like each other, they do not treat them as existential threats. In other words, mutually tolerant politicians on opposing sides regard one another as rivals, but not enemies. This is especially important to sustaining democracy because when politicians unfairly cast their opponents as illegitimate, dangerous threats, they can also justify using authoritarian measures to defeat them.[35]

Another aspect of responsible political behavior is keeping power out of the hands of extremist leaders.[36] Political leaders and parties generally enjoy a significant capacity to curb the influence of political extremists through, for instance, making choices about coalitions and leadership roles. Yet history shows that it is a mistake for pro-democracy establishment politicians to permit the rise of radical leaders under the belief that they will benefit from their popularity and be able to control their worst impulses.[37]

Unfortunately, not all would-be despots are easy to spot. Some of today's infamous, illiberal leaders, such as Hungary's Viktor Orbán, had promising beginnings. In 1989, Orbán studied civil society at Oxford University, funded by a scholarship from the Soros Foundation. He began his political career as a liberal democrat and governed democratically in his first term as prime minister from 1998 to 2002.[38] His turn towards authoritarianism—following his return to power in 2010— came as a slowly-dawning, unpleasant surprise to some.[39]

> History shows that it is a mistake for pro-democracy establishment politicians to permit the rise of radical leaders under the belief that they will benefit from their popularity and be able to control their worst impulses.

As an early-warning system of such developments, political scientists have articulated a generally reliable framework for identifying prospective dictators. Drawing upon the foundational scholarship of Juan Linz,[40] Steven Levitsky, and Daniel Ziblatt propose four key indicators of authoritarian behavior. They include: "1) Rejection of (or weak commitment to) democratic rules of the game; 2) Denial of the legitimacy of political opponents; 3) Toleration or encouragement of violence; and 4) Readiness to curtail civil liberties of opponents, including the media."[41] It is important to note that prospective authoritarian leaders initially tend to demonstrate these behaviors within the confines of existing laws and powers that they already possess. They often go to great lengths—such as inventing threats to justify the utilization of emergency powers—to maintain the legality of their actions. Political parties and leaders must, therefore, respond in turn, using all legal and discretionary tools at their disposal to isolate and ostracize aspiring politicians who meet one or more of these criteria.

Levitsky and Ziblatt suggest five mechanisms for how pro-democratic establishment groups can respond to authoritarian behavior. First, and most importantly, rival pro-democracy parties and leaders should collaborate in a united front to push back against extremists. Second, they can refrain from placing would-be authoritarians on party ballots for higher office, even when doing so might generate votes. Third, they can purge extremists in the grassroots of their own parties, by expulsion if necessary. Fourth, political parties can avoid forming any alliances with

potentially extremist wings on their own side of the ideological spectrum. Finally, they can go one step further by refraining from appearing or associating with would-be authoritarians, in turn refraining from providing those groups or individuals with political legitimacy.[42] Such steps can go a long way toward marginalizing, and in turn defeating, would-be authoritarians.[43]

French establishment politicians used a combination of these strategies in the 2017 presidential election to keep the far-right National Front leader Marine Le Pen out of power. All moderate presidential hopefuls who lost in the first round of the election immediately endorsed centrist candidate Emmanuel Macron in the second round. These endorsements provided a much-needed boost for Macron, who went on to defeat Le Pen in a landslide—albeit with a lesser margin than in 2002 when France rallied around Jacques Chirac against Jean-Marie Le Pen, Marine's father. Reportedly, the French establishment politicians who universally endorsed Macron did so in order to limit the influence of Le Pen and her party, whom they perceived to be a danger to democracy.[44]

## C. JUDICIAL INDEPENDENCE AND RULE OF LAW

Healthy democracies thrive on a partnership between the general public, elected officials, and independent institutions.[45] Among those institutions, the judiciary is one of the most important, particularly in countries veering toward illiberalism. As Christopher Larkins notes, an independent judiciary serves a unique role in constitutional democracies in enforcing the constitution, civil and political rights, and other democratic procedures.[46] An independent judiciary is one that remains impartial, approaches cases without bias, including towards the politically powerful, and operates without fear.[47]

Conversely, an important strategy of the aspiring authoritarian is to operate under a veneer of legality, and put into place a system that Kim Lane Scheppele calls a "Frankenstate", wherein autocrats pull the worst elements of liberal democracies to create a new and wholly illiberal system.[48] To combat this "autocratic legalism", it is crucial to view the rule of law as a first line of defense against the dismantling of democratic institutions and to defend it vigorously.[49]

The increase in Europe of illiberal tendencies poses a serious threat to judicial independence. In a 2015 survey of 6,000 judges across 22 countries, many "judges did not feel that their independence had been respected by government and the media."[50] Respondents also noted that the appointment and promotion processes in their countries had been influenced by factors other than ability and experience. At a 2016 high-level Council of Europe conference, a British judge highlighted a myriad of interrelated threats faced by his European colleagues: inadequate investment in courts and judicial structure, increased case complexity and workload, inadequate staffing and administrative assistance, corruption, and political interference.[51] Constitutional courts in particular have been targeted by populist leaders. As Bojan Bugarič and Tom Ginsburg note, "rule-of-law institutions in Central and Eastern Europe always lacked the necessary support of genuinely liberal political parties and programs, leaving the courts vulnerable to attacks from populists."[52]

**The Democracy Playbook:** Preventing and Reversing Democratic Backsliding



PHOTO CREDIT

*Official posters of the candidates for the 2017 French presidential election, Emmanuel Macron (L) and Marine Le Pen, are displayed in northern France.*

For example, in Poland, the ruling Law and Justice (PiS) party has brought the country close to "a point of no return concerning the independence of its judiciary."[53] While serving as prime minister from 2015 to 2017, Beata Szydło packed the courts with new judges, reorganized the Constitutional Tribunal to decrease power, and changed decision-making rules to "paralyze the court."[54] Among several new laws designed to cripple judicial independence was a 2015 amendment that required a two-thirds majority for binding decisions and raised the quorum to hear cases from nine to 13.[55] Since the court had only 12 justices at the time, the rule rendered the body effectively inoperable. The PiS has in recent years continued to chip away at judicial integrity through action as well as legal changes: it forcibly removed upwards of 149 regional court officials for "discretionary" reasons, appointed poorly qualified replacements, has delayed the adjudication of cases, and re-shaped National Council of the Judiciary (created to ensure judicial independence) with political appointees.[56]

In response to such predations in Poland and beyond,[57] the Council of Europe in 2016 identified a series of steps to defend an increasingly besieged judiciary.[58] First, states should seek to depoliticize the election and appointment of judges. Appointees should neither represent political factions nor face "political influence either from the executive or legislature." Second, established procedures should guide the selection, appointment, and promotion of judges. These procedures should be transparent and "based on objective criteria relating to the exercise of judicial office and focused primarily on ability and experience." Third, states should enact codes of ethical behavior for the executive and legislative branches that "restrain (unduly

harsh or politically motivated criticism), and protect the integrity of the judicial decision-making process from undue political pressure, intimidation and attacks." Fourth, the judiciary itself should pursue a more "proactive" approach to media to increase public confidence and dispel misunderstandings about processes and cases. Engagement with media might come through independent "communication services or spokespersons that can answer criticism on behalf of the judiciary and give general explanations of the legal process." Fifth, objective and established criteria should determine the allocation of cases to judges. Sixth, states can deter corruption through adequate remuneration, working conditions, transparent investigations, and clear ethical standards.[59]

**It is crucial to view the rule of law as a first line of defense against the dismantling of democratic institutions and to defend it vigorously.**

Furthermore, rule of law can be strengthened through judicial transparency mechanisms. Though transparency is no panacea for spurring democratic mobilization,[60] empirical research has shown that there is a positive relationship between judicial transparency and trust in judges.[61] Therefore, both state actors and members of the judicial system should work to open up courtrooms by producing publicly available transcripts of proceedings in a timely fashion, taking steps to ensure that sealed documents are minimized, and placing cameras in courtrooms. These actions can help to augment both judicial independence and citizen trust in the judiciary. In addition, emerging technologies, particularly big data and artificial intelligence, pose both challenges and opportunities in promoting judicial independence and equity. For example, big data and AI can play a role in litigation by, forecasting which judges and jurisdictions are responsive to specific arguments, thereby guiding well-funded litigants while disadvantaging those without access to such tools. They can also play a more beneficial role within the judiciary by identifying and serving as tools in mitigating bias in judicial decisionmaking.[62] As these technologies develop, democratic actors must work to ensure that their benefits are available to all.

---

**SECTION 1.1 KEY RESOURCES:**

- Levitsky, Steven, and Daniel Ziblatt. *How Democracies Die* (New York: Crown, 2018).

- Linz, Juan J., and Alfred Stepan. (Eds.) *The Breakdown of Democratic Regimes: Crisis, Breakdown, and Reequilibration* (Baltimore, MD: Johns Hopkins University Press, 1978).

- "Council of Europe Plan of Action on Strengthening Judicial Independence and Impartiality." *Council of Europe* April 13, 2016, https://rm.coe.int/1680700125.

# 2. Political opposition groups

**SUMMARY**

Political opposition groups should:

- **Form networks** between other opposition groups, local electoral activists, civil society groups, and, where appropriate, international organizations and actors.

- **Create a unified democratic opposition where possible or consider using referenda as an alternative.** When opposition groups can build a broad-based coalition, they significantly increase their chance of a liberalizing outcome. Where forming a coalition is not possible, an alternative model to consider is implementing a popular referendum that can provide the advantages of a binary structure and the potential to expose the unpopularity of populist governments.

- **Increase election monitoring capacity and be prepared to use electoral abuse evidence as the basis for reform advocacy.** Pro-democratic opposition parties must prioritize ensuring independent election monitoring. The opposition can boost its technical proficiency by partnering and collaborating with international election observers and involving them in the process early. Where there is evidence of electoral abuses, the opposition should be prepared to work with external allies to apply pressure to the regime to reform electoral practices.

- **Engage new voters by presenting a vision for the future.** The pro-democracy political opposition must get voters to the polls. The opposition should partner with civil society groups to reach new segments of the population and convey optimism and good cheer to communicate that change is possible. Successful tactics include bus tours and marches, discussion fora between candidates and citizens, door-to-door canvassing, street theater, popular music concerts, and satire.

- **Remember that the message matters.** The opposition must explain the costs of keeping an illiberal incumbent regime in power. Successful campaigns use positive and inclusive messaging rather than relying on negative attacks on the incumbent.

- **Forcefully contest each individual illiberal act of non-democratic actors** within the bounds of democratic norms. Utilizing institutional measures such as the constitutional authorities of courts and legislatures can slow or obstruct illiberal reforms. Opposition leaders may also choose to pursue more extreme institutional measures available to them (e.g., impeachment processes, votes of no confidence, and recall referenda) and/or deploy extra-institutional tools (e.g., protests, strikes, or boycotts).

Political opposition groups face stark challenges in governments controlled by illiberal politicians, who, surrounded by loyalists, have gradually degraded democratic processes and consolidated their own holds on power.[63] To varying degrees, authoritarian-leaning political parties and leaders in countries like Turkey and Hungary have already significantly eroded their nations' democratic natures. Elections in such places are heavily tilted to favor the party in power, if not outright rigged; pro-democracy political opposition parties have been marginalized or extinguished altogether; and freedoms of speech and assembly are warped or non-existent. These conditions constrain the operating space of pro-democratic opposition actors and, in turn, make illiberals harder to oust. While this should not discourage pro-democratic actors from working toward improved conditions in those nations, it highlights the importance of preventing deterioration in nations that may be flashing warning signs.

The iterative process of democratic backsliding provides opportunities for pro-democratic political opposition parties to resist these trends. Especially in early stages of democratic reversal, political opposition groups still have many tools available to them to compete for power through standard political processes, both at the polls and within legislative bodies. Although would-be authoritarians should be expected to continue to try to tilt the rules of the game in their favor, pro-democracy opposition parties have a very important role to play.[64]

What, then, should pro-democracy political opposition parties in backsliding nations do to restore democracy? Based upon recent scholarship, this section provides detailed recommendations for leaders and members of the political opposition—broken down between electoral strategies and institutional and extra-institutional tools.[65]

## A. WINNING AN UNFAIR ELECTION

Elections, even when warped by authoritarians in hybrid states, have the potential to lead to liberalizing outcomes and provide real opportunities for transformational political change.[66] They can serve as an important mode of democratization that political opposition groups should aggressively pursue, even when the odds seem stacked against them.

Political scientists Valerie Bunce's and Sharon Wolchik's analysis of eleven elections in nine nations suggests that variance in opposition group electoral strategy was the most important explanation of success or failure. Ambitious and innovative opposition groups exhibited strong performance in elections and, in turn, improved democracy.[67]

Bunce and Wolchik outline the "electoral model," a set of electoral strategies for opposition campaigns against authoritarians.[68] To implement the model, pro-democracy political opposition must practice long-term planning, as well as pay close attention to detail, coordination, and lessons learned from past failures. Perhaps most importantly, pro-democracy parties must pursue an overarching process through which they form transnational networks between civil society groups, other opposition groups, local electoral activists, international organizations, and nations striving to promote democracy.

The electoral model includes several important components. The first, which has received significant scholarly attention, is forming a unified democratic opposition. Although far from a guarantee of electoral victory or ultimate democratization, empirical analysis of elections in competitive authoritarian regimes between 1990 and 2002 suggests that there is great value in taking this step. Even in challenging cases, when oppositions were able to build a broad-based coalition, the likelihood of a liberalizing electoral outcome increased by over 80%. Across ten tested variables (including structural factors such as economic growth and the prior occurrence of a liberalizing electoral outcome), the opposition's formation of a coalition was the best predictor of a positive result.[69]

Although overcoming differences can be a challenge, forming a unified opposition provides multiple benefits. Most obviously, coalitions can reduce the number of squandered votes for different pro-democracy groups. Collaboration can also signal commitment to contesting power and demonstrates that the groups involved possess the political skills necessary to effectively govern. This can persuade skeptical citizens, civil society groups, and external democracy promoters to join the cause.[70] Although institutional factors such as electoral rules and social cleavages do shape the formation of political coalitions before elections, scholarship suggests that their effects in hybrid regimes are only modest.[71] Thus, political opposition groups in backsliding nations enjoy agency to set their own electoral coalition strategies; environmental factors are not deterministic.

Of course, coalition formation can be excruciatingly difficult, especially in contexts where illiberal leaders have engineered or exploited divisions. Voters also face difficulties with this approach, as strategic voting may point them toward candidates whose views they find unpalatable. As Jan-Werner Müller argues, one way out of this political dilemma is the use of referenda.[72] With their binary yes-or-no structure and potential to craft pointed questions that reflect unity among opposition parties, referenda offer an opportunity to citizens to decisively communicate their aversion to a populist government. While not possible in all contexts, such exercises of direct democracy could serve as alternatives to coalition formation when the latter is beyond reach.

A second core component involves voting processes themselves. As we know, in hybrid regimes the ruling party works to tilt the playing field in its favor. Election rigging techniques can be sophisticated, and at times, even include meddling with vote counts.[73] In response, the pro-democratic opposition must work hard to ensure independent election monitoring as well as find innovative solutions to counteract these practices.

The opposition can boost its technical proficiency by partnering and collaborating with international election observers and involving them in the process early. While independent election monitors are most effective, as they can more easily deflect claims of bias, opposition parties should also work to have their own trained election monitors where possible. Moreover, once armed with evidence of electoral abuses, the opposition should work with external allies to apply pressure to the regime to reform electoral practices.[74] We discuss possible synergies in greater detail in section 2 of the report, which focuses on how international actors can best promote democracy.

A third and final critical element of the electoral model is generating high turnout. There is no way around it: to win back power, the pro-democracy political opposition must get voters to the polls and must be prepared to counter unfair voter suppression tactics. Opposition parties in hybrid states often lose elections partly because citizens opposed to the regime nonetheless abstain from voting due to their frustration with the opposition's frequent infighting or incompetence.[75] Others are young and are potentially first-time voters. The opposition must tune their messaging to win over both groups, generating new votes. Recent research investigating 61 competitive authoritarian elections after the end of the Cold War shows that increased voter turnout is directly associated with a larger vote share for the opposition.[76]

**There is no way around it: to win back power, the pro-democracy political opposition must get voters to the polls and must be prepared to counter unfair voter suppression tactics.**

How can the opposition mobilize votes? Here again, partnerships with a broad swath of civil society (and with international actors, who can help to provide an enabling environment, support political space, and provide skill-building opportunities for opposition groups) are valuable. The opposition should also maximize media opportunities to disseminate messages to a broader audience. Civil society groups can provide a key link to segments of the population that are otherwise difficult to reach. International organizations can also play a role; we say more about this in section 2 of this report.

The opposition must clearly explain to the public the costs of keeping the incumbent regime in power and promote direct contact between opposition political leaders and citizens outside of major cities. The opposition must articulate, in clear terms, how particular encroachments place the system at risk, and advantage the incumbent. Also effective is a positive and inclusive message that does not solely rely upon negative attacks on the incumbent. The opposition should go beyond rhetoric by improving upon policy failures and proposing better solutions that will meet the needs of real people.[77] To do so effectively, the opposition must understand the conditions of anger and disillusionment along the electorate that led to the rise of authoritarian leaders in the first place; merely seeking a return to the previous status quo is unlikely to suffice.

Pro-democracy parties must also adjust to the changing digital landscape for political campaigns. Despite initial optimism about the internet's potential to make elections more democratic, it has become clear that the web is a double-edged sword for political campaigns, one that seems to favor illiberals. On the one hand, the internet enables candidates to fundraise, run less expensive campaigns, organize supporters, and mobilize voters.[78] But, as the legal scholar Nathaniel Persily argues, "what the internet uniquely privileges above all else is the type of campaign message that appeals to outrage or otherwise grabs attention."[79] As a result, extreme actors have been able to harness the power of the internet better than their pro-democratic counterparts. Social media platforms such as Facebook have enabled democratic vulnerability, provided fora for false information and hate speech, and fueled partisan divisions. Although such platforms have begun to make changes in the face of public pressure, these measures are unlikely to prove adequate on their own. As Persily points out,

"democracy depends on both the ability and the will of voters to base their political judgments on facts, or at least on strong intermediary institutions that can act as guardrails to channel decisionmaking within the broad range of democratic alternatives."[80]

Democratic campaigns will need to learn from the success of illiberal candidates and implement a targeted digital strategy that maximizes message virality, connects better with supporters on social media, and employs clever mobilization tactics. At the same time, opposition campaigns should take the high road by being truthful and inclusive in their messaging. Moreover, until governments and tech companies can plug digital vulnerabilities, the reality is that campaigns will also need a cybersecurity risk management plan. A successful example of a prepared and nimble campaign can be found in Emmanuel Macron's 2017 presidential election. Despite a "coordinated attempt to undermine" Macron's candidacy in what is now referred to as the "Macron Leaks" operation, Macron's campaign was able to fend off the attack, win the election, and boost its credibility as a modern, tech-savvy party.[81]

Social media strategies can be used in combination with offline mobilization tactics to increase citizen engagement. These tactics can include, but are not limited to, bus tours and marches, discussion fora between candidates and citizens, and door-to-door canvassing. In successful campaigns, youth groups have used street theater and satire to ridicule and de-legitimize would-be authoritarians, as well as rock concerts and the media to add energy to what is often considered a dull process. In the words of participants in Slovakia's Civil Campaign OK'98—who successfully ousted the illiberal Prime Minister Vladimír Mečiar through an ambitious electoral campaign—such activities were aimed at making participation in elections "fun and not just a duty."[82] As Bunce and Wolchik assess, Slovakia's pro-democracy movement in the lead-up to the 1998 elections helped create "a climate of optimism supporting the ideas that votes count and that change was possible."[83]

Appropriately calibrating and implementing electoral policies designed to favor the incumbent is more difficult for authoritarian leaders than is generally assumed, even when they face few legal or institutional obstacles.[84] And even the most extreme election fraud (such as ballot box stuffing, multiple voting, voter intimidation arising from a lack of voter secrecy, or the falsification of vote counts), presents significant management problems for the authoritarian. Recent scholarship suggests that the uncertainty and collective action problems inherent to implementing electoral fraud tend to produce unintended results that are not ideal from an authoritarian's perspective. There may be either excessive fraud that produces a flagrantly false margin of victory drawing widespread condemnation, or too little rigging, such that the authoritarian loses.[85] Indeed, as strong independent analyses by election observers in nations such as Russia and Hungary have shown, vote rigging is very difficult to conduct undetected.[86] Even when incumbents are actively trying to secure their re-election using the most extreme election rigging measures, they may fail. To push back against election rigging, opposition parties (and the movements that support them) should proactively develop plans ahead of time in the event that such fraud occurs. Relevant mechanisms include election monitoring, exit polling, and a mass mobilization strategy if discrepancies arise. In competitive authoritarian contexts, political opposition campaign strategies and individual votes can make a difference.



*Mayor of Istanbul Ekrem Imamoglu of the main opposition Republican People's Party (CHP) and his wife, Dilek, greet supporters from the top of a bus outside City Hall in Istanbul, Turkey.*

## B. SLOWING DETERIORATION

Although winning elections should be a centerpiece of pro-democratic political opposition parties' strategies to promote democratic change, it cannot be their only objective. While running ambitious and energetic campaigns, the opposition must also compete within the government (and, at times, outside of it) to slow the process of democratic backsliding as much as possible. As we know, when leaders and parties with authoritarian tendencies gain power in democracies, they will take incremental steps to tilt the playing field to their advantage.[87] The political opposition must vigilantly contest each individual act.

Despite narrowing democratic space, the political opposition does have a broad menu of institutional and extra-institutional options of varying severity available to them. How, then, should the opposition best compete? The answer is context dependent. However, as a general rule, the opposition should not resist would-be authoritarians by breaking the democratic norms that it ultimately seeks to strengthen.

Instead, opposition members should draw mainly upon institutional measures, the standard tools of the democratic game, to slow or obstruct illiberal reforms.[88] These measures derive primarily from the constitutional authorities of courts and legislatures to maintain a check on executive power. Though exact mechanisms vary depending on a country's political system, opposition legislators should work to obstruct the passage of an executive's anti-democratic agenda. If justified, opposition leaders may also choose to pursue more extreme institutional measures available to them, such as impeachment processes, votes of no confidence, and recall referenda. To raise the profile of their campaign against democratic erosion, opposition leaders can also utilize extra-institutional tools—engaging in or encouraging, for example, a protest, strike, or boycott, in conjunction with civil society.

In this model, the norms of mutual toleration and institutional forbearance—which incumbents must practice to preserve democracy—still maintain their importance, even as the political opposition resists an illiberal leader. While the goal of the opposition is to gain control of the government in order to halt democratic decay and begin a process of reform, they must also keep the system running. Full breakdown, which becomes more likely when the opposition casts these two norms to the wind, will always favor the incumbent. It provides him or her with increased incentives, further justification, and greater means to crack down and seize ever more control.[89]

Moreover, one important prize at stake in the contest between the would-be authoritarian and the opposition is legitimacy. Legitimacy confers tangible benefits: without it, rulers exercise coercive power—not authority.[90] Accordingly, it is unsurprising that aspiring authoritarians expend great effort attempting to maintain their nation's democratic façade, even as they work to dismantle its democratic character.[91] The pro-democratic opposition, then, must work within the system and partner with civil society experts to expose the ways in which would-be authoritarians are mimicking, but actually violating, the rule of law. Kim Lane Scheppele, for example, argues that the seemingly normal continuity of the surface-level indicators of rule of law can conceal creeping autocratic legalism. She therefore contends that deeper legal forensic analysis and wider education of citizens on constitutionalism are needed to combat growing dysfunction.[92] The pro-democratic opposition must not abandon democratic principles in their contest with illiberal leaders. Extreme, extra-institutional resistance measures will usually serve neither end.[93]

> **The opposition should not resist would-be authoritarians by breaking the democratic norms that it ultimately seeks to strengthen.**

Recent steps by Turkey's pro-democracy political opposition offer a promising example of the aforementioned strategies. Despite more than 15 years of democratic deterioration led by the authoritarian-leaning President Recep Tayyip Erdoğan and his Justice and Development party (AKP), opposition parties have generated recent electoral successes.[94] These parties formed a strategic alliance with one another, focused campaign rhetoric on finding constructive solutions to Turkey's economic problems, undercut Erdoğan's legitimacy with clever social media messaging using his own words against him, and emphasized face-to-face interaction with a broad array of Turkish voters.[95]

---

### SECTION 1.2 KEY RESOURCES:

- Bunce, Valerie J., and Sharon L. Wolchik. *Defeating Authoritarian Leaders in Post-Communist Countries*. Cambridge, UK: Cambridge University Press, 2011.

- Gamboa, Laura. "Opposition at the Margins: Strategies against the Erosion of Democracy in Colombia and Venezuela." *Comparative Politics* 49, no. 4 (July 2017): 457-477.

- Morjé Howard, Marc, and Philip Roessler. "Liberalizing Electoral Outcomes in Competitive Authoritarian Regimes." *American Journal of Political Science* 50, no. 2 (April 2006): 365–381.

# 3. Civil society and independent media

**SUMMARY**

Civil society groups should:

- **Seek broad, diverse, and large-scale participation** in their activities.

- **Model organizationally what they seek to achieve in a democracy.** Leadership teams should conduct open, regular grassroots deliberations and decision-making authority rather than concentrate decision-making power in the hands a few.

- **Establish defined goals, a clear vision, and an actionable agenda** with specific desired changes to the status quo. Organizations should define *who* is mobilizing *whom* to do *what*.

- **Be prepared to use diverse and varied nonviolent tactics** to increase the pressure on government and attract more people to participate.

Independent media should focus their efforts on four key areas:

- **Occupational development and education** to provide a pipeline to up-and-coming media actors able to notice and resist threats to the industry.

- **Professional associations** to enable and support individual journalists on issues like professional values, employment conditions, legal questions, and editorial standards.

- **Media self-scrutiny and development of a robust media criticism community.** Such a community could increase public trust, and thus public support, through the transparent and constructive questioning of the relationship between journalists and politicians and advertisers.

- **Internal governance.** As with civil society organizations (CSOs), media outlets should assume responsibility for improving their own internal governance and develop mechanisms to deal fairly with audience complaints and develop all work contracts to cover all employees to prevent self-censorship.

Most people in a nation are neither politicians nor government officials. Centuries of scholarship and millennia of political history show that people can exert extraordinary influence on politics and government through separate avenues. This section addresses those seeking to influence politics from outside the public sector. We begin with recommendations to leaders and members of civil society, and then turn to professionals working in perhaps the democratic institution most often attacked—independent media. Both civil society and the media are critical parts of the democratic process, and we thus aim to distill best practices for ensuring their strength and efficacy.

## A. THE ROLE OF CIVIL SOCIETY IN DEMOCRACY

There are numerous definitions of civil society. For purposes of this section, we follow Kohler-Koch and Quittkat's representative definition: "Civil society includes all those organisations which play an important role in giving voice to the concerns of citizens and in delivering services that meet people's needs," including grassroots organizations and NGOs.[96] A robust civil society helps preserve democratic vibrancy, provides citizens with information that can help inform their voting, and presents opportunities for powerful collective action. Even when these social connections and activities are completely unrelated to political or governance issues, their depth and frequency bear important implications for the strength of democracy, and paths of democratization.[97] In the words of two political scientists, civil society organizations can "sensitize society to pressing domestic and international issues, build cohesion within communities, help citizens to articulate their beliefs and interests, exercise control over those holding political power, and provide social services."[98]

In contrast to civil society groups writ large, civil resistance movements are formations of individuals engaged in particular kinds of collective tactics. We follow the International Center on Nonviolent Conflict in defining civil resistance as "a way for people (often ordinary people with no special title, status, or privilege) to wield power without using or threatening physical violence. It consists of (a) acts of commission, in which people do things they're not supposed to do, not expected to do, or forbidden from doing; (b) acts of omission, in which people don't do things that they're supposed to do, expected to do, or required to do; or (c) a combination of both acts of commission and omission."[99] Acts of commission include demonstrations, petitions, and civil disobedience. Acts of omission include boycotts, strikes, and divestment.[100]

While many of the recommendations we make can be adapted by leaders with a wide range of goals, we place emphasis on associations and movements that adopt political ends and push to bolster democracy through non-institutional channels. These groups can protect civil liberties and other democratic institutions through persistent advocacy for democratic rights and norms and civil resistance against authoritarian encroachment. Czech dissident (and later president) Václav Havel's Charter 77, which ultimately became the political movement called Civic Forum, is one famous example.[101] How do groups like Havel's surmount enormous obstacles to successfully promote democratic renewal?

*For advocates of democracy, among the most encouraging academic findings from the past decade is that civil resistance works.*

Despite relying on nonviolent tactics and operating without access to standard levers of government control, civil society groups and civil resistance movements are able to wield great influence, because ultimately, power derives from the consent of the governed. As Gene Sharp argues, would-be authoritarians may use lies, economic inducements, and a variety of coercive tools to obtain that consent, but without it, they are powerless.[102] Indeed, in order to carry out policy initiatives and government functions, modern would-be authoritarians are dependent on a wide variety of other people and organizations, many of whom exist

outside the government. Neil Fligstein and Doug McAdam note that modern nation-states exist within "strategic action fields," units of collective action that include both state and non-state actors.[103] If enough of those actors withdraw their consent, the state can lose its basis of authority and capacity to rule. Citizens and organizations can do their part by withdrawing their consent and applying pressure on other actors to do the same. Eventually, pillars of authoritarian power start to show cracks, and a nonviolent group can coerce valuable, or even transformative, concessions from the government.[104] In other words, everyday citizens, working together, can turn the entire system upside-down. Several scholars have substantiated this idea empirically.[105]

Indeed, for advocates of democracy, among the most encouraging academic findings from the past decade is that civil resistance works. Erica Chenoweth and Maria Stephan argue that nonviolent resistance can be an effective means of promoting democratic consolidation and transition, even in especially challenging scenarios.[106] Moreover, after analyzing 323 violent and nonviolent resistance campaigns from 1900 to 2006, the authors find that nonviolent groups were more than twice as likely to achieve a full or partial success as their violent counterparts.[107] Other work by Stephen Haggard and Robert Kaufman supports this finding. In fact, they argue that a public's capacity to engage in collective action to hold leaders accountable is among the most important predictors of democracy.[108]

## B. DEVELOPING LEADERSHIP TEAMS WITH HIGH STRATEGIC CAPACITY

Not every civil society organization or social movement, of course, achieves its goals. The decisions made by civil society groups and social movements are important to their ultimate success or failure.[109] In this section, we review which kinds of approaches and tactics seem to correlate most with success.[110]

We begin by discussing a fundamental question, especially considering the context-dependence of particular strategies. Why do some groups make better decisions than others?

Scholar and activist Marshall Ganz seeks to answer this question by proposing the concept of "strategic capacity." He writes that leadership teams with high strategic capacities are better able to think and plan creatively, respond to shifting and uncertain environmental conditions, and mobilize supporters around shared goals than those with lower capacities.[111] In other words, leadership teams with high strategic capacities are more likely to succeed.

According to Ganz, a group's strategic capacity derives from two principal sources: biographical and organizational.[112] Biographical sources include a leadership team's combined identities, social networks, and tactical repertoires. Organizational sources refer to a leadership team's bureaucratic structures, including its deliberative processes, resource flows, and accountability mechanisms.

Across biographical sources, diversity is crucial. To maximize its biographical strengths, a movement must build a leadership team from a diverse array of people, with different backgrounds, networks, and skills. Leaders with diverse identities will bring relevant knowledge from a wide range of constituencies that can allow for innovative problem solving.[113] As Ganz summarizes, "[a] leadership team's strategic capacity grows out of who its members are."[114]

Organizations and movements can also maximize their organizational sources of strategic capacity by following a series of best practices. For instance, the organizational structure itself matters. Hierarchical organizations tend to have more centralized decision-making processes; in turn, because rank-and-file members have less say in group decisions, their commitment to the organization can be lowered.[115] Leadership teams that conduct "regular, open, and authoritative deliberations" will benefit from the full diversity and innovation of their team, producing better strategy than groups that concentrate decision-making power in the hands of one leader who makes choices without broader input.[116] Ganz details a wide array of additional best practices in his work.[117]

## C. ENCOURAGING BROAD AND DIVERSE PARTICIPATION

While the characteristics of an organization or movement's leadership are critical, so is the make-up of the entity's member base. The most successful movements and organizations are those that appeal to broad and diverse audiences. Srdja Popovic, a leading civil resistance practitioner and thinker, emphasizes that building bridges between disparate societal groups is key. As he colorfully puts it, "It's unity, stupid!"[118] Participants' diversity within a movement—in gender, age, religion, ethnicity, ideology, profession, and socioeconomic status—makes it harder for a government to ignore, discredit, or isolate it.[119] Quantitative research confirms that robust social ties reduce the effectiveness of repression.[120]

In addition to having diverse participants, civil society organizations and civil resistance movements should strive to have as many members or followers as possible. Initiatives with large numbers of people participating are fundamentally more likely to succeed than small movements. Chenoweth and Stephan confirm this empirically: controlling for other variables, nonviolent resistance movements with high participation levels are significantly more likely to succeed.[121]

> The diversity of a movement—in gender, age, religion, ethnicity, ideology, profession, and socioeconomic status—makes it harder for a government to ignore, discredit, or isolate it.

To gather a large and diverse support base, Popovic recommends that movements work hard to figure out what people truly care about. They should assume that a majority of potential participants will be generally uninterested and set political priorities that will be popular. Two notable historic political movements, the American Revolution and Mahatma Gandhi's campaign for Indian independence, chose British taxes on simple, everyday goods as the foci of their struggles. Choosing a broadly relatable symbol—in the American case, tea, and in the Indian case, salt—helped the revolutionaries inspire the ordinary masses into action.[122]

In addition to picking popular policy goals, groups and movements should adopt widely appealing rhetoric and culture. Too often, contemporary pro-democracy campaigns end up being defined by one particular segment of the population, thus losing their appeal to the rest of the populace. For example, Pussy Riot, a Russian anti-authoritarian, punk rock protest group, has appealed far more to educated, primarily urban youth than it did to rural and older Russians who may not relate to the colorful satire of the demonstrators. Popovic contrasts this example with the success of his own pro-democracy movement, *Otpor*! ("Resistance!"), after it adopted a simple, universal slogan, "He's finished," to define its campaign against Serbian leader Slobodan Milošević.[123]

Of particular note is the importance of encouraging broad and diverse participation within trade and labor unions, including because union members sit squarely in a demographic often targeted by right-wing populist politicians for support. Research has shown that labor union participation has a negative effect on extreme right-wing voting—that is, "unionization immunizes voters" from the messages of extreme right-wing populists, likely due to the principles and values of labor movements.[124] While unionization is not a magic bullet against increased populist support, unions can serve as a bulwark for democracy. They can also serve as a model by integrating migrants, women, and other historically marginalized workers,[125] and adopting democratic and inclusive practices and procedures within their own decision-making structures.[126]

## D. ESTABLISHING DEFINED GOALS AND A CLEAR VISION

Having an area of passionate concern is not enough; organizations and movements should have an actionable agenda with specific desired changes to the status quo. These goals do not need to be sweeping or all-encompassing: Chenoweth and Stephan find that maximalist goals are perceived to be less likely to succeed than more limited ambitions.[127] As Sharon Erickson Nepstad notes, advocates of civil resistance often seek specific political or economic reforms in society or within a particular regime or institution, rather than pursuing a full-fledged political transition.[128]

An example of an organization that has set specific goals to great effect is *Rekonstrukce Státu*, or Reconstruction of the State, in the Czech Republic—a country faced with longstanding and endemic corruption. Despite its name, *Rekonstrukce Státu* did not seek to reorganize the entirety of Czech government to eliminate corruption; instead, it set forth nine practical principles for government anti-corruption efforts that could be easily written into law. They include transparency in public procurement, publishing government contracts on the internet, and increased independence of public prosecutors. These specific goals have helped the organization achieve success, with a majority of the nine goals being passed into law in three years.[129]

## E. UTILIZING DIVERSE AND VARIED TACTICS

The exact tactics employed by activists vary widely depending on context, resources, and mission. As a general rule, however, groups should aim to diversify their tactics. Employing a range of different nonviolent strategies increases the pressure on government and attracts more people to participate based on the activities that appeal to them most. In contrast, limiting an organization to one particular tactic, or even type of tactic, can constrict a movement's reach and efficacy.

By way of example, Popovic points to the Occupy Wall Street movement that began in 2011, during the "Great Recession." The group was focused on the scale of economic inequality and wealth disparity in the United States. It garnered national and global attention at a time when many felt that those responsible for the economic downturn were facing few repercussions. Yet, argues Popovic, Occupy failed to capitalize on the massive popular frustration with capitalism's failures. He contends that one of the Occupy movement's predominant errors was that it named itself after a single tactic. To participate in Occupy meant to conduct sit-ins, immediately limiting the number of people willing to engage. Many of those sympathetic to the cause who would have been willing to support the movement in other ways were not able to skip work, class, or other obligations to participate in open-ended sit-ins. Occupy also overlooked other tactics that might have worked to apply pressure. Artificially limiting its support base and restricting its tactical repertoire likely prevented Occupy from generating more meaningful change.[130]

Slovakia offers an inspiring contemporary example of a civil resistance campaign that utilized diverse tactics to achieve meaningful change. In February 2018, a Slovak investigative journalist named Ján Kuciak was shot dead in his home, along with his fiancé. In the months leading up to his death, Kuciak published dozens of articles on Slovak corruption. He exposed potential corrupt ties between Slovak businesses, state agencies, as well as the ruling political party, Direction–Social Democracy (SMER-SD).[131] The murders sent shockwaves through the nation. Recognizing the widespread public frustration, and the opportunity it presented to push for political change, a small group of students, calling their movement "A Decent Slovakia", organized an assembly and candlelight tribute in the center of Bratislava. Five hundred people attended the first gathering. Next, the group organized a memorial march. Over 135,000 people flooded the streets in Bratislava and 55 other Slovak cities. Weekly protests grew ever larger, reaching sizes unseen in Slovakia since the Velvet Revolution. The massive public mobilization succeeded in forcing the resignations of three key government figures in March: Prime Minister Robert Fico, Interior Minister Robert Kaliňák, and Police Chief Tibor Gašpar.[132]

Effectively demonstrating the importance of employing diverse tactics, A Decent Slovakia next pivoted to electoral politics. One of its co-founders, Juraj Seliga, noted that although protests were able to purge problematic officials, "real, lasting change would have to come through elections."[133] Accordingly, the movement has worked with and endorsed pro-democracy political candidates seeking to mobilize votes. All signs suggest that these efforts are continuing to work. In June, Slovakia inaugurated its first female president: the moderate,

pro-democracy Zuzana Čaputová. Her unlikely win was broadly perceived as a strong rebuke of the populism, illiberalism, and democratic erosion that have plagued Slovakia and many of its neighbors in recent years.[134]


## F. THE ROLE OF INDEPENDENT MEDIA IN DEMOCRACY

In addition to a robust civil society, democracy cannot flourish without an equally strong media sector. A free and independent press fulfills critical democratic roles, including monitoring public officials, providing a platform for debate, and informing citizens.[135] An informed citizenry serves as a check on powerful officials by ensuring that "representatives uphold their oaths of office and carry out, broadly, the wishes of those who elected them."[136] James Curran and Toril Aalberg highlight the positive impact of well-informed citizens on society: stable and meaningful opinions on issues, linked interests and attitudes, and preference for political candidates who represent their views.[137] Freedom of the press plays a "crucial role" in democracy as the "'matrix, the indispensable condition of nearly every other form of freedom', and indeed of the democratic process itself."[138]


## G. INDIVIDUAL AND SYSTEMIC THREATS TO MEDIA ACTORS

The independent media has become a popular target of illiberal politicians looking to consolidate power across Europe. Indeed, the Council of Europe this year called press freedom "more fragile now than at any time" since the end of the Cold War.[139] Journalists increasingly face obstruction, hostility, and overt violence in their investigations.[140] Following a new "illiberal toolbox," populist leaders have used a variety of strategies to undermine independent news: government-backed takeovers, arbitrary tax investigations, unjustified lawsuits, selective enforcement of laws, abuse of regulatory and licensing practices, and verbal harassment.[141] In Italy, for example, members of a coalition government subjected journalists to hostile rhetoric, intimidation, and threats to withhold public funding and protections.[142] Widespread action against independent media across the EU led the Council of Europe to caution that the "space for the press to hold government authorities and the powerful to account has been diminished."[143]

*A free and independent press fulfills critical democratic roles including monitoring public officials, providing a platform for debate, and informing citizens.*

Two cases in particular illustrate the risks posed to media independence. In Turkey, President Erdoğan and the AKP have carried out a "massive purge" of independent media following the 2016 attempted coup.[144] Over the past few years, Erdoğan has pursued his assault on media across several fronts: hostile rhetoric amplified by pro-regime press, legal and regulatory constraints, outright censorship, and consolidation of media companies. Other tactics have included buying off or forcing out media moguls, intimidation, mass firings, wiretapping, and imprisonment of journalists.[145] As a result, Freedom House has deemed the country's media as "not free,"[146] and Reporters Without Borders ranks it at a dismal 157 out of 180 countries for press freedom.[147]

Another example of increasingly restricted media freedom is in Hungary, where physical threats against journalists coupled with systemic efforts to compromise independence have led Freedom House to rate its media as "partly free."[148] Orbán and his regime have reshaped the media landscape to gain control and exert sway over "most of the country's media."[149] In November 2018, for example, pro-government media outlets merged to create a "huge right-wing media conglomerate under the direction" of an Orbán ally.[150] The new conglomerate has intensified concern about media pluralism due to its lack of transparency, exemption from external scrutiny, and close ties to the ruling regime. Those outlets that have maintained autonomy face numerous obstacles, including "lack of advertising revenue, a restrictive regulatory environment, and public campaigns to discredit independent journalists."[151] However, Hungary's media environment is not necessarily static. Especially as the U.S.-based news outlet Radio Free Europe seems increasingly likely to return to Hungary to bolster access to independent media, there remains some hope and opportunity for Hungary's media landscape.[152]

## H. MAINTAINING AND DEFENDING INDEPENDENT MEDIA

Media actors in backsliding democracies should focus their efforts on five key areas:

- **Occupational development**. Journalism classes should integrate practitioners and draw on the collective knowledge of older generations of media actors[153] to "foster occupational socialization."[154] The aim is to provide a critical mass of up-and-coming media actors able "to recognize and withstand" threats to the industry.[155]

- **Professional associations**. These should enable and support individual journalists on issues like professional values, employment conditions, legal questions, salaries, and editorial standards.[156] The European Commission in 2014 noted that many problems faced by media result from the "civic weakness of the media community," which is "largely fragmented and politically polarized thereby giving ample space for clientelism and a decline in professional standards."[157] Strengthening the capacity and representativeness of professional associations may help alleviate that threat.

- **Media self-scrutiny**. Additional efforts should focus on the development of a robust media criticism community. Such a community could increase public trust, and thus public support, through the transparent and constructive questioning of "journalists' relations with politicians and advertisers."[158]

- **Internal governance**. Media outlets should assume responsibility for improving their own internal governance. The European Commission offers several suggestions: adhere to clearly and publicly defined ethics codes, develop mechanisms to deal "honestly and transparently with readers'/viewers' complaints," develop all work contracts to cover all employees to prevent self-censorship, and offer opportunities for professional development.[159]

**The Democracy Playbook:** Preventing and Reversing Democratic Backsliding



*Press photographers
take pictures in France.*

- **Financial independence and sustainability**. Finally, where possible, media outlets should seek to avoid capture by state and state-affiliated funders. In Hungary and Serbia, for instance, pro-government actors have acquired prominent media entities and used advertising and other financial means to gain leverage over other press organizations.[160] To maintain independence, media actors in backsliding nations should explore alternative funding models such as crowdfunding, subscriptions, paywalls, and grants.[161]

Freedom House further recommends support for social media as an "alternative outlet for free expression."[162] Indeed, new technologies like social media offer the chance to better engage citizens, provide space for opposition, and hold elites accountable for their actions. As shown by Matthew Placek, social media can increase demands for democracy and be used to mobilize and express dissent.[163] Notably, Placek finds that social media is associated with higher support for democracy in Central and Eastern Europe. It also helps to facilitate the flow of societal commentary and political information that may "diffuse democratic norms."[164]

The positive impact of new technology has been further outlined in Larry Diamond's theory of "liberation technology": forms of "information and communication technology (ICT) that can expand political, social, and economic freedom."[165] ICTs like social media can contribute to a "more pluralistic and autonomous arena of news" in illiberal regimes.[166] They serve several functions: supporting transparency, monitoring actions of officials, and mobilizing dissident networks.

Social media and similar technologies are not, of course, without potential downsides. Illiberal states sometimes filter content on the internet or deny access. The advent of disinformation—"false, inaccurate, or misleading information designed, presented and promoted to intentionally cause public harm or for profit"[167]—poses an additional serious challenge to democracy by social media. A 2018 European Commission report noted that digital media enables some disinformation by public officials who "actively seek to directly or indirectly control" news media.[168] The report goes on to highlight strategies for combating disinformation: enhance transparency of online news, promote media literacy, develop tools to tackle disinformation, protect the diversity of news media, and continue research on the problem.

### SECTION 1.3 KEY RESOURCES

- Chenoweth, Erica, and Maria J. Stephan. *Why Civil Resistance Works: The Strategic Logic of Nonviolent Conflict*. New York: Columbia University Press, 2011.

- Popovic, Srdja. *Blueprint for Revolution: How to Use Rice Pudding, Lego Men, and Other Nonviolent Techniques to Galvanize Communities, Overthrow Dictators, or Simply Change the World*. New York: Spiegel & Grau, 2015.

- Ganz, Marshall. *Why David Sometimes Wins: Leadership, Organization, and Strategy in the California Farm Worker Movement*. New York: Oxford University Press, 2009.

- Sharp, Gene. *The Politics of Nonviolent Action* (Boston: Extending Horizons Books, 1973) and *From Dictatorship to Democracy: A Conceptual Framework for Liberation* (New York: The New Press, 2012).

# 4. The private sector

**SUMMARY**

The private sector should:

- **Resist corruption, co-optation and state capture**. Corporate actors that shape the system to work for them, rather than the public, are, by definition, fundamentally undermining representative democracy and may be undermining economic growth. History is replete with examples of businesspeople who disregarded these dangers and came to rue doing so for the sake of their firms—and themselves.

- **Aim to do well by doing good**. Beyond merely avoiding the negative, the business sector should seek affirmative ways to help protect democracy and, in turn, promote its long-term interests. These include activism, philanthropy, and corporate social responsibility.

- **Recognize the key role of social media companies**. They should:

  - **Prioritize digital media literacy**.

  - **Quickly remove material that violates the law and their codes of conduct policies**.

  - **Support narrowly tailored targeted government regulations that do not infringe on users' right to free speech**—focusing on mechanisms like political advertising and disinformation prevalence measures.

  - **Intensify cooperation with other platforms** to share best practices.

In this section, we address the role that the business sector can play in protecting democracy.[169] Corporate behavior can be influential for the health of democratic institutions. The private sector also has a profound capacity to increase societal prosperity, which in turn, presents significant opportunities to protect and promote democracy.[170] We review why advancing democracy is in the corporate interest, how businesses sometimes harm democracy, and recommend strategies that both local companies and multinational corporations can use to support democracy.

Since social media companies face unique challenges as gatekeepers of information, we address them separately at the end of this section.

## A. DEMOCRACY AND BUSINESS

Democracies and business are co-dependent: a healthy democracy needs successful companies, and successful companies require a healthy democratic society. Outputs of strong democratic institutions and processes such as the rule of law, property rights, education, human rights, access to healthcare, and low levels of corruption all facilitate economic growth and corporate sector profitability.[171] These operating conditions, which democracies provide, allow business to flourish.[172]

Authoritarian and democratically backsliding nations tend to be reliably poor places to conduct business. Russia, for instance, is ridden with structural and political issues that harm businesses. Business leaders and property holders accused of failing to comply with laws (often with little or no legitimate evidence) can be stripped of ownership rights or have their revenues seized.[173] Russian corporations can also be pressured to sell their shares to the government, as happened with the profitable oil company Yukos in 2004.[174] Western-based corporations, in particular, are often targeted with government threats of regulatory changes, unplanned inspections of facilities, and other increased and arbitrary regulation that slows efficiency.[175]

*Avoiding corruption is perhaps the most fundamental thing businesses can do to support democracy.*

Conversely, when democratic conditions improve, so too does the business environment. According to a recent quantitative study, higher levels of democracy have led to more positive labor market outcomes in Central and Eastern European countries. The study found that democracy increases average annual hours worked and employment rates, in addition to reducing general and long-term unemployment rates.[176] Thus, corporations that work to advance democracy will be furthering their labor pool, and so their lasting interests.[177]

## B. AVOIDING STATE CAPTURE, CO-OPTATION, AND CORRUPTION

Corporate corruption is inimical to democracy, and avoiding corruption is perhaps the most fundamental thing businesses can do to support democracy. At its most drastic level, corporate corruption takes the form of state capture, where firms seize such control of the mechanisms of government that they "shape the formation of the basic rules of the game (i.e., laws, rules, decrees, and regulations) through illicit and non-transparent private payments to public officials."[178] Corporate actors that shape the system to work for them, rather than the public, are, by definition, fundamentally undermining representative democracy.

Less obviously, they are also undermining the economic growth and overall business environment of the countries in which they are operating: one study found that the growth rates of captured economies over a three-year period were reduced by 10 percentage points,[179] and raising regulatory barriers for new firms to enter the market stifles competition and the long-term health of the captured economy.[180]

Instances of multinational corporations actively profiting from dealings with others who are corrupt and authoritarian also merit attention. For example, McKinsey, the U.S.-based consulting giant, has recently courted controversy as a result of its dealings with authoritarian and corrupt actors in countries such as China, Russia, Ukraine, Saudi Arabia, and South Africa.[181] In Ukraine, for instance, McKinsey took on a contract to help presidential candidate Viktor Yanukovych improve his public image, despite Yanukovych's previous criminal convictions and attempt to rig an election. Yanukovych went on to win the presidency and lead Ukraine into upheaval and illiberalism.[182] McKinsey also notably did business with the state-connected South African power companies, Eskom and Trillian, who came under fire for their corruption and undue influence over the government.[183] The contract was initially lucrative for McKinsey, reportedly making up more than half of its African revenue.[184] After the widespread publication and protest of McKinsey's activities, however, the consulting company lost most of its South African clients and had to pay back the $74 million that it had gained from the deal.[185] Companies should take note of these matters and exercise more prudence in their business dealings with potentially corrupt and illiberal actors.

Businesses can also be misused by governments as a tool to undermine democracy, as in the case of Microsoft in Russia. Russian authorities seized the computers and other equipment of democratic organizations working to hold the government accountable under the guise that they were cracking down on piracy of Microsoft software. While software piracy is a legitimate problem in Russia, government authorities selectively and exclusively targeted pro-democratic organizations.[186] Given that the Russian government claimed to be seizing equipment to protect Microsoft, activist groups engaged in Russia argued that Microsoft had an obligation to speak out against this behavior.[187] The Moscow Helsinki Group denounced Microsoft's failure to push back on Russian officials, and accused them of taking part in the "persecution of civil society activists."[188] Microsoft ultimately sought to make amends by announcing it would provide free software licenses for independent media and NGOs in Russia.[189]

## C. CORPORATE BEST PRACTICES

In addition to avoiding corruption and the like, there are affirmative ways that the business sector can work to help protect democracy and, in turn, promote its long-term interests. These include activism, philanthropy, principled investments, and smart corporate social responsibility.

Corporations can exert positive influence as public advocates for democratic values.[190] From the CEO of a leading global financial institution speaking out for the rights of LGBTQ individuals to 14 CEOs of the world's largest food companies co-signing a letter to call for meaningful climate change policies, CEO activism has become an increasingly important method that companies use to promote their engagement with social and political causes.[191] Frequently, CEO activism is influential in framing public discourse, particularly because the media is likely to report comments from CEOs of recognizable corporations.[192] Other promising developments include the work of the Business Network on Civic Freedoms and Businesses

for Social Responsibility, who recognize that attacks on civic freedoms are also attacks on the business sector, and publicly advocate for improved democratic conditions.[193]

Corporate philanthropy is another way that businesses can work to strengthen democratic principles. Nike's global Community Impact Fund, for example, partners with several community-based organizations in both the United States and Europe to support grassroots movements that work to provide equal opportunity for children.[194] Corporations can also work to bolster the rule of law and government accountability. General Electric, for example, contributed to government reform in emerging markets by meeting with business leaders, NGO leaders, and government officials



*Wads of British Pound Sterling banknotes are stacked in piles in Vienna, Austria.*

from a Southwest Asian country to discuss reforms to strengthen the rule of law. It also sponsored legal and educational training for government officials to ensure the effectiveness and legitimacy of GE's action.[195]

Corporations should also avoid providing a veneer of legitimacy to illiberal leaders, and instead ensure that investment decisions are informed, principled, and sensitive to the country context. For example, Hungary's Orbán has encouraged the continued investment of the German car companies such as Audi and Daimler in the country, granting them tax reductions, subsidies, and access to decisionmakers.[196] In return, he has used their support to legitimize his economic policies, which contributes to his continued grip on power. Such companies should, as Thorsten Benner has argued, disinvest from the Hungarian economy, and demonstrate their support for the liberal democratic institutions that Orbán is working to dismantle.

Companies can act in support of the elements of democratic systems by engaging in corporate social responsibility (CSR). As defined by the UN Industrial Development Organization, CSR is "a management concept whereby companies integrate social and environmental concerns in their business operations and interactions with their stakeholders."[197] The principles of CSR can help promote transparency, corporate accountability, and sustainable development, and help businesses keep in mind the long-term democratic health of their society.[198] CSR can include donations, employee volunteering, and pro bono work for civil society organizations.[199] Within the framework of CSR, companies can also work to defend established standards and regulations that can counter democratic backsliding, and can themselves propose their own policies that promote and protect democratic values, even when the state itself rolls back such protections.[200]

At the same time, corporations must take care not to undermine the role of the state or of democratic institutions when designing CSR programs. As Anthony Bebbington argues, CSR programs are typically presented to the public not only as "acts of corporate good will," but, notably, as "responses to states that lack significant capacities in the development of programmes of social welfare and environmental protection," wherein "corporations assume roles they would really rather not but feel they have to."[201] By replacing the role of the state, these CSR programs can have the perverse effect of undermining government institutions themselves; because corporations are not responsible to the public, democracy is undermined by the replacement of state institutions with those run by the private sector.[202] Moreover, governments could be incentivized to free ride on corporate efforts, and no longer face incentives to provide those same services to maintain public support. Like other corporate functions, CSR is also susceptible to abuse. For example, it can be used as a convenient cover for paying bribes to government officials. Or well-intentioned reduced price or outright gifted technology can be deployed for purposes of surveillance. Firms and their compliance departments should be keenly attentive to these risks when designing and implementing CSR programs.

**Social media companies face unique challenges and responsibilities, given their immense capability to aid or harm democracy in the countries in which they operate.**

## D. SOCIAL MEDIA COMPANIES

Social media companies face unique challenges and responsibilities, given their immense capability to aid or harm democracy in the countries in which they operate. Through their roles in enabling, facilitating, and monitoring debate in the public arena, these companies have in effect created a new governing ecosystem within which democracies function. As social media platforms become more integral to daily life, early optimism about the technology's democratic potential has shifted into profound concern about misuse by authoritarian and illiberal actors. As a result, social media companies have faced increasing pressure to prioritize platform regulation and corporate responsibility. In this section, we briefly overview risks posed by social media platforms and related responsibilities for those who own them.

### How anti-democratic actors have polluted democratic space online

Anti-democratic actors have weaponized democratic space online through a multifaceted strategy that includes propaganda, trolls and bots, cyberattacks, and misuse of private data. Given the estimated 3.2 billion people who are active on social media, "state-affiliated threat groups have access to massive troves of personal data that can inform sophisticated spear phishing campaigns."[203] Several key risks posed to democracy by social media include polarizing civil society through echo chambers, amplifying and spreading disinformation, algorithms that create distorted reality, gathering data to manipulate behavior, and facilitating harassment of target groups.[204]

While individual actors are responsible for some democracy-disruptive action, governments in authoritarian regimes tend to fund and coordinate the bulk of bad behavior.[205] Samantha Bradshaw and Philip Howard found that among 28 countries they surveyed, "every authoritarian

regime has social media campaigns targeting their own populations." Illiberal leaders rely on constantly evolving methods operationalized by "cyber troops" (government actors who receive public funding) "to spread disinformation and attempt to generate false consensus."[206]

Social media can also enable illiberal leaders to communicate directly over platforms. In doing so, these leaders' actions affect the proper functioning of democracy. Illiberal leaders, by highlighting anti-democratic tendencies, "subvert established protocol, shut down dissent, marginalize minority voices, project soft power, normalize hateful views, showcase false momentum for their views, or create the impression of tacit approval of their appeals to extremism."[207]

### How to address the challenge

Numerous studies and articles have outlined recommendations for social media companies to fight the spread of misinformation. At the user level, social media companies should prioritize digital media literacy to teach users how to spot and report misleading content.[208] In addition, data should be well protected and responsibly shared for academic research that furthers the study of disinformation.[209] At the content level, social media companies should quickly remove material that violates policy. To ensure that this critical task receives adequate attention, companies should hire someone to oversee "company-wide responsibility for combating false information"—and, critically, give them the budget and authority to carry out their mandate. [210] Decisions to take down content should be governed by clear criteria that illustrates the "connection between facts, rational argument, and a healthy democracy."[211] In addition, companies should develop and maintain a robust appeals process run by employees not involved in the initial decision.

At the company level, executives should design algorithms to reduce "the outrage factor" and thereby diminish falsehoods. Regular training should be provided to staff on current threats and "to exchange views on the potential for further improvement."[212] Companies should support "narrow, targeted government regulation" that does not infringe on users' rights to free speech—focusing on things like political advertising and disinformation prevalence measures.[213] Lastly, companies should intensify cooperation with other platforms to share best practices.[214]

---

**SECTION 1.4 KEY RESOURCES:**

- Chatterji, Aaron K., and Michael W. Toffel. "The New CEO Activists." *Harvard Business Review* 96, no. 1 (January 2018). https://hbr.org/2018/01/the-new-ceo-activists.

- "Business for the Rule of Law Framework." United Nations Global Compact, 2016, https://www.unglobalcompact.org/library/1341.

- Deb, Anamitra, Stacy Donohue, and Tom Glaisyer. "Is Social Media a Threat to Democracy?" The Omidyar Group. October 1, 2017, https://www.omidyargroup.com/wp-content/uploads/2017/10/Social-Media-and-Democracy-October-5-2017.pdf.

*People queue to enter the voting booths at a polling station during the parliamentary elections in Odense, Denmark.*



# 5. Conclusion of section 1

This section reviewed the challenges faced by four major kinds of actors with capacity to promote democracy within their own nations: the incumbent political establishment; political opposition; civil society and independent media; and private enterprise. Throughout, we outlined challenges faced by each group, as well as strategies they might employ to improve odds of success. The next section explores how international organizations and foreign partners can best support domestic actors. But before transitioning to international actors, we would be remiss if we did not say a word about the role of the individual citizen.

As we have argued, those who lead in international organizations, politics, business, and civil society all have critical domestic roles to play in the defense of democracy, and this section has surveyed strategies they might choose to do so. Yet just as important to democracy as leaders are ordinary citizens. At the end of the day, democracy expresses the will of the people, and the choices made by ordinary people shape the spirit of the governing order. Not every citizen will take an active role in political life by running for office, becoming a civil servant, joining a civil society organization, or even attending a demonstration. However, everyday choices can have an important impact on the democratic process.

That is no less true in countries where democracy is under threat. While the full literature on this subject is beyond our scope,[215] Timothy Snyder's recommendations for people in such nations are a suitable coda to this section. First, of course, citizens should vote, ensuring the continued existence of multi-party elections.[216] When possible, they should take part in state and local elections in addition to national contests. Beyond merely voting, Snyder calls on people to reject symbols of hate and exclusion, refrain from repeating divisive and extremist rhetoric, and focus on verifiable information. Furthermore, citizens should respect and recognize the importance of democratic institutions in their daily lives, being sure not to take them for granted. As Snyder puts it, "choose an institution you care about—a court, a newspaper, a law, a labor union—and take its side."[217]



# SECTION 2: International actors and external assistance

*By Torrey Taussig and Alina Polyakova*

*Demonstrators march as part of the United for Global Change movement in Madrid.*

nternational actors can play a significant role in bolstering the efforts of domestic pro-democracy actors. This section highlights best practices of engagement for U.S. actors (including Congress, the Department of State, and USAID); donor partners and foundations; and international institutions, specifically in the wider European context. We explore in particular how support from this set of international actors can aid domestic NGOs, bolster civil resistance and nonviolent movements, counter disinformation campaigns, and push back against illiberal governments' use of corruption and repression. The following best practices and policy recommendations stem from the operating assumption that democratic governments and international organizations can and should continue to support and strengthen democracy globally, and particularly in countries experiencing backsliding, and where international actors have the most leverage.

Maintaining strong relations across democratic states through economic, political, informational, and social ties has historically helped to generate and maintain democratic institutions. Support from external pro-democracy actors is even more important in an increasingly contested international environment of global democratic stagnation. Now more than ever in the post-Cold War era, powerful authoritarian states such as Russia and China are lending support and presenting an alternative governance model to bolster the strength of illiberal regimes in Europe and elsewhere. They are also subverting and weaponizing digital technologies—once thought of as a boon to global democracy—to develop and export models of digital authoritarianism.

As Gene Sharp notes, "the main brunt of the struggle must be borne by the grievance group immediately affected by the opponents' political elite. Third party action can be seen as at best supplementary and complementary to internal resistance, never as the main actions of the struggle."[218] An indirect approach to supporting democracy by international actors and foreign governments thus works best. These outside actors should aim to empower local actors not by managing them but by collaborating with them to incentivize democratic reforms, support organic democratic development, and empower an active pluralistic civil society.

It is also necessary to recognize that the efficacy of diplomatic pressure varies across target states. Efforts to leverage trade or aid in support of democratic outcomes may not be effective with states less dependent on trade with or aid from the relevant outside actors.[219] Despite these limitations, democratic foreign governments and international institutions have their own toolkits to promote and support free and fair elections, rule of law, freedom of the press, and human rights, and to counter democratic backsliding, particularly in countries where recently established democratic institutions are coming under attack. But foreign economic incentives or financial support will not change the situation on the ground unless there is a powerful and genuinely domestic movement to hold public figures and institutions accountable to democratic rules and principles.

# 1. Partnering with domestic CSOs and NGOs

**SUMMARY**

International actors should partner with domestic CSOs and NGOs by:[220]

- **Going local**. Foundations and other international donors should enhance collaboration with local NGOs such that external support to well-established, well-known, and Westernized organizations is balanced with cooperation with local entities.

- **Building basic capacities**. Where local NGOs lack the capacities of more established organizations in national capitals, donors can help develop basic core organizational capacities, especially financial management and human-resources management.

- **Coordinating donor support**. A multiplicity of foreign donors can overwhelm a recipient organization's bandwidth and undermine their effectiveness through competing demands and priorities. Establishing networks of donors supporting democracy and coordinating support across organizations would help to mitigate the problem.

- **Responding to government attacks on NGOs**. External actors including donors, NGOs, and government officials should issue systematic, coordinated, and high-level responses to government authorities' restrictions on NGO activities, while taking steps to avoid the perception that activities are solely externally driven. In more supportive environments, donors and governments should vocally promote laws that safeguard NGOs and activists to help create an environment that is conducive to their activities.

- **Empowering nontraditional actors**. Donors should help develop pro-democracy networks of actors such as businesses, individuals, universities, student groups, and think tanks. In parallel, efforts should be made to help establish mechanisms and incentives to induce well-established NGOs to provide training to the less well-established groups. Such training needs to be relevant to the location and culture.

- **Developing local sources of funding and philanthropy**. Particularly in countries that are at risk of democratic backsliding, donors should help NGOs diversify their external support, develop local sources of funding, and build local habits of corporate philanthropy to help build sustainable civil society ecosystems over time.

Civil society organizations (CSOs) and non-governmental organizations (NGOs) in both emerging and backsliding democracies are important partners for international engagement.[221] Although international actors and foreign governments have supported domestic NGOs for decades, CSOs did not emerge as a focal point for external support until the late 1980s and early 1990s, as donors grew frustrated with operating through corrupt and uncommitted state institutions.[222] At the time, leading academics were also embracing neo-Tocquevillian ideas about the relationship between civil society and democracy. Robert Putnam argued that civil society built social capital by facilitating cooperation, building trust, and encouraging solidarity.[223] Similarly, Larry Diamond suggested that civil society was vital for democratic consolidation.[224]

The "third wave" of democratization swept across Southern Europe, Latin America, and Central and Eastern Europe between the 1970s and the 1990s, and was most prominently captured with the citizen-led protests that toppled the Berlin Wall and facilitated the Central and Eastern European democratic transitions of 1989. International donors came to see civil society as a "domain that is nonviolent but powerful, nonpartisan yet prodemocratic, and that emerges from the essence of particular societies, yet is nonetheless universal."[225] The 1990s witnessed the "NGOization" of civil society, and aid from the West increased massively.[226] The number of NGOs and other CSOs skyrocketed, and between 1970 and 2000, there was a sevenfold increase in resources transferred through international NGOs.[227]

NGOization, however, did not start out as an inclusive endeavor.[228] Foreign governments, foundations, and other donors initially preferred to work with Western NGOs. Collaboration with local NGOs was generally limited to organizations based in a country's capital and resembled patron-client relationships as opposed to more equal partnerships. This proved costly and unsustainable.[229] It was expensive to fly in and host Westerners, and NGOs struggled to build genuine relationships with local citizens and organizations. In Russia, for instance, citizens "repeatedly rejected what they saw as a paternalistic model positioning them as recipients of aid and instead advocated for equal partnerships in the design and delivery of projects."[230]

EU funding to CSOs in Bosnia and Herzegovina, Cyprus, and Georgia also point to a risk of widening disconnects between CSOs and the public. EU funding has incentivized many domestic NGOs in these countries to prioritize EU-friendly projects that are more short-term and measurable.[231] In each country, there are a handful of organizations that are selected to receive funds owing to their competitive advantages, such as having employees fluent in English and familiar with the application and report writing process. Consequently, an "elitist civil society sector" has emerged.[232] And, as Sarah Bush has argued, Western democracy assistance programs have contributed to a "taming" of democracy promotion by shifting to the support of technical programs rather than those aiming at transformative change.[233]

This elitist civil society sector's power is reinforced by the media, which calls upon representatives from those organizations to provide input on certain issues. This cycle has harmed grassroots organizations and distanced many big CSOs from the public.[234] In Cyprus, for example, citizens describe many NGOs that receive foreign funding as "artificial" and "externally driven," while those in Bosnia and Herzegovina see them as corrupt entities.[235] Understandably, confusion emerges as a result of this divide, with many citizens not being informed about how foreign funding works, how CSOs operate, and what their goals are.

In response to these weaknesses and criticisms, external assistance became a more local endeavor starting in the mid-1990s.[236] "Going local" was cheaper and more effective, and external actors and donors began to prefer working with local NGOs because of their many comparative advantages.[237] This remains true today, although working with local and less well-known organization also has its drawbacks. In terms of their strengths, they can be deeply aware of the local context, less constrained by bureaucracy and sovereignty laws than official government actors, maintain clear goals and professional structures that match donor needs, and are better trained to organize pro-democracy movements. Advocacy NGOs in particular can aggregate citizen demands and push for government action and accountability, acting as a "transmission belt" between civil society and the state.[238] Local NGOs, however, can have limited capacities, be overly dependent on competing and inefficient donor agendas, and lack powerful political contacts.[239]

External assistance to CSOs and NGOs in Kosovo make it clear that international donors conceptualize local consultation in different ways, and that there is no one size fits all model when it comes to working with partners on the ground.[240] Some organizations such as the German Friedrich Ebert Stiftung have employed local staff and consult with them, while

others have more formal processes.[241] For instance, the EU has held multi-level consultations with various local actors, while the Swiss Agency for Development and Cooperation and the Swedish International Development Cooperation Agency have sent delegations to Kosovo while interacting with domestic actors through formal institutions, like advisory boards. Other donors rely more on reports and data to shape their approach: the UN Kosovo Team is guided by its own Human Development reports as well as the UN Sustainable Development Goals (SDGs) and Kosovo's European integration agenda, which already have input from Kosovo specialists and groups operating in the area.[242]

## A. ADDRESSING RESTRICTIONS ON CSOs AND NGOs

Over the last decade, illiberal government actors intent on consolidating power have taken steps to restrict the activity of independent NGOs by enacting censorship laws; restricting freedom of assembly; banning or limiting foreign funding; requiring approval by the government for operations; creating registration requirements; not issuing visas to employees of foreign partner organizations; and labeling NGOs as foreign agents.[243] Another complicating factor is when regimes sponsor or create NGOs or GONGOs (government-organized non-governmental organizations) to further their own political interests. GONGOs can confuse external actors by making it difficult to discern what is a genuine civic group and what is not.

Restrictions on NGOs—especially foreign-funded ones—date back to the post-cold war years.[244] In the aftermath of major waves of decolonization that took place in the 1950s and 1960s, external actors tended to give aid—which was aimed at facilitating socioeconomic development as opposed to political reform—directly to governments. This was a way of respecting the agency of newly independent recipients wary of continued Western interventionism, given their colonial history.[245] But by the end of the Cold War, donors were focused on democracy promotion and preferred to channel aid through NGOs.[246] Initially, governments in countries with a growing third sector didn't see NGOs and democracy assistance as a threat—a perception that was reinforced by the end of the Cold War, which reduced concerns about Western interventionism.[247]

However, NGOs quickly became prominent and powerful. Their development worried host governments, who reacted by restricting the ability of NGOs to receive foreign aid.[248] These regulations were exacerbated by the "color revolutions" in the early 2000s, which showed the world the capacity of opposition parties and organizations that received Western support.[249] Between 1993 and 2012, more than a quarter of low and middle income countries enacted laws (e.g., administrative burdens, limitations on the use of foreign funds, reporting requirements, and high taxes) that restricted foreign contributions to local NGOs.[250]

*In recent years, the overall environment for CSOs in Central and Eastern Europe has been deteriorating, a development closely connected to the rise of illiberal populism in the region.*

*Activists join fists in solidarity ahead of a protest march.*



In recent years, the overall environment for CSOs in Central and Eastern Europe has been deteriorating, a development closely connected to the rise of illiberal populism in the region. Governments in many Central and Eastern European countries have been cracking down on NGOs. In 2017, Hungary passed an act on "the transparency of organizations supported from abroad" similar to Russia's "foreign agent" law discussed below.[251] The law requires a CSO that receives funding from foreign sources above a certain amount register as "foreign funded" and label itself as such on all publications and websites.[252] The law, which is the first of its kind in an EU member state, also includes stringent reporting requirements. Noncompliance is punishable by high fines and even eventual dissolution. Other nations have to varying degrees passed laws that have imposed burdensome restricting requirements and administrative duties on foreign-funded NGOs.[253] That being said, there have been some positive developments. Macedonia's VMRO-DPMNE Party, which had overseen democratic backsliding, attacks on civil society, and a spree of nationalist building projects, lost power to the more pro-democracy Social Democratic Union of Macedonia in 2017.[254] Prioritizing joining NATO and the European Union, the new government resolved the country's long-standing name dispute with Greece and has accelerated governance reforms.[255]

Lawmakers understand that adopting legislation that hampers civil society comes at a cost. In enacting restrictive legislation, governments risk being named and shamed by the international community, losing valuable services provided by NGOs, and being met with public disapproval. Yet governments often think that these costs are outweighed by political survival, which can be threatened when civil society, and society as a whole, is empowered to demand accountability, rights, and democratic rule, and takes active steps to pursue these goals. Governments fear, and rightfully so, that external support and international attention can facilitate their efforts.

Crackdowns that draw the most attention tend to take place in semi-authoritarian or competitive authoritarian regimes, who try to retain some form of legitimacy in the eyes of the international community (e.g., through pluralist elections or allowing some NGOs to do advocacy work) while hampering challenges to the regime.[256]

Common forms of restriction include: [257]

- Hampering civil society: enacting censorship laws and restricting freedom of assembly;

- Targeting foreign funding and support: banning or limiting foreign funding, requiring its approval by the government, creating registration requirements, and not issuing visas to employees of foreign partner organizations; and

- Intimidation and harassment: labeling NGOs as foreign agents, threats to public order, violent actors, or even terrorists, suing activists, and carrying out illegitimate audits.

In light of these repressive tactics, international donor responses matter. When international organizations, including aid agencies, take decisive action to signal disapproval of attacks on civil society and rule of law, governments are forced to respond. Uncoordinated action can have the opposite effect of facilitating further attacks on civil society.[258] Based on these assumptions, below is a series of best practices and case studies to help international actors assess both the pros and cons of partnering with domestic NGOs.

> **Donors should also diversify support among smaller and nontraditional recipients in order to go around repressive government policies.**

## B. COORDINATING AND DIVERSIFYING SUPPORT

The multiplicity of donors operating in similar spaces and with similar organizations on the ground can overwhelm recipients' bandwidth and even undermine their effectiveness through competing demands and priorities. To address this, donors should coordinate and diversify their support. One possible model of pro-democracy networking is the Community of Democracies that works with civil society to coordinate the efforts of their member states for democratic processes and institutions.[259] As illiberal governments implement restrictive laws targeting foreign funding of civil society organizations, it is important to foster coordination among like-minded donors as well as among local organizations. Responses include creating platforms (e.g., in international organizations) for activists who have been affected by a closing civil society space and bringing domestic NGOs together to develop joint responses to restrictive government policies. A lack of systematic, coordinated, and high-level responses to government authorities' restrictions on NGO activities opens more opportunities for heavier-handed approaches that will further hamper local actors' freedom of operation.

Donors should also diversify support among smaller and nontraditional recipients in order to go around repressive government policies that target well-known and more Westernized

CSOs. This involves providing aid through smaller grants (and therefore developing small grant funding models) to less Westernized groups and local organizations operating outside the capital cities.[260] It also involves working to empower nontraditional actors such as businesses, individuals, universities, student groups, and think tanks.[261] For example, one way of supporting local pro-democracy actors is through scholarships to specific individuals. In parallel, efforts should be made to help establish mechanisms and incentives inducing well-established NGOs (which donors typically favor) to provide culture and location specific training to the less well-established groups.

### C. PLANNING IN ADVANCE AND DEVELOPING CORE CAPACITIES

In countries that are at risk of democratic backsliding, donors should help CSOs and NGOs develop local sources of funding and build local habits of corporate philanthropy—all of which can build sustainable civil society ecosystems over time. Donors can also help organizations develop core organizational capacities, especially financial management and human resources management, rather than just providing support for project activities with limited time horizons. Kosovo in recent decades has proven why it is important for external actors to help develop basic capacities among native CSOs and NGOs. In the 1990s, external donors and organizations did not enter Kosovo with hopes of supporting democratization by collaborating with young CSOs. Instead, they came in as part of an emergency, attempting to balance the provision of humanitarian aid and the facilitation of peacebuilding in the aftermath of a devastating bloody conflict. As a result, many of Kosovo's NGOs were left inexperienced and needing to "depend entirely on international donor funding."[262] Second, there are "no developed NGO networks with relevant and appropriate capacities for advocacy, project management, service provision, or basic community development," save for a few in the capital, Pristina.[263]

> **Donors should help CSOs and NGOs develop local sources of funding and build local habits of corporate philanthropy— all of which can build sustainable civil society ecosystems over time.**

As the political situation in Kosovo changed (e.g., with the declaration of independence in 2008), so did donor priorities. External actors such as the EU now work on democracy promotion by collaborating with government institutions and NGOs. However, early enthusiasm from external actors proved that funding NGOs' initiatives is not enough to maximize their efficacy; it is also crucial to do basic organizational capacity-building activities and equip them with important skills like advocacy and grant management.

In more supportive environments, external actors should vocally promote laws that safeguard NGOs and activists and create an environment that is conducive to their activities (e.g., recognizing freedom of speech and peaceful assembly). One example is Article 56 of Montenegro's Constitution that states that "Everyone shall have the right of recourse to international organizations for the protection of their own rights and freedoms guaranteed by

the Constitution," thereby welcoming NGO and activist access to international organizations where they can advocate for their causes.[264]

In countries where governments employ narratives of "hypersovereignty" to restrict civil society actors, foreign governments and international organizations should work toward reversing and/or mitigating restrictions through diplomatic pressure and sanctions on the home government.[265] Condemnation of repressive tactics should be issued immediately and pressure applied (even if it solely rhetorical) consistently. Meanwhile non-government actors can encourage citizens to support NGOs in any way that they can (e.g., protests, donations, lobbying, advocacy, citizen journalism). Donors should keep in mind that illiberal governments tend to target NGOs after favorable national elections, when they can justify their actions with the veneer of democratic legitimacy on nationalist/sovereignty grounds by painting NGOs as foreign agents.

To foster greater resiliency before restrictions occur and in places where backsliding is already taking place, official actors including the U.S. State Department and USAID should increase longer-term support for independent civil society and investigative independent media in Central Europe, with Hungary and Poland as the most urgent priorities. This funding program should prioritize projects that will demonstrate to communities outside of national capitals (by providing services, education, etc.) the benefits of democratic institutions. It should also improve government accountability and transparency through in-depth investigative reporting on, for example, misuse of public resources.[266] In addition, donors can encourage NGOs to develop productive relationships, when possible, with central and local governments, moving away from the idea that advocacy NGOs must naturally take a completely independent, or even antagonistic, stance toward their governments.

### SECTION 2.1 KEY RESOURCES

- Merriman, Hardy. "Small Grants, Big Commitment: Reflections on Support for Grassroots Activists and Organizers." *International Center on Nonviolent Conflict*, January 10, 2019. https://www.nonviolent-conflict.org/blog_post/small-grants-big-commitment-reflections-support-grassroots-human-rights-activists-organizers.

- Carothers, Thomas. *Aiding Democracy Abroad: The Learning Curve*. Washington, DC: Brookings Institution Press, 2011.

# 2. Assisting civil resistance and nonviolent movements

**SUMMARY**

International actors should assist civil resistance and nonviolent movements by:

- **Developing clear criteria for providing support.** Civil resistance movements involve many actors and organizations. It is therefore important to make informed decisions about whom to support both during and after civil resistance campaigns. Baseline criteria for a campaign to receive support should include: a public commitment to nonviolence; campaign goals that are consistent with internationally recognized human rights; and clear independence from registered political parties (although total electoral disengagement is not a prerequisite).[267]

- **Thinking long-term.** There is always work to be done in the aftermath of successful civil resistance campaigns. This involves supporting newly empowered political actors and taking steps to avoid a power vacuum. These political actors must be trained in policymaking and processes of deliberative governance. Building democratic governance institutions and processes can take years and requires patience from all actors involved.

- **Establishing the local context.** Given the difficulties around identifying appropriate internal partners within a jurisdiction, a starting point for external support must be understanding the local context and expressed needs of local activists. This knowledge transfer should occur through frequent interactions with a broad range of civil society and other local actors.

- **Promoting local ownership.** External support to nonviolent movements, while beneficial, can in certain contexts be used by domestic governments to delegitimize homegrown movements. Support that is poorly administered can also be detrimental to their success. Therefore, it is critical to advance local ownership and involvement. This can help prevent possible free-riding and encourage domestic support from those who might have concerns about association with a foreign actor.[268]

- **Focusing on training and skills development.** Invest in developing and sharing knowledge across civil resistance and movement organizing, so that activists have greater opportunities for learning and cultivating skills.

- **Helping to boost the efforts of independent media.** Independent journalism plays an important role in raising awareness of and supporting the goals of civil resistance and nonviolent movements. Enhancing media effectiveness should involve training journalists inside and outside of resistance movements. Independent journalists and news outlets need to be sensitized to the dynamics of civil resistance movements, and nonviolent activists must be trained as effective spokespeople for their causes.

## A. DEFINING CIVIL RESISTANCE AND NONVIOLENCE

Per section 1, we follow Gene Sharp in defining civil resistance or nonviolent struggle as "a technique used to control, combat, and even destroy the opponents' power by nonviolent mean of wielding power."[269] Generally, it emerges when political, economic, or social grievances go unaddressed with no feasible way to enact change in the status quo.[270] It tends to occur when more traditional channels including dialogue negotiations and institutional processes such as elections and legal recourse fail to produce results.

## B. WHY SUPPORT CIVIL RESISTANCE, AND WHOM TO SUPPORT?

Why should international actors support civil resistance and nonviolent movements? They work. One reason for their success is that they tend to attract sympathetic international attention, especially when the regime responds disproportionately. This attention can be highly valuable. For instance, international divestments, sanctions, boycotts, and even barring sports teams from international competitions, all played important roles in ending apartheid in South Africa.

In recent decades international actors have provided various types of assistance to civil resistance campaigns through diplomatic engagement, material support, sanctions, and international coverage.[271]

Steps supported by external actors include:

· Challenging government cover ups through investigations and reports;

· Bringing issues and civil resistance leaders to multilateral institutions (e.g. EU, UN, OAS, G-7) to bolster their international legitimacy;

· Promoting dialogue and peaceful conflict resolution;

· Developing and sharing knowledge about civil resistance and movement organizing, so that activists have greater opportunities for learning and cultivation of skills;[272]

· Monitoring and attending trials of political prisoners;

· Attending protests, activist trials, and vigils;[273]

· Supporting independent media;

· Pressuring the government to enact changes or step down; and,

· Creating safe spaces for activists to meet and organize.

These forms of assistance have helped to promote the aims of civil resistance movements and enforce human rights standards in oppressive environments.

Civil resistance movements involve many actors that coordinate actions, recruit participants, and inform the international community. As such, it is important for external actors to make informed decisions about *whom* to support during and after civil resistance movements.[274] Diplomats are influential due to their political connections, have an easier time getting in contact with government figures, and are protected by diplomatic immunity.[275] Diplomats and government affiliated organizations can help convene civil society actors with funders, and they can facilitate meetings between government supporters and opposition groups.[276] Domestic CSOs and NGOs are also powerful partners, as they tend to be more informed about the situation on the ground, less constrained by bureaucracy and sovereignty laws, and better trained to organize resistance movements.

More broadly, Hardy Merriman and Peter Ackerman of the International Center of Nonviolent Conflict (ICNC) outline three basic criteria for campaigns to receive assistance: a public commitment to nonviolence and calls for nonviolent discipline from all supporters; campaign goals that are consistent with internationally recognized human rights, as outlined in the Universal Declaration of Human Rights; and maintaining independence from registered political parties (although total electoral disengagement is not a prerequisite).[277]

In terms of timing of support, there are two additional elements for external actors to keep in mind. First, there is still work to be done in the aftermath of a successful civil resistance campaign in order to support newly empowered political actors and avoid a power vacuum. As leaders of a successful movement and new political parties move onto the political stage, they must be trained in policymaking and processes of deliberative governance, such as participatory budgeting.[278] Second, building democratic governance institutions can take years and requires patience from external actors. Supporters must avoid buying into the "graduation myth" that countries become immediately stable, democratic, and peaceful after a certain combination of years and funds.[279]

> **Building democratic governance institutions can take years and requires patience from external actors.**

## C. UNDERSTANDING THE OPERATING ENVIRONMENT

Given the difficulties around identifying appropriate internal partners, a starting point for any discussion of external support must be understanding the domestic context and expressed needs of national and local activists. This knowledge transfer should occur through frequent interactions with a broad range of civil society actors. External organizations and institutions must also be aware of the legal, political, and social constraints faced by activists. According to Hardy Merriman of the ICNC, civil resistance movements face daunting challenges to building unifying visions and networks of trust; eliciting broad participation and mobilization; and spreading knowledge about how nonviolent conflict works. A key component to their success is developing local and national level strategies that work in unison to challenge powerholders and institutions.[280] For external actors to support these goals, a deep understanding of the operating environment and range of actors engaged in civil resistance movements will help to better coordinate resources and avoid duplicative efforts.

## D. PROMOTING LOCAL OWNERSHIP

While external support for civil resistance movements can be incredibly valuable, it can also be detrimental to their success—a risk that all international actors must take into consideration when considering support of domestic campaigns. Governments can use external assistance to delegitimize homegrown movements, portraying them as foreign agents. Moreover, large amounts of funding that are poorly administered can destroy resistance movements internally. While we believe that external assistance to movements can do more good than harm, it is important that international actors make every effort to encourage local ownership.[281] Deep knowledge of the national and local context can help avoid (although not entirely) the risk of internal quarrels, accusations of profiteering, and the loss of movement momentum and people.[282] Local involvement can help prevent free-riding as well as the dissuasion of locals who might choose not to participate in order to avoid being associated with a foreign actor.[283]

One successful example of civil resistance came in the late 1980s and early 1990s, when citizens in Lithuania, Latvia, and Estonia initiated efforts to gain independence from the Soviet Union.[284] The West was initially reluctant to help the Baltic states, whose governments were declaring their sovereignty and condemning military occupation by the USSR, though the longstanding policy of the United States of not recognizing their incorporation into the Soviet Union gave symbolic assistance to the uprisings.[285]

> A key component to civil resistance movements' success is developing local and national level strategies that work in unison to challenge powerholders and institutions.

The independence movements cooperated across Estonia, Lithuania, and Latvia, with some backing from other nationalist movements in the USSR. Activists shared tactics and ideas, and they coordinated protests.[286] Perhaps one of the most memorable manifestations of this cooperation was the Baltic Way demonstration of August 23, 1989, that saw approximately two million people form a human chain across Estonia, Latvia, and Lithuania. Organizers across the Baltics worked together to map the chain, organize transportation to maximize participation, and disseminate information about the protest.[287]

## E. PROVIDING TRAINING AND SKILLS DEVELOPMENT

To support in-country efforts, training and mentoring in strategic nonviolent action and coalition building can help improve the skills and effectiveness of local activists. Trainings (in-person and virtual) should highlight practical ways to maintain nonviolent movements in repressive environments including: codes of conduct, lessons of dealing with security forces, and diversifying tactics to maintain resiliency. Training in activities such as political party development, voter mobilization, and election monitoring can complement support for civil resistance activities.[288] Trainings—online and in person—can also be facilitated by convening diverse actors engaged in a civil resistance movement from across the political and NGO spectrum to coordinate and share best practices, and to help convene and recruit participants.



*A pro-democracy banner is pictured in a protest during the EU-Asia leaders summit in Brussels, Belgium.*

In Serbia, international support and trainings helped end the repressive regime of Slobodan Milošević after the September 2000 presidential election, which was rife with irregularities.[289] The nonviolent movement that ended Milošević's rule was organized by the domestic activist group Otpor. It drew the support of hundreds of thousands of people in Serbia, and received support from various international actors. Otpor received aid and trainings from two American organizations, the National Democratic Institute (NDI) and the International Republican Institute (IRI), and the Serbian organization Center for Civic Initiatives gave copies of Gene Sharp's foundational work *From Dictatorship to Democracy* to demonstrators.[290]

External actors also helped counter government censorship of independent media outlets such as the Serbian broadcaster Radio B92. When domestic outlets were censored or shut down, foreign outlets like the BBC and VOA broadcast some of their content.[291] Furthermore, external actors like the EastWest Institute understood the importance of bringing activists together. They started the Bratislava Process in 1999 by facilitating meetings between anti-Milošević parties and organizations, Slovak NGOs, Slovak activists, and media correspondents to "build a broad coalition of all relevant democratic actors in Serbian society and friends from the international donor community."[292] American and European officials also participated in some of these meetings and provided advice and aid.[293]

In Georgia, external actors who had experience in civil resistance against repressive regimes worked with Georgian activists prior to the Rose Revolution in 2003, which ousted the entrenched authoritarian President Eduard Shevardnadze. Giga Bokeria of National Movement and Levan Ramishvili of the Liberty Institute met with Otpor activists in Belgrade in the spring, and young Georgian activists were trained by Otpor volunteers in the summer.[294] Georgian NGOs, which "had a disproportionate influence on the Rose Revolution and its peaceful

outcome," also received assistance from international actors seeking to support civil society: the U.S. government, the EU, the World Bank, and other organizations like the Eurasia Foundation gave hundreds of millions of dollars to the "third sector" of Georgia, which helped push for democratization and helped organize protests.[295] For example, the Georgia-based International Society for Fair Elections and Democracy, which received Western funding, helped train election monitors, conducted exit polling, and coordinated protests.[296] That said, it is important to note that many Western governments had supported Shevardnadze in the past (he had even been awarded the National Democratic Institute's Harriman Democracy Award for leadership in democracy and human rights), which helped legitimize his regime. [297]

## F. BOOSTING EFFORTS OF INDEPENDENT MEDIA

As noted earlier in this report, independent journalism has played historically important roles in raising awareness of and supporting the goals of civil resistance and nonviolent movements. Enhancing media effectiveness involves training inside and outside of resistance movements. From the outside, independent journalists and news outlets need to be "sensitized to the dynamics of civil resistance;" on the inside of movements, nonviolent activists must be trained as effective spokespeople for their causes.[298] Traditional media outlets including television, print, and radio, are often the first target of authoritarian regimes in minimizing voices critical of government policies. Social media outlets are harder for government forces to regulate and can highlight shared grievances, expose regime propaganda, present governance alternatives, and facilitate communication among local activists.

> *Independent journalism has played a historically important role in raising awareness of and supporting the goals of civil resistance and nonviolent movements.*

## G. UKRAINE'S ORANGE REVOLUTION: A CASE STUDY OF EXTERNAL SUPPORT TO CIVIL RESISTANCE MOVEMENTS

Ukraine's nonviolent Orange Revolution of 2004 helped to bring the democratically elected Viktor Yushchenko to power after widespread election fraud had resulted in the victory of Prime Minister Viktor Yanukovych.[299] External actors, including USAID, the Westminster Foundation, National Endowment for Democracy (NED), and the Alfred Moser Foundation had been supporting Ukrainian civil society for several years prior to the election.[300] Ongoing efforts included running seminars on civil society activism and democratic principles.[301] One of the leading organizers of the Orange Revolution, Pora (meaning, "It's Time"), received grants from the German Marshall Fund, Freedom House, the Canadian International Development Agency, and others, helping them to spread awareness about their movement and develop their organizational capacity.[302] Pora also received assistance from other groups that had triumphed over repressive regimes: Otpor leader Aleksandar Marić ran seminars for Ukrainian activists in Serbia, while Slovak organizations who had defeated Vladimír Mečiar helped Pora to strategize.[303]

Diplomats coordinated their actions, at times using their own embassy funds to fund independent media outlets like *Ukrainska Pravda* and exit polls.[304] They also used their diplomatic immunity to protect activists. For example, on October 23, security services attempted to search the house of Pora leader Vladyslav Kaskiv; their entry was blocked by two members of parliament from the opposition (who had parliamentary immunity), three diplomats from France, and some representatives from the OSCE and European Commission. Eventually, the security forces withdrew.[305] Moreover, international representatives on both sides of the conflict (Polish President Aleksander Kwaśniewski, Lithuanian President Valdas Adamkus, and, EU Foreign Policy Chief Javier Solana) helped broker talks between Yanukovych and Yuschenko.[306]

### SECTION 2.2 KEY RESOURCES

- Stephan, Maria J., Sadaf Lakhani, and Nadia Naviwala. *Aid to Civil Society: A Movement Mindset*. Washington: United States Institute of Peace, 2015. https://www.usip.org/sites/default/files/SR361_Aid_to_Civil_Society_A_Movement_Mindset.pdf.

- Ackerman, Peter and Hardy Merriman. *Preventing Mass Atrocities: From a Responsibility to Protect (RtoP) to a Right to Assist (RtoA) Campaigns of Civil Resistance*. Washington: International Center on Nonviolent Conflict, 2019. https://www.nonviolent-conflict.org/wp-content/uploads/2019/05/Right-to-Assist.pdf.

- Merriman, Hardy. "Supporting Civil Resistance Movements: Considerations for Human Rights Funders and Organizations. *International Center on Nonviolent Conflict*, September 11, 2018. https://www.nonviolent-conflict.org/blog_post/supporting-civil-resistance-movements/.

- Kinsman, Jeremy and Kurt Bassuener. *A Diplomat's Handbook for Development Support*. Waterloo, Can.: Centre for International Governance Innovation, 2013. http://www.democratizationpolicy.org/diplomats-handbook/.

# 3. Countering disinformation

**SUMMARY**

International actors should counter disinformation by:

- **Supporting independent media organizations and CSOs working to expose disinformation campaigns.** International actors should use targeted funding to support the investigative capacities of domestic watchdog groups that monitor and expose media consolidation through nontransparent financial schemes, journalist harassment and censorship, raids of independent news outlets, and other abuses of public resources aimed at stifling the space for independent media.

- **Investing in and expanding organizational capabilities.** The EU, NATO, G-7 and other international organizations should invest in and expand capabilities for monitoring disinformation campaigns emanating from foreign actors.

- **Enhancing communication between democratic governance and social media companies.** Establish better communication and information sharing processes between social media companies and democratic governments.

- **Advancing pro-democracy messaging.** Develop positive narratives around democratic values and principles to counter anti-democratic ones.

Russia has pioneered a toolkit of digital and traditional disinformation to undermine democracies.[307] These techniques were first and foremost deployed against the Russian people as the Kremlin sought to control information flows, propagate negative narratives about the West and liberal democracies, and suppress independent domestic voices.[308] After Vladimir Putin came to power in 2000, the Russian government moved to consolidate control over domestic media and co-opt the digital domain. It did so by placing media networks in the hands of pro-regime oligarchs, using the police and intelligence agencies to harass independent journalists, shutting down independent news outlets under trumped-up charges, labeling journalistic organizations as foreign agents or undesirables, and infiltrating social media networks to spread disinformation narratives.[309]

Journalists, pro-democracy activists and organizations, and human rights proponents are among the most vulnerable groups in Russia today. Anna Politkovskaya, a prominent Russian investigative journalist and human rights activist reporting on the Russian government's brutal activities in Chechnya, was gunned down in her apartment building in 2006 after years of intimidation and violence against her.[310] Boris Nemtsov, a former Russian government official turned anti-government opposition leader, was assassinated near the Kremlin in 2015.[311] Other opposition leaders are routinely harassed, searched, and face cyber and disinformation attacks by Russian government proxies. During non-violent protests in 2011–2012[312] and 2019,[313] Russian opposition leaders, student activists, and protesters were arrested and



*Facebook and Twitter logos are seen on a shop window in Malaga, Spain.*

sentenced to jail time. In the time since, the government's security services have intensified their repressive efforts with nation-wide raids on opposition movements' offices.[314]

Indeed, for decades, Putin's regime has been crafting an increasingly repressive and nuanced legal and administrative apparatus to expel foreign NGOs and impose costs on local CSOs that receive any financial support from foreign sources—public or otherwise.[315] The process began in 2006 with a federal law that put initial limits on access to information by so-called undesirable foreign NGOs. This law was followed by multiple amendments and a 2012 law that requires any CSO receiving foreign funding to register as a foreign agent.[316] A 2015 legal extension allows the Kremlin to ban any organization it considers undesirable, de facto creating a blacklist of organizations.[317] The Kremlin applies the "foreign agent," "undesirable," or "extremist" labels to any organization that challenges the government.[318] The foreign agent classification greatly limits an organization's ability to operate in Russia.[319] Put together, these measures have set up a complex legal web of repression while granting the Russian government the power to block access to information that it designates extremist or undesirable, including any distributed information appealing for public protest.

As a result, well known international NGOs such as the MacArthur Foundation, NED, Open Society Foundation, and IRI have all closed their operations in Russia after being classified as undesirable foreign agents.[320] USAID is also banned from operating in Russia.[321] And local CSOs, particularly those with a focus on democracy, human rights, electoral transparency, and even environmental issues, have been fined, audited, and raided either for failing to prove that they are not foreign agents or refusing to voluntarily register as such.[322] In this repressive environment, foreign actors' abilities to support local actors have been limited to supporting independent media and CSOs that have moved operations abroad or using passthroughs to get very limited funding for groups still operating in Russia.[323]

The Kremlin's consolidation of traditional media (e.g. television networks and newspapers) in the hands of government linked oligarchs has allowed the regime to control domestic information flows and narratives.[324] More recently, the government has moved to force tech companies and other digital media platforms, such as Tinder, to provide data access to government agencies, most notably the intelligence services.[325] As with NGOs and CSOs, the Kremlin erected a complex legal structure that, among other things, requires companies to install surveillance hardware on their systems, store data in Russia rather than abroad, and give away encryption keys to the Russian security services.[326] With these tools, the government is able to monitor communications between individuals and groups, acquire personal

information, and monitor online activities on social media platforms. Using this suite of traditional and digital media resources and surveillance capabilities, the Kremlin is able to control messaging at home and attack opposition activists.[327]

Abroad, Russian state-funded outlets, such as RT and Sputnik, and Russian-linked social media entities (e.g., trolls, bots, cyborgs) lend support to far-right political movements and like-minded governments while propagating anti-democratic narratives and content.[328] This Kremlin toolkit finds appeal among political parties and leaders who aim to stifle opposition and criticism in their own countries.

In addition to supporting independent local media, as outlined above, international actors should help support domestic watchdog groups that monitor and expose media consolidation through nontransparent financial schemes, journalist harassment and censorship, raids of independent news outlets, and other abuses of public resources aimed at stifling the space for independent media. When such abuses take place within the EU, for example in Hungary, the EU should take immediate steps to publicly condemn such behavior while pressing for government leaders to be held publicly accountable for their repressive actions. For example, the European Commission publicly rebuked the Orbán government's disinformation campaign spreading false information about the EU's migration policy.[329] In addition, international donor organizations should fund local media outlets that identify disinformation campaigns not only from foreign states, such as Russia, but also those that emanate from their own governments.

> **International donor organizations should fund local media outlets that identify disinformation campaigns.**

Lastly, the United States, European national governments, the EU, and NATO, should introduce and enforce transparency standards, including with respect to foreign-origin political and issue ads on both traditional and social media, and otherwise monitor and notify their publics in real time about the activities of foreign propaganda outlets. In order to combat disinformation campaigns, governments should seek to emulate initiatives by EU's East StratCom, NATO's StratCom Center of Excellence in Riga, the Helsinki Hybrid Center of Excellence, and the U.S. Department of Homeland Security.[330]

---

**SECTION 2.3 KEY RESOURCES:**

- Fried, Daniel and Alina Polyakova. *Democratic Defense Against Disinformation*. Washington: The Atlantic Council, 2018. https://www.atlanticcouncil.org/in-depth-research-reports/report/democratic-defense-against-disinformation.

- Helmus, Todd C. et al. *Russian Social Media Influence: Understanding Russian Propaganda in Eastern Europe*. Santa Monica, Calif.: RAND Corporation, 2018. https://www.rand.org/content/dam/rand/pubs/research_reports/RR2200/RR2237/RAND_RR2237.pdf.

- European Commission. "Policy: Tackling Online Disinformation." https://ec.europa.eu/digital-single-market/en/tackling-online-disinformation.

# 4. Providing foreign government and institutional support

**SUMMARY**

Foreign governments and institutions should:

- **Leverage EU structural funds.** The EU should adopt rule of law conditionality for member states to receive structural funds. Conditionally should be imposed fairly across the EU, including in long-tenured member states as well as those that joined in the 2004 and subsequent enlargements. An alternative approach would be to link overall levels of EU funds provided to a member state to a rule of law index, whereby states that score higher on the index have greater access to funds.[331]

- **Enhance support for civil society and independent media.** Official actors within the EU, the U.S. State Department, and USAID should increase support for independent civil society and investigative, independent media organizations. More funding should be allocated to countries where checks and balances are under attack, and particularly to organizations operating outside of national capitals.

- **Encourage NGO-Government relations, when possible.** Positive relations between NGOs and central and local governments should be encouraged, when possible. This would help move away from the idea that advocacy NGOs must naturally take a completely independent, or even antagonistic, stance toward their governments.

- **Prioritize governance and democracy issues.** High-level officials, as well as official actors within the State Department's Bureau of European and Eurasian Affairs and the U.S. embassies in countries of concern should engage in ongoing dialogue with ruling political forces. This engagement should prioritize messages that the U.S. does not support democratic rollbacks, infringements on human rights, censoring of independent media, universities and NGOs, and the hindering of judicial independence and efficacy.

- **Advance institutional channels.** Nearly all European countries are members of the Council of Europe (CoE) and the Organization for Security and Co-operation in Europe (OSCE). The OSCE contains an Office of Democratic Institutions and Human Rights (ODIHR) and CoE members are subject to the European Court of Human Rights and European Commission for Democracy through Law (Venice Commission). The Court of Justice of the European Union (CJEU) has been an important institution for EU member states. While support from these institutions can only go so far (given weak enforcement mechanisms based on member government compliance), they do produce rulings and reports that create a record and that can deter misbehavior by governments that fear reputational damage.

Foreign governments and international institutions have historically played critical roles in advancing democratic movements in Europe by placing pressure on governments and supporting pro-democracy actors. Efforts include orchestrating sanctions, providing press coverage, creating economic and trade incentives for change, and issuing statements of condemnation at multilateral fora. The United States in particular, as a leading economic and democratic power, has tremendous leverage in applying carrots and sticks in pursuit of democratic outcomes in the region.

At the end of the Cold War and throughout the 1990s, the United States lent support to consolidating democratic governance in countries across Central and Eastern Europe. Today, this support is once again of critical importance. During a time of heightened illiberal and authoritarian-leaning trends in Europe, it remains a key U.S. interest to bolster democracy at home and abroad. Scholars, however, point out that this interest should be qualified by the Hippocratic responsibility to first do no harm.[332] The United States has a long track record of both working with authoritarian governments to advance national interests and attempting democratic advancements that result in unintended consequences. This does not mean that Washington has not and will not continue to learn valuable lessons from past efforts, moving forward with humility and better informed of best practices.

> **During a time of heightened illiberal and authoritarian-leaning trends in Europe, it remains a key U.S. interest to bolster democracy at home and abroad.**

European institutions have also historically been a powerful impetus behind advancing democracy in the region.[333] Today, the European Union, as a supranational quasi-government aiming for "ever closer union among the peoples of Europe" since the Maastricht Treaty created it from predecessor organizations in 1992, has the broadest toolkit to advance democratic institutions in prospective member states, and to a lesser degree in member states.[334] These criteria incentivized post-communist countries like Poland and Hungary seeking admission to democratize their domestic institutions.[335]

## A. STRENGTHENING PRE-ACCESSION EU TOOLS

Today, the EU's pre-accession requirements remains one of the EUs most important tools of leverage to strengthen democracy and rule of law in a country, although they have faded as an incentive for European countries in recent years. In the accession process, candidate countries have to adopt a large body of EU law over a number of years; engage in technical negotiations with the European Commission to open and close 35 chapters of the *acquis communautaire*, including on the judiciary and fundamental rights; and face scrutiny and detailed public reports by the Commission until they meet the Copenhagen Criteria.[336]

Slovakia was a notable success story. The illiberal populist prime minister, Vladimir Mečiar, had run the country from before independence in 1993; he was ousted in a general election in 1998 (although his party finished first in that and the subsequent election) amid U.S. and

EU pressure for the Slovak government "to alter its policies and redress past violations as a condition for NATO and EU membership."[337] Kevin Deegan-Krause notes that the Euro-Atlantic organizations' demand for respect for institutional accountability was a disincentive for Mečiar's government, which had built power by dismantling restraints. Public opinion in favor of European integration—and the ballot box—led to Mečiar's loss of power.

Deegan-Krause's point is also relevant for Turkey and the Western Balkan countries. Elites in these countries can benefit from a close relationship with the EU, but fully meeting the Copenhagen Criteria requires more reform, rule of law, and accountability than many are comfortable with. Bulgaria and Romania, which joined in 2007, three years after the "big bang" enlargement of other post-communist member states, are also widely perceived as having been given entry before they truly met criteria. They have been subject to additional monitoring and remain outside the Schengen borderless area.

## B. LEVERAGING POST-ACCESSION EU TOOLS

The European Union is more limited in its ability to impose costs on member states that are infringing on democratic institutions and the rule of law at home. On the extreme end of the spectrum, the EU maintains the power under Article 7 of the Treaty on European Union, passed in 1999, to suspend certain rights from a member state if it is identified by the European Council as breaching the EU's founding values of human rights, democracy, and the rule of law. The activation of Article 7 was debated when Austria's far-right Freedom Party was included in a coalition government in 2000 and mentioned when the French government expelled thousands of Roma in 2009 as well as during a power struggle between President Traian Băsescu and Prime Minister Victor Ponta in Romania in 2012.[338]

However, ongoing examples of democratic backsliding in Poland and Hungary highlight the limitations of Article 7 and other EU institutional responses. In 2015, after eight years of domination of Polish politics by Civic Platform, a center-right party well-regarded in Brussels (its leader Donald Tusk was elected president of the European Council the year prior), the Law and Justice Party (PiS) won the Polish presidency and a narrow parliamentary majority.[339] Joanna Fomina and Jacek Kucharczyk write, "Since then, the PiS government has sought to impose its will in a ruthlessly majoritarian fashion, taking on the high court, the prosecutor's office, the public media, and the civil service in a campaign meant to dismantle existing checks and balances while leaving the opposition and the general public little say."[340] Jarosław Kaczyński, the party's leader, was thwarted on policy by the country's Constitutional Tribunal a decade prior as prime minister and immediately targeted it when PiS returned to power. The government amended the law regulating the Tribunal and has refused to recognize its rulings.[341]

After only two months of PiS rule, the EU activated its new "pre-Article 7" procedure for Poland, a "framework to safeguard the rule of law in the European Union" adopted by the European Commission in March 2014.[342] In December 2017, in the face of Warsaw's intransigence, the Commission moved to the "nuclear option" of invoking Article 7 itself.[343] While this was

an important step, the outcome is not yet clear, since a suspension of voting rights would require unanimity among other member states and many expect Hungary would veto the punishment of Poland.

Returning to power in Hungary in 2010 with a legislative supermajority, Prime Minister Viktor Orbán's party *Fidesz* was able to write and implement a new constitution without opposition input and take legislative action to threaten the independence of the judiciary and the media. The European Commission frequently expressed legal concerns and demanded changes via its infringement process. Around the same time, the European Commission referred Hungary to the European Court of Justice over its Higher Education Law,[344] amended in April 2017 in what was broadly seen as an attack on Central European University, an American institution in Budapest founded by financier and "open society" champion George Soros. In September 2018, the European Parliament triggered Article 7 against Hungary. Broadly speaking, Budapest has not ignored Brussels but has made largely cosmetic adjustments.[345] The potential effective-ness of this step has also been blunted by European party politics, as the European People's Party (EPP), of which Orbán's Fidesz is a member, has helped shield Orbán from political recourse and is an obstacle to effective democracy protection in the EU.

> **European states are subject to a uniquely dense web of regional institutions that aim to support democracy with free and fair elections, rule of law, freedom of the press, and human rights.**

A more successful example of the EU helping to check democratic back-sliding was in the case of Romania in 2012, when Victor Ponta of the center-left Social Democratic Party took power as prime minister and impeached center-right president, Traian Băsescu, removing constitu-tional checks on the impeachment procedure to ease the task. Issue linkage increased Brussels' leverage in Romania. The country remains outside the Schengen Area and with Bulgaria is subject to post-accession monitoring via the EU's Mechanism for Cooperation and Verification, instituted in 2006 shortly before their accession to assess progress against corruption, organized crime, and judicial reform.[346] Ponta complied with Commission and Council demands, including reinstating a 50-percent turnout requirement to validate the referendum to confirm the impeachment. This was a miscalculation by Ponta;[347] the opposition opted for a strategy of boycotting the referendum that then failed to meet the 50-percent requirement.

Another promising example is the success that Polish courts have found in protecting the independence of the judiciary by referring cases to the CJEU concerning their independence and status, relying on EU law and the understanding that Polish courts are European courts. For example, Polish legislation that would have lowered the retirement age of judges of the Supreme Court was brought before the CJEU in 2018 and found to be contrary to EU law.[348]

The EU should also adopt rule of law conditionality for member states to receive struc-tural funds. Conditionality should be imposed fairly across the EU, including in long-tenured member states as well as those that joined in the 2004 and subsequent enlargements. An alternative way to structure such measures to protect rule of law via the EU budget would be



*NATO Secretary-General Jens Stoltenberg gives a news conference in Brussels, Belgium.*

to link overall levels of EU funds provided to a member state to a rule of law index, whereby states that score higher on the index have greater access to funds. This would employ an incentive process rather than a punitive approach.[349] The definitions and measurements of such a rule of law index could be established according to rulings of the European Court of Human Rights and with reference to the opinions of the Council of Europe's Venice Commission that has already conducted reviews of numerous problematic policies in Hungary and Poland.[350]

## C. ADVANCING INSTITUTIONAL APPROACHES

European states are subject to a uniquely dense web of regional institutions that aim to support democracy with free and fair elections, rule of law, freedom of the press, and human rights, including the Council of Europe (CoE), the European Court of Human Rights, the European Commission for Democracy through Law (Venice Commission), and the Organization for Security and Co-operation in Europe (OSCE). These institutions produce reports and rulings that deter mis-behavior by governments that fear reputational damage, but they lack strong enforcement mechanisms.[351] This dynamic is evident in the fact that the OSCE includes governments long considered to be more authoritarian than that of Turkey, including Azerbaijan, Belarus, Kazakhstan (which has held the chairmanship of the organization),[352] Kyrgyzstan, Russia, Tajikistan, Turkmenistan, and Uzbekistan.[353] Additionally, Azerbaijan and Russia are also part of the Council of Europe despite their shaky democratic records.[354]

Nearly all European countries are members of the CoE and the OSCE. The OSCE contains an Office for Democratic Institutions and Human Rights (ODIHR) that deals with the "human dimension" of security; conducts election monitoring; and works to strengthen democratic governance, human rights, tolerance, and non-discrimination.[355] CoE members are subject to the European Court of Human Rights[356] and the Venice Commission.[357] Despite their weak enforcement mechanisms, these institutions can still work in a deterrent capacity, urging member states to heed rulings out of concern for the blow they would suffer to their positional influence in the organization if they did not.

## D. BOLSTERING U.S. DIPLOMATIC AND ECONOMIC TOOLS

In the contemporary cases of democratic backsliding in Europe, the United States has a mixed record of advancing democratic reforms. The Obama administration spoke out against Hungary's[358] backsliding, and in 2014, the State Department banned six Hungarian officials from entering the United States on suspicion of corruption.[359] Poland was a sharper challenge as a larger country more central to U.S. security and defense strategy in Europe and the host of NATO's 2016 Warsaw summit. Obama gently expressed concerns about Warsaw's actions against the rule of law and the need to work to "sustain Poland's democratic institutions" in public remarks with President Andrzej Duda; Polish public television mistranslated Obama to remove the criticism.[360]

The Trump administration's positions on illiberal governments have been less consistent and at times enabling for regressing regimes. While President Obama's speech on Warsaw's Castle Square in 2014 stressed democracy, this theme was conspicuously deemphasized from President Trump's speech there three years later in favor of Western civilization.[361] In background remarks ahead of then Secretary Tillerson's travel to Poland in January 2018, a senior State Department official stated: "Poland is one of Europe's oldest democracies. Democracy is alive and well there. We leave questions of internal policy to the Poles and trust that any reforms that they're looking at are consistent with their constitution and the will of their people."[362] However, on-the-record statements by then-Department spokeswoman Heather Nauert were more critical.[363] While Hungary was initially disappointed by a lack of attention from Trump—whom Orbán had endorsed as a like-minded leader—Trump received Orbán in the White House in May 2019 providing an endorsing effect in the run-up to the 2019 European Parliamentary Elections.[364] Congress has remained more critical, particularly over the Higher Education Law, which targeted an American university, but the Trump administration's policy of engagement is lending credibility to the ruling governments in Hungary and Poland.[365] Moreover, the steady erosion of diplomatic capabilities within the U.S. Government and the deprioritization of democracy and governance programming is clearly hurting U.S. efforts. So too are President Trump's attacks on the media, judges, political opposition, and blatant use of racist rhetoric.

However, the United States still has important economic and diplomatic tools at its disposal to advance democratic progress, if it has the political will. In terms of incentives, the U.S., along with other foreign governments, can leverage trade relations and potential economic "carrots" including visa liberalization and customs union dialogues to encourage democratic reforms. The inclusion of Poland in the U.S. Visa Waiver Program (a long-running sore point in the relationship as Poland is one of few EU and NATO members not included) could be used to incentivize rule of law improvements, for example.[366]

Among punitive measures, tracking corruption and issuing targeted sanctions is one effective tool. Foreign governments should coordinate with intelligence and diplomatic efforts to call out governments on illicit practices and identify, seize, and track ill-gotten wealth. Additional options include asset freezes and restrictions on the ability of corrupt or illiberal elites to travel, purchase luxury goods, and send their children to private schools overseas. Travel bans should include spouses, families, and supporters of regime elites.[367]

Sanctions, when applied appropriately, can be an effective tool. In current circumstances, one option would be to expand sanctions under the Global Magnitsky Act against specific corrupt actors in Turkey, Hungary, and possibly Poland to communicate that corruption is a transgression that Washington takes seriously. The sanctions should not be removed on political grounds.[368] The private sector can also be effective in opening space for democracy, and global financial institutions cutting off credit can drive a wedge between authoritarian governments and economic elites. It is important to note, however, that unilateral sanctions or blanket sanctions that punish entire sections of a society tend to be less effective, allowing regimes to project themselves as defenders of the people against outside punishment.

**Foreign governments should coordinate with intelligence and diplomatic efforts to call out governments on illicit practices and identify, seize, and track ill-gotten wealth.**

In addition, transatlantic governments could consider imposing targeted sanctions against foreign officials, or officially sponsored, purveyors of disinformation. In 2018, the U.S. administration provided for sanctions against individuals and entities involved in operations to interfere in the U.S. elections. This included individuals and companies that were part of the so-called "troll farm" in St. Petersburg that produced and distributed disinformation during the 2016 presidential elections. The United States should work in coordination with democratic allies to expose disinformation operations by foreign governments and sanction the entities involved in such operations.[369]

Finally, the U.S. government has the power to raise attention among domestic and international audiences of transgressions against democracy and the rule of law. Congress, especially the Senate Foreign Relations Committee and the House Foreign Affairs Committee, should hold regular hearings on the state of democracy in Central and Eastern Europe. The purpose of such hearings should be to raise awareness of the economic, political, and defense concerns posed by illiberal regimes to U.S. national security interests in Europe, and to press the executive branch on its policies for countering democratic decline in these countries.[370] The U.S. Helsinki Commission—an independent government agency set up by Congress to monitor European and Eurasian respect for human rights and fundamental freedoms—is another channel to voice concerns. As money reflects priorities, it is also critical that appropriations committees work to maintain or increase foreign assistance.

## E. BETTER UTILIZING NATO PLATFORMS

NATO is another transatlantic venue that should be better utilized in responding to democratic backsliding. While NATO as a military organization is not and should not be a leading actor in addressing democracy challenges, it is an institution comprised of member states that have committed to "strengthening their free institutions"[371] and should therefore stand by those principles whenever possible. Member states, foremost among them Turkey, Hungary, and Poland, are experiencing democratic backsliding that is hurting, particularly in the case of Turkey, alliance trust and interoperability. Democracy, individual liberty, and the rule of law are founding principles of NATO. Democratic backsliding and corruption within member states not only go against these principles, but also pose threats to shared security, and provide more vulnerabilities for Russia and other adversaries to exploit. Allies therefore have a responsibility to push back on such political developments.

Possible steps include creating a commission or special ombudsman's office within NATO that would be responsible for identifying violations of alliance principles. A more stringent step would be revising NATO's consensus voting rule in favor of a procedure that requires a qualified majority of states to agree in order to pass a proposal. This would prevent a bloc of illiberal states within NATO from shielding one another from attempts by other member states to use NATO mechanisms to apply pressure for anti-democratic practices. At a minimum, NATO should continue to bolster its communiqué language regarding the importance of democracy to the strength of the alliance and should not hold summits or meetings in countries that have seen significant regression on rule of law.

---

### SECTION 2.4 KEY RESOURCES:

- Burrows, Matthew J. and Maria J. Stephan, *Bolstering Democracy: Lessons Learned and the Path Forward.* Washington: The Atlantic Council, 2017.

- Polyakova, Alina et al. *The Anatomy of Illiberal States.* Washington, DC: The Brookings Institution, 2019. https://www.brookings.edu/research/the-anatomy-of-illiberal-states.

*European Union leaders attend a roundtable meeting at the European Union leaders summit in Brussels, Belgium.*



# 5. Conclusion of section 2

This section examined the role foreign partners can play in supporting domestic pro-democracy actors. We identify four best practices of engagement for national governments and institutions, individual government officials, donor partners, and international institutions: (1) partnering with domestic civil society and non-governmental organizations; (2) supporting nonviolent movements; (3) fighting disinformation campaigns; and (4) providing institutional support. Throughout, we advocate for an indirect approach to democracy support that prioritizes empowering domestic actors.



# Conclusion

*A map of European countries is pictured during the election campaign of Arne Lietz, candidate of the Social Democratic Party (SPD) for the upcoming European Parliament elections.*

The battle for democracy is a long game, one that has been contested for centuries. The word itself (from demos, "common people" and kratos, "strength") provides us the starting point for a playbook that aims to equip diverse groups and individuals with strategies and tactics to strengthen democratic resilience, reverse regression, and fend off authoritarian resurgence.

In his initial address to the nation as the first post-communist president of Czechoslovakia, Václav Havel captured the essence of why democracy is a participatory game, one with responsibilities for a broad array of stakeholders: "the best government in the world, the best parliament and the best president, cannot achieve much on their own. And it would be wrong to expect a general remedy from them alone. Freedom and democracy include participation and therefore responsibility from us all."[372]

We opened with a call for democratic actors to see this competition between democracy and illiberalism as an urgent and unrelenting challenge, but a winnable one. To restore and strengthen democracy's vibrancy and resiliency, democratic actors must be prepared to compete more effectively with would be authoritarians by demonstrating that democracies best meet the needs of their citizens. *The Democracy Playbook* distills strategic insights, drawn from social science research and case

**To restore and strengthen democracy's vibrancy and resiliency, democratic actors must be prepared to compete more effectively with would be authoritarians by demonstrating that democracies best meet the needs of their citizens.**

studies on the United States and Europe, and provides a broad set of methods and tactics that can help democratic actors outmaneuver illiberal forces and strengthen the pillars of liberal democracy.

This playbook was divided into two main sections. The first focused on assessing the challenges and proposing a set of strategies for the direct "players," four major domestic actors with the capacity to promote democracy within their own nations: the incumbent political establishment; the political opposition; civil society and independent media; and private enterprise. Mere capacity for action is insufficient. It is the strength and willingness of the people to wield their power to hold leaders accountable and exercise all existing rights that can make a difference. We argued that fighting for democracy is a worthy goal, and that not all strategies are created equal; some are generally more effective than others.

Democratic nations of course exist in a contested global environment. To oversimplify the challenge: we now have a global field of competition that pits the community of democratic states against the opposing illiberal model pushed by powerful states such as Russia and China. External support from pro-democracy actors is thus critical, but must be complementary to internal democratic reform. In section 2 we provide a set of strategies and best practices for external actors to support pro-democracy actors on the ground. Lines of effort include: empowering and partnering with domestic organizations; assisting nonviolent and civil resistance movements; countering disinformation; leveraging institutional and official diplomatic and economic tools in order to incentivize democratic reforms; exposing the fraudulent and corrupt tactics of authoritarians; and, enhancing the capacity and training of pro-democracy actors.

> **Mere capacity for action is insufficient. It is the strength and willingness of the people to wield their power to hold leaders accountable and exercise all existing rights that can make a difference.**

Because there are varying amounts of free space to operate in backsliding democracies, cross-cutting imperatives for both domestic and external actors should be proactive, define clear goals, and begin to map out the "plays" as early as possible. Ultimately, greater success will come from the concerted and interconnected efforts of diverse actors to push back on illiberal activity before it becomes entrenched.

Appearances matter to authoritarians. They seek to operate under a veneer of legality, perverting their own justice system in incremental and underhanded ways. Similarly, they seek to erode the credibility and capacity of international institutions to act as a bulwark against domestic backsliding. Defending the rule of law is fundamental and should be a first line of defense.

A shared reality for domestic and international actors is that technology has forever changed the game of democracy. Elections are now increasingly complex and vulnerable to manipulation—and the threats shift faster than we can identify them. We are only able to scratch the surface of this topic; it merits its own playbook, ongoing research, and a far greater dedication

of resources. But, in order to trust elections and their outcomes, they first and foremost must be protected from interference. Technology enables incredible advances in democracy and can improve its efficiency, but an ongoing challenge will be to protect the pillars of democracy from internal and external manipulation. Technology is not a stand-alone component; it is the connective tissue that can inform, connect, and mobilize voters. It can also misinform, alienate, and undermine trust in democracy. Managing this tension and understanding how to harness social media and technology to defend democracy will be part of the battlefield for generations.

Another important area that deserves its own playbook—and has been a recurrent theme for this report—is the issue of messaging; speaking to citizens in a way that earns their trust, understands emotional needs, makes an evidence-based case for the benefits of democracy, exposes the dangerous encroachments of authoritarians, and makes people feel respected. Illiberals have been successful at using technology to better effect, channeling outrage and stoking fear—in part because social media is designed to reward those messaging tactics. Merely to blame social media is lazy—pro-democracy actors need to be self-critical, understand where they have not delivered, and how they can do better. It may be that the liberal actors have a more difficult challenge because long-term success depends on taking the high road by being truthful and inclusive in their messaging. But to resort to the toolkit of the illiberals will only undermine pro-democracy efforts in the long run.

As we crafted this report, we consulted with leading experts in countries where democracy is being threatened, and where there is an urgent need for dynamic strategies to resist the illiberal toolkit. We unpacked strategies employed by domestic and international actors and sought to discern when and where they might work best. Democracy is not perfect, but it is the only political system that can legitimately hold governments accountable and, in turn, provide a more peaceful and prosperous world. Moreover, people are at the heart of democratic improvement. When it comes to defending democracies, each person matters, as do the strategic decisions they make. Let each of us take our turn—the stakes have seldom been higher.

# Endnotes

1   The Varieties of Democracy Institute (V-Dem) defines "autocratization" as any substantial and significant worsening on the scale of liberal democracy. This umbrella term covers both erosion in democratic countries (democratic backsliding), breakdown of democracy, and worsening of conditions in electoral authoritarian countries. See Anna Lührmann et al., *Democracy Facing Global Challenges. V-Dem Annual Democracy Report 2019* (Gothenburg: V-Dem, May 2019), https://www.v-dem.net/media/filer_public/99/de/99dedd73-f8bc-484c-8b91-44ba601b6e6b/v-dem_democracy_report_2019.pdf.

2   Freedom House, *Freedom in the World 2019* (Washington, DC: Freedom House, 2019), 4, https://freedomhouse.org/sites/default/files/Feb2019_FH_FITW_2019_Report_ForWeb-compressed.pdf.

3   Larry Diamond, "The Global Crisis of Democracy," *Wall Street Journal*, May 17, 2019, https://www.wsj.com/articles/the-global-crisis-of-democracy-11558105463.

4   Lührmann et al., *Democracy Facing Global Challenges*.

5   There is a robust debate among scholars over the extent and severity of the global democratic recession. The current wave of autocratization is occurring within a relatively democratic era. More than half of all countries in the world are considered democratic, and democratic progress across parts of Asia and Africa means that globally, more people now live in democracies than at any point in history. For a useful overview of this debate, see Anna Lührmann and Staffan I. Lindberg, "A Third Wave of Autocratization is Here: What is New About it?" *Democratization* 26, no. 7 (2019): 1096–1098.

6   Lührmann and Lindberg, "A Third Wave of Autocratization is Here."

7   Ibid.

8   Alina Polyakova, Torrey Taussig, Ted Reinert, Kemal Kirişci, Amanda Sloat, Melissa Hooper, Norman Eisen, and Andrew Kenealy, *The Anatomy of Illiberal States: Assessing and Responding to Democratic Decline in Turkey and Central Europe*, (Washington, DC: The Brookings Institution, February 2019), https://www.brookings.edu/wp-content/uploads/2019/02/illiberal-states-web.pdf.

9   Jon Stone, "Spain Elections: Right-Wing Populists and Eurosceptics Now Represented in 23 out of 28 EU Member States," *Independent*, April 29, 2019, https://www.independent.co.uk/news/world/europe/spain-elections-far-right-party-eu-member-states-vox-parliament-a8891706.html.

10  For an assessment of the importance of contextual factors, see J. Preston Whitt et al., "Leveraging Transparency, Accountability, and Participation to Build Effective Anti-Corruption Strategies in the Natural Resource Space," (Washington, DC: The Brookings Institution, *forthcoming*).

11  See, e.g., Andrea Kendall-Taylor and Alina Polyakova, "Populism and the Coming Era of Political Paralysis in Europe," *Washington Post*, May 24, 2019, https://www.washingtonpost.com/opinions/2019/05/24/populism-coming-era-political-paralysis-europe.

12  See, e.g., Charles Tilly and Sidney Tarrow, *Contentious Politics*, 2nd ed. (Oxford: Oxford University Press, 2015).

13  For scholarship on the importance of structural variables (and, in particular, authoritarian strength) in explaining regime type see, e.g., Steven Levitsky and Lucan Way, *Competitive Authoritarianism: Hybrid Regimes After the Cold War* (New York: Cambridge University Press, 2010).

14   Christopher Carothers, "The Surprising Instability of Competitive Authoritarianism," *Journal of Democracy* 29, no. 4 (October 2018): 129–135.

15   On the importance of incumbent political elites' decisions, see, e.g., Steven Levitsky and Daniel Ziblatt, *How Democracies Die* (New York: Crown, 2018), and Scott Mainwaring and Aníbal Pérez-Liñan, *Democracies and Dictatorship in Latin America: Emergence, Survival, and Fall* (New York: Cambridge University Press, 2013); on political opposition see, e.g., Valerie Bunce and Sharon Wolchik, *Defeating Authoritarian Leaders in Postcommunist Countries* (New York: Cambridge University Press, 2011), and Laura Gamboa, "Opposition at the Margins: Strategies against the Erosion of Democracy in Colombia and Venezuela," *Comparative Politics* 49, no. 4 (July 2017): 457–477; on civil society and civil resistance, see, e.g., Stephen Haggard and Robert Kaufman, *Dictators and Democrats: Masses, Elites, and Regime Change* (Princeton: Princeton University Press, 2016); Marshall Ganz, *Why David Sometimes Wins: Leadership, Organization, and Strategy in the California Farm Worker Movement* (New York: Oxford University Press, 2009), and Erica Chenoweth and Maria Stephan, *Why Civil Resistance Works: The Strategic Logic of Nonviolent Conflict* (New York: Columbia University Press, 2011); and on the average citizen see, e.g., Timothy Snyder, *On Tyranny: Twenty Lessons from the Twentieth Century* (New York: Crown, 2017). There is also evolving literature describing the structural causes of democratic backsliding. See, e.g., David Andersen, "Comparative Democratization and Democratic Backsliding: The Case for a Historical-Institutional Approach," *Comparative Politics* 51, no. 4 (2019): 645–663. However, the solutions to these structural determinants are debatable and beyond the more immediate and actionable focus of this playbook.

16   Larry Diamond, *In Search of Democracy* (New York: Routledge, 2016), 3.

17   Consider voter suppression policies in the United States, such as heightened voter-ID requirements, automatic voter roll purging, and frequent changes to polling locations that all disproportionately affect people of color and students. These policies tend to disfavor one of the major political parties over the other.

18   Andrew Kenealy, Norman Eisen, and Darrell West, "A Perilous Election Looms," *The Brookings Institution*, October 22, 2018, https://www.brookings.edu/blog/fixgov/2018/10/22/a-perilous-election-looms.

19   Michael Birnbaum and Craig Timberg, "E.U.: Russians Interfered in Our Elections, Too," *Washington Post*, June 14, 2019, https://www.washingtonpost.com/technology/2019/06/14/eu-russians-interfered-our-elections-too.

20   Kenealy, Eisen, and West, "A Perilous Election."

21   Alina Polyakova and Spencer P. Boyer, *The Future of Political Warfare: Russia, the West, and the Coming Age of Global Digital Competition* (Washington, DC: The Brookings Institution, 2018), https://www.brookings.edu/wp-content/uploads/2018/03/fp_20180316_future_political_warfare.pdf.

22   E.g., Kedron Bardwell, "Campaign Finance Laws and the Competition for Spending in Gubernatorial Elections," *Social Science Quarterly* 84, no. 4 (2003): 811–825; Kihong Eom and Donald A. Gross, "Contribution Limits and Disparity in Contributions Between Gubernatorial Candidates," *Political Research Quarterly* 59, no. 1 (2006): 99–110; Donald Gross and Robert K. Goidel, "The Impact of State Campaign Finance Laws," *State Politics & Policy Quarterly* 1, no. 2 (2001): 180–195; Robert E. Hogan, "The Costs of Representation in State Legislatures: Explaining Variations in Campaign Spending," *Social Science Quarterly* 81, no. 5 (2000): 941–956; and Patrick Flavin, "Campaign Finance Laws, Policy Outcomes, and Political Equality in the American States," *Political Research Quarterly* 68, no. 1 (2015): 77–88.

23    Levitsky and Ziblatt, *How Democracies Die*, 48–49. For instance, at the Democratic National Convention of 1968, Hubert Humphrey won the presidential nomination despite not participating in any primaries, due to the preference and power of party insiders. Humphrey's controversial nomination led to protests outside the convention, and his presidential loss led to reforms for a more democratic nomination system.

24    Frances McCall Rosenbluth and Ian Shapiro, *Responsible Parties: Saving Democracy from Itself* (New Haven, CT: Yale University Press, 2018), 123-124; Bruce Bueno de Mesquita and Alastair Smith, *The Dictator's Handbook: Why Bad Behavior is Almost Always Good Politics* (New York: Public Affairs, 2011), 66.

25    Fabio Wolkenstein, "Deliberative Democracy Within Parties" (PhD diss., London School of Economics and Political Science, 2016), 3.

26    Levitsky and Ziblatt, *How Democracies Die*, 106–117.

27    Ibid., 106–111.

28    Robert Axelrod, *The Evolution of Cooperation* (New York: Basic Books, 2006).

29    Levitsky and Ziblatt, *How Democracies Die*, 112–113.

30    Mark Tushnet, "Constitutional Hardball," *The John Marshall Law Review* 37 (2004): 523–553.

31    Levitsky and Ziblatt, *How Democracies Die*, 109–111. In jurisdictions where constitutionally permissible, further legal mechanisms may be used to respond to extreme behavior by sanctioning or disqualifying candidates or parties from elections without deeming them illegal or unconstitutional. Such sanctions can be used to allow illiberal political parties to continue operating while still limiting their political participation. The specifics of these mechanisms vary depending on the context, but can be effective given an enabling environment. See Svetlana Tylkina, *Militant Democracy: Undemocratic Political Parties and Beyond* (New York: Routledge, 2015).

32    Hana de Goeij and Marc Santora, "In the Largest Protests in Decades, Czechs Demand Resignation of Prime Minister," *New York Times*, June 23, 2019, https://www.nytimes.com/2019/06/23/world/europe/czech-republic-protests-andrej-babis.html.

33    Polyakova et al., *The Anatomy of Illiberal States*.

34    Levitsky and Ziblatt, *How Democracies Die*, 102.

35    Ibid., 104.

36    Much scholarship has focused on the "inclusion-moderation" thesis, which holds that inclusion in political processes can serve to moderate radical or extremist groups. Recent work, particularly in the wake of the Arab Spring, suggests that this approach depends on contextual factors, and there is little consensus regarding which strategies are effective. This subject requires further study before best practices are articulated. See, e.g., Jillian Schwedler, "Can Islamists Become Moderates? Rethinking the Inclusion-Moderation Nexus," *World Politics* 63, no. 2 (April 2011): 347–376.

37    Levitsky and Ziblatt, *How Democracies Die*, 11–32. We acknowledge that there are exceptions to this rule, such as the populist Progress Party's place in the coalition government in Norway. We nevertheless offer the following typology for identifying prospective authoritarians as a guide for when and how to exclude extremist leaders.

38    Elisabeth Zerofsky, "Viktor Orbán's Far Right Vision for Europe," *The New Yorker* online, January 14, 2019, https://www.newyorker.com/magazine/2019/01/14/viktor-orbans-far-right-vision-for-europe.

39    James Kirchick, "Hungary," in Polyakova et al., *The Anatomy of Illiberal States*, 13–15.

40    Juan Linz, *The Breakdown of Democratic Regimes: Crisis, Breakdown, and Reequilibration* (Baltimore: Johns Hopkins University Press, 1978).

41    Levitsky and Ziblatt, *How Democracies Die*, 23–24.

42    Ibid., 24–26.

43    Political parties and leaders also have a responsibility to educate their constituencies and the electorate about the dangers of authoritarianism and flag the early indicators of authoritarian-leaning politicians. Their efforts should further be complemented by a public education campaign conducted by civil society. Cf. Richard D. Kahlenberg and Clifford Janey, "Putting Democracy Back in Public Education," *The Century Foundation*, November 16, 2016, https://tcf.org/content/report/putting-democracy-back-public-education/?session=1.

44    Zack Beauchamp, "Macron vs. Le Pen: The French Presidential Election, Explained," *Vox*, May 6, 2017, https://www.vox.com/world/2017/5/5/15543294/french-election-macron-le-pen.

45    Cristóbal Rovira Kaltwasser and Paul Taggart, "Dealing with Populists in Government: A Framework for Analysis," *Democratization* 23, no. 2 (2016): 201–220.

46    Christopher M. Larkins, "Judicial Independence and Democratization: A Theoretical and Conceptual Analysis," *The American Journal of Comparative Law* 44, no. 4 (Autumn 1996): 605–626.

47    Richard Stacey and Sujit Choudhry, "International Standards for the Independence of the Judiciary," *The Center for Constitutional Transitions at NYU Law and Democracy Reporting International Briefing Papers,* September 2013, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3025990.

48    Kim Lane Scheppele, "The Rule of Law and the Frankenstate: Why Governance Checklists Do Not Work," *Governance* 26, no. 4 (2013): 559–562.

49    Kim Lane Scheppele, "Autocratic Legalism," *The University of Chicago Law Review* 85, no. 2 (2018): 545–583.

50    Geoffrey Vos, "Protecting the Independence of Individual Judges and Ensuring their Impartiality," *Strengthening Judicial Independence and Impartiality as a Pre-Condition for the Rule of Law in Council of Europe Member States: Opening and Concluding Remarks, Key Speeches and General Rapporteur's Report*, April 21-22, 2016, 27, https://rm.coe.int/proceedings-of-the-conference-on-strengthening-judicial-independence-s/16808b64d4, 27.

51    Ibid.

52    Bojan Bugarič and Tom Ginsburg, "The Assault on Postcommunist Courts," *Journal of Democracy* 27, no. 3 (2016): 74.

53    "Justice Purged: Poland Politicizes its Judiciary," *Human Rights First,* June 2018, https://www.humanrightsfirst.org/resource/justice-purged-poland-politicizes-its-judiciary.

54    Bugarič and Ginsburg, "The Assault on Postcommunist Courts," 73.

55    Ibid.

56    "Justice Purged: Poland Politicizes its Judiciary," 2; Bertelsmann Stiftung, *BTI 2016: Poland Country Report* (Gütersloh: Bertelsmann Stiftung, 2016), 8, https://www.bti-project.org/fileadmin/files/BTI/Downloads/Reports/2016/pdf/BTI_2016_Poland.pdf.

57  Hungary is another place where the judiciary faces attacks on independence. The Fidesz party has "drastically revised the Hungarian constitutional and political order by systematically dismantling checks and balances" (Bugarič and Ginsburg, "The Assault on Postcommunist Courts," 73). The revisions have systematically targeted institutional independence and turned the judiciary into a political tool. From 2010 to 2015, for example, Prime Minister Viktor Orbán and his administration pushed to change nomination rules, restricted jurisdiction over fiscal matters, filled the court with hand-picked loyalists, and passed an amendment to prevent judges from invoking past precedents in new cases (Ibid.). More recently, Orbán's government created a separate administrative court to handle cases touching on elections, asylum, right to assembly, and police violence (Lydia Gall, "Hungary's Latest Assault on the Judiciary," *Human Rights Watch*, December 14, 2018, https://www.hrw.org/news/2018/12/14/hungarys-latest-assault-judiciary). The Minister of Justice will control hiring and promotion of judges on the new court "without any effective judicial oversight." Critics of the law have warned of its "enormous potential to control the workings of judges and the courts" (Ibid.).

58  "Council of Europe Plan of Action on Strengthening Judicial Independence and Impartiality," *Council of Europe*, April 13, 2016, https://rm.coe.int/1680700125.

59  Ibid., 19–24.

60  E.g., Catharina Lindstedt and Daniel Naurin, "Transparency is Not Enough: Making Transparency Effective in Reducing Corruption," *International Political Science Review* 31, no. 3 (June 2010): 301–322.

61  Stephen Grimmelikhuisjen and Albert Klijn, "The Effects of Judicial Transparency on Public Trust: Evidence from a Field Experiment," *Public Administration* 93, no. 4 (2015): 995–1011.

62  Daniel Chen, Tobias J. Moskowitz, and Kelly Shue, "Decision-Making Under the Gambler's Fallacy: Evidence from Asylum Judges, Loan Officers, and Baseball Umpires," *National Bureau of Economic Research*, February 2016, https://www.nber.org/papers/w22026; Matt Dunn, Levent Sagun, Hale Sirin, and Daniel Chen, "Early Predictability of Asylum Court Decisions," *Proceedings of the 16th Edition of the International Conference on Artificial Intelligence and Law*, June 2017, https://dl.acm.org/citation.cfm?id=3086537.

63  Polyakova et al., *The Anatomy of Illiberal States.*

64  On the importance of political parties in Europe to democratization, see Giovanni Capoccia and Daniel Ziblatt, "The Historical Turn in Democratization Studies: A New Research Agenda for Europe and Beyond," *Comparative Political Studies* 43, no. 8–9 (August 2010): 931–968.

65  Bunce and Wolchik, *Defeating Authoritarian Leaders*. For an analysis of the two levels of competition between authoritarians and the pro-democratic political opposition, see Andreas Schedler, *The Politics of Uncertainty: Sustaining and Subverting Electoral Authoritarianism* (Oxford: Oxford University Press, 2013).

66  Marc Morjé Howard and Philip Roessler, "Liberalizing Electoral Outcomes in Competitive Authoritarian Regimes," *American Journal of Political Science* 50, no. 2 (April 2006): 365–381.

67  Bunce and Wolchik, *Defeating Authoritarian Leaders*, 215–246.

68  Ibid., 247–277.

69  Howard and Roessler, "Liberalizing Electoral Outcomes in Competitive Authoritarian Regimes."

70  Bunce and Wolchik, *Defeating Authoritarian Leaders*, 252.

71   Jennifer Gandhi and Ora John Reuter, "The Incentives for Pre-Electoral Coalitions in Non-Democratic Elections," *Democratization 20*, no. 1 (2013): 137–159.

72   Jan-Werner Müller, "Can Direct Democracy Defeat Populism?," *Project Syndicate*, September 18, 2019, https://www.project-syndicate.org/commentary/direct-democracy-weapon-against-populism-by-jan-werner-mueller-2019-09.

73   For more on how authoritarians tamper with elections, see Nic Cheeseman and Brian Klaas, *How to Rig an Election* (New Haven: Yale University Press, 2018).

74   Bunce and Wolchik, *Defeating Authoritarian Leaders*, 256.

75   Ibid., 46.

76   Erica Frantz, "Voter Turnout and Opposition Performance in Competitive Authoritarian Elections," *Electoral Studies* 54 (August 2018): 218, 225.

77   See, e.g., Jan-Werner Müller, "Populism and the People," *London Review of Books*, May 23, 2019, https://www.lrb.co.uk/v41/n10/jan-werner-muller/populism-and-the-people; and Luigi Zingales, "The Right Way to Resist Trump," *New York Times*, November 18, 2016, https://www.nytimes.com/2016/11/18/opinion/the-right-way-to-resist-trump.html.

78   Nathaniel Persily, "Can Democracy Survive the Internet?" *Journal of Democracy* 28, no. 2 (2017): 71–72.

79   Ibid., 72.

80   Ibid.

81   Jean-Baptiste Jeangène Vilmer, "The #Macron Leaks Operation," *Atlantic Council*, June 20, 2019, https://www.atlanticcouncil.org/in-depth-research-reports/report/the-macron-leaks-operation-a-post-mortem.

82   Bunce and Wolchik, *Defeating Authoritarian Leaders*, 257.

83   Ibid.

84   Carothers, "The Surprising Instability of Competitive Authoritarianism."

85   Ashlea Rundlett and Milan Svolik, "Deliver the Vote! Micromotives and Macrobehavior in Electoral Fraud," *American Political Science Review* 110, no. 1 (February 2016): 180–197.

86   Valentin Baryshnikov and Robert Coalson, "Numbers Don't Lie: Statistics Point to Massive Fraud in Russia's Duma Vote," *Radio Free Europe/Radio Liberty*, September 20, 2016, https://www.rferl.org/a/statistics-point-to-massive-fraud-russia-state-duma-elections/28002750.html; Kim Lane Scheppele, "Hungary and the End of Politics," *The Nation*, May 6, 2014, https://www.thenation.com/article/hungary-and-end-politics.

87   For more on these processes, see Polyakova et al., *The Anatomy of Illiberal States*.

88   This framework of political opposition strategies derives from Laura Gamboa, "Opposition at the Margins: Strategies against the Erosion of Democracy in Colombia and Venezuela," *Comparative Politics* 49, no. 4 (July 2017): 457–477.

89   Levitsky and Ziblatt, *How Democracies Die*, 215–220.

90   For more on these distinctions, see, e.g., Peter Fabienne, "Political Legitimacy," in *The Stanford Encyclopedia of Philosophy*, ed. Edward N. Zalta (Summer 2017 edition), https://plato.stanford.edu/entries/legitimacy/#FunPolLeg.

91   Christian von Soest and Julia Grauvogel, "Identity, Procedures, and their Performance: How Authoritarian Regimes Legitimize Their Rule," *Contemporary Politics* 23, no. 3 (May 2017): 287–305.

92   Scheppele, "The Rule of Law and the Frankenstate"; and Scheppele, "Autocratic Legalism."

93   While Gamboa (2017) categorizes protests as extra-institutional radical measures, we believe that the relationship between nonviolent resistance and democracy is strong, and so distinguish nonviolent resistance from such extreme extra-institutional measures as coups or guerilla warfare. See, e.g., Adrian Karatnycky and Peter Ackerman, *How Freedom is Won: From Civil Resistance to Durable Democracy* (Washington, DC: Freedom House, 2005), https://freedomhouse.org/sites/default/files/How%20Freedom%20is%20Won.pdf; Chenoweth and Stephan, *Why Civil Resistance Works*; Markus Bayer, Felix S. Bethke, and Daniel Lamback, "The Democratic Dividend of Nonviolent Resistance," *Journal of Peace Research* 53, no. 6 (2016): 758–771; and Felix S. Bethke and Jonathan Pinckney, "Non-Violent Resistance and the Quality of Democracy," *Conflict Management and Peace Science* (2019).

94   Henry Olsen, "Turkey's Elections in Istanbul Show that Democracy is Tough to Subvert," *Washington Post*, June 24, 2019, https://www.washingtonpost.com/opinions/2019/06/24/turkeys-elections-istanbul-shows-that-democracy-is-tough-subvert.

95   Lisel Hintz, "How a Hashtag and Memes are Uniting Turkey's Opposition," *Washington Post*, May 22, 2018, https://www.washingtonpost.com/news/monkey-cage/wp/2018/05/11/how-a-hashtag-and-memes-are-uniting-turkeys-opposition; Murat Somer, "Turkish Democracy is Still Alive," *Foreign Policy*, June 19, 2019, https://foreignpolicy.com/2019/06/19/turkish-democracy-is-still-alive.

96   Beate Kohler-Koch and Christine Quittkat, "What is Civil Society and Who Represents Civil Society in the EU?—Results of an Online Survey Among Civil Society Experts," *Policy & Society* 28, no. 1 (2009): 14.

97   See, e.g., Robert Putnam with Robert Leonardi and Raffaella Nonetti, *Making Democracy Work: Civic Traditions in Modern Italy* (Princeton, NJ: Princeton University Press, 1993); Mark Warren, "Civil Society and Democracy," in *The Oxford Handbook of Civil Society*, ed. Michael Edwards (Oxford, UK: Oxford University Press, 2011), 377–390; and Robert Fishman, "How Civil Society Matters in Democratization: Setting the Boundaries of Post-Transition Political Inclusion," *Comparative Politics* 49, no. 3 (April 2017): 391–409.

98   Joerg Forbrig and Pavol Demeš, "Civic Action and Democratic Power Shifts: On Strategies and Resources," in *Reclaiming Democracy: Civil Society and Electoral Change in Central and Eastern Europe*, eds. Joerg Forbrig and Pavol Demeš (Washington, DC: German Marshall Fund, 2007), 176, http://www.gmfus.org/publications/reclaiming-democracy-civil-society-and-electoral-change-central-and-eastern-europe.

99   Hardy Merriman, "A Movement-Centered Support Model: Considerations for Human Rights Funders and Organizations, Part II," *International Center on Nonviolent Conflict*, May 21, 2018, https://www.nonviolent-conflict.org/blog_post/part-2-movement-centered-support-model-considerations-funders-organizations. The definition is adapted from Gene Sharp's definition of nonviolent action.

100   Ibid.

101   For more on Charter 77, see, e.g., Jonathan Bolton, *Worlds of Dissent: Charter 77, The Plastic People of the Universe, and Czech Culture Under Communism* (Cambridge: Harvard University Press, 2014).

102   Gene Sharp, *From Dictatorship to Democracy: A Conceptual Framework for Liberation* (New York: The New Press, 2012), 26–36.

103   Neil Fligstein and Doug McAdam, *A Theory of Fields* (New York: Oxford University Press, 2012), 75.

104   For more on "pillars" of authoritarian power, see Robert Helvey, *On Strategic Nonviolent Conflict: Thinking About the Fundamentals* (Boston: Albert Einstein Institution, 2004), 9–18.

105   Chenoweth and Stephan, *Why Civil Resistance Works.*

106   Ibid.

107   Ibid., 3–61.

108   Haggard and Kaufman, *Dictators and Democrats,* 65–69.

109   Chenoweth and Stephan, *Why Civil Resistance Works.* Haggard and Kaufman, *Dictators and Democrats*, agrees that group strategy is an important factor.

110   Additional recommendations can be found in the work of the International Center on Nonviolent Conflict. See, e.g., Hardy Merriman, "Democracy Insurance," *International Center on Nonviolent Conflict,* September 7, 2017, https://www.nonviolent-conflict.org/blog_post/democracy-insurance; Peter Ackerman and Hardy Merriman, "The Checklist for Ending Tyranny," in *Is Authoritarianism Staging a Comeback?,* eds. Mathew Burrows and Maria J. Stephan (Washington, DC: The Atlantic Council, 2015), 63–80.

111   Ganz, *Why David Sometimes Wins*, 8, 10–21, and *passim*.

112   Ibid., 14–19.

113   Ibid., 17.

114   Ibid.

115   Catherine Corrigall-Brown, *Patterns of Protest: Trajectories of Participation in Social Movements* (Stanford: Stanford University Press, 2011), 61–62.

116   Ganz, *Why David Sometimes Wins*, 17.

117   Ibid., 19.

118   Srdja Popovic, *Blueprint for Revolution: How to Use Rice Pudding, Lego Men, and Other Nonviolent Techniques to Galvanize Communities, Overthrow Dictators, or Simply Change the World* (New York: Spiegel & Grau, 2015), 151.

119   Chenoweth and Stephan, *Why Civil Resistance Works*, 40.

120   Ibid., 39–61.

121   Ibid., 10.

122   Popovic, *Blueprint for Revolution*, 39.

123   Ibid., 159–167.

124   Nadja Mosimann, Line Rennwald, and Adrian Zimmermann, "The Radical Right, the Labour Movement and the Competition for the Workers' Vote," *Economics and Industrial Democracy* 40, no. 1 (2019): 81.

125   Peter Ackers, "Trade Unions as Professional Associations," in *Finding a Voice at Work: New Perspectives on Employment Relations*, eds. Stewart Johnstone and Peter Ackers (Oxford: Oxford University Press, 2015), 95–126.

126   Rebecca Gumbrell-McCormick and Richard Hyman, "Democracy in Trade Unions, Democracy Through Trade Unions?" *Economics and Industrial Democracy* 40, no. 1 (2019): 91–110; Lucio Baccaro, Chiara Benassi, and Guglielmo Meardi, "Theoretical and Empirical Links Between Trade Unions and Democracy," *Economic and Industrial Democracy* 40, no. 1 (2019): 3–19.

127   Chenoweth and Stephan, *Why Civil Resistance Works*, 69–73. The authors find three exceptions to this principle—regime change, anti-occupation, and secession—that are beyond the scope of this report.

128   Sharon Erickson Nepstad, *Nonviolent Struggle: Theories, Strategies, and Dynamics* (Oxford: Oxford University Press, 2015), 6–7.

129   "Prosazujeme protikorupční zákony," *Rekonstrukce Státu*, https://www.rekonstrukcestatu.cz/cs/co-delame/prosazujeme-protikorupcni-zakony. One of the report's authors, Norman Eisen, engaged with this group while serving as U.S. Ambassador to the Czech Republic from 2011 to 2014.

130   Popovic, *Blueprint for Revolution*, 169–171.

131   Grigorji Meseznikov and Oľga Gyarfasova, "Explaining Eastern Europe: Slovakia's Conflicting Camps," *Journal of Democracy* 29, no. 3 (July 2018): 78–90.

132   "Alumni Profile: Juraj Seliga," *John Jay Institute*, June 25, 2019 interview, https://www.johnjay-fellows.com/news/2019/06/25/alum-profile-juraj-seliga; Marc Santora, "Young Slovaks Buck a Trend, Protesting to Save Their Democracy," *New York Times*, March 17, 2018, https://www.nytimes.com/2018/03/17/world/europe/slovakia-protests-robert-fico-jan-kuciak.html. The success of A Decent Slovakia also demonstrates the importance of recognizing opportunities for mass mobilization. As such moments—in this case, the murder of a journalist—can be impossible to foresee, civil resistance leaders must be nimble and adaptive enough to seize on them when they arise.

133   "Alumni Profile: Juraj Seliga."

134   Marc Santora, "Slovakia's First Female President, Zuzana Caputova, Takes Office in a Divided Country," *New York Times*, June 15, 2019, https://www.nytimes.com/2019/06/15/world/europe/zuzana-caputova-slovakia-president.html.

135   James Curran and Toril Aalberg, *How Media Inform Democracy: A Comparative Approach* (New York: Routledge, 2012).

136   Ibid., 3.

137   Ibid.

138   Irwin Stotzky, "Democratic Theory, the Courts and the Press," *Democratization* 11, no. 3 (2004): 121 (quoted in part from Benjamin Cardozo).

139   "Democracy at Risk: Threats and Attacks Against Media Freedom in Europe," *Council of Europe*, February 2019, 5, https://rm.coe.int/annual-report-2018-democracy-in-danger-threats-and-attacks-media-freed/1680926453.

140   Ibid.

141   Zselyke Csaky, "A New Toolbox for Co-opting the Media" in *Freedom and the Media: A Downward Spiral,* ed. Sarah Repucci (Washington, DC: Freedom House, 2019): 16–23, https://freedom-house.org/sites/default/files/FINAL07162019_Freedom_And_The_Media_2019_Report.pdf.

142   "Democracy at Risk," 24–25.

143   Ibid., 5.

144   "Freedom of the Press 2017: Turkey," *Freedom House,* 2017, https://freedomhouse.org/report/freedom-press/2017/turkey.

145   Susan Corke, Andrew Finkel, David J. Kramer, Carla Anne Robbins, and Nate Schenkkan, *Democracy in Crisis: Corruption, Media, and Power in Turkey* (Washington, DC: Freedom House, 2014), https://freedomhouse.org/sites/default/files/Turkey%20Report%20-%202-3-14.pdf.

146   Ibid.

147   "2019 World Press Freedom Index," *Reporters Without Borders,* https://rsf.org/en/turkey.

148   "Freedom of the Press 2017: Hungary," *Freedom House,* 2017, https://freedomhouse.org/report/freedom-press/2017/hungary.

149   Corke et al., *Democracy in Crisis*, 25.

150   Ibid., 26.

151   Ibid., 25–26.

152   Benjamin Novak, "Radio Free Europe is Poised to Return to a Less Free Hungary," *New York Times*, September 6, 2019, https://www.nytimes.com/2019/09/06/world/europe/radio-free-europe-hungary-orban.html.

153   Ibid.

154   Epp Lauk and Halliko Harro-Loit, "Journalistic Autonomy as a Professional Value and Element of Journalism Culture: The European Perspective," *International Journal of Communication* 11 (2016): 1968.

155   Ibid.

156   Ibid., 1956–1974.

157   "European Commission Guidelines for EU Support to Media Freedom and Media Integrity in Enlargement Countries, 2014–2020," *European Commission,* February 21, 2014, https://ec.europa.eu/digital-single-market/en/news/european-commission-guidelines-eu-support-media-freedom-and-media-integrity-enlargement.

158   Lauk and Harro-Loit, "Journalistic Autonomy," 1968.

159   "European Commission Guidelines," 3.

160   Csaky, "A New Toolbox," 17–18, 20.

161   Kornelia R. Kiss, "Can Innovative Funding Models Help East European Media Avoid State Capture?," *European Journalism Observatory,* March 25, 2019, https://en.ejo.ch/media-economics/business-models/can-innovative-funding-models-help-east-european-media-avoid-state-capture.

162   Repucci, *Freedom and the Media.*

163  Matthew Alan Placek, "#Democracy: Social Media Use and Democratic Legitimacy in Central and Eastern Europe," *Democratization* 24, no. 4 (2017): 632–650.

164  Ibid., 644.

165  Diamond, *In Search of Democracy*, 133.

166  Ibid., 134.

167  "A Multi-Dimensional Approach to Disinformation," *European Commission,* March 2018, 3, https://ec.europa.eu/digital-single-market/en/news/final-report-high-level-expert-group-fake-news-and-online-disinformation.

168  Ibid., 11.

169  For the importance of the role of labor and trade unions in promoting democracy, see section 3C.

170  Greg Urban, ed., *Corporations and Citizenship* (Philadelphia: University of Pennsylvania Press, 2014); Lynn Sharp Paine, "Corporate Power and the Public Good," in *Corporations and Citizenship*, 31, 32.

171  Michael E. Porter and Mark R. Kramer, "Strategy & Society: The Link Between Competitive Advantage and Corporate Social Responsibility," *Harvard Business Review* 84, no. 12 (December 2006): 83; Aron Cramer, Salah Husseini, Michelle Nadboy, and Bennett Freeman, "Human Rights Policy Engagement: The Role of Companies," *Business for Social Responsibility* (June 2019): 3.

172  Bennett Freeman with Sif Thorgeirsson, Adele Barzelay, and Brooks Reed, "Shared Space Under Pressure: Business Support for Civic Freedoms and Human Rights Defenders: Guidance for Companies," *Business & Human Rights Resource Centre*, August 29, 2018, https://www.business-humanrights.org/en/new-guidance-for-companies-encourages-action-to-support-civic-freedoms-human-rights-defenders-explores-opportunities-for-engagement.

173  Andrei Kolesnikov and Denis Volkov, "Pragmatic Paternalism: The Russian Public and Private Sector," *Carnegie Moscow Center*, January 18, 2019, https://carnegie.ru/commentary/78155.

174  Michael McFaul and Kathryn Stoner-Weiss, "The Myth of the Authoritarian Model: How Putin's Crackdown Holds Russia Back," *Foreign Affairs* 87, no. 1 (2008): 68–84.

175  Mark McNamee, "Navigating the Complexities of Doing Business in Russia," *Harvard Business Review*, May 29, 2017, https://hbr.org/2017/05/navigating-the-complexities-of-doing-business-in-russia.

176  Dimitar Eftimoski, Antonija Josifovska, and Dushko Josheski, "Does Democracy and Government Policy Affect Labor Market Outcomes in CEE Countries?" *Journal of Sustainable Development* 5, no 12 (2015): 4–22.

177  Brandon Boze, Margarita Krivitski, David F. Larcker, Brian Tayan, and Eva Zlotnicka, "The Business Case for ESG," *Stanford Closer Look Series,* May 23, 2019, https://www.gsb.stanford.edu/sites/gsb/files/publication-pdf/cgri-closer-look-77-business-case-esg.pdf.

178  Joel S. Hellman, Geraint Jones, and Daniel Kaufmann, "Seize the State, Seize the Day: State Capture and Influence in Transition Economies," *Journal of Comparative Economics* 31, no. 4: 751–773.

179  Ibid.

180  World Bank Group, *World Development Report 2017: Governance and the Law* (Washington, DC: World Bank Group, 2017), https://www.worldbank.org/en/publication/wdr2017.

181  Walt Bogdanich and Michael Forsythe, "How McKinsey Has Helped Raise the Stature of Authoritarian Governments," *New York Times*, December 15, 2018, https://www.nytimes.com/2018/12/15/world/asia/mckinsey-china-russia.html; "Call for 'Desperately Needed' Probe into McKinsey's 'Wrongdoing,'" *Fin24*, October 5, 2017, https://www.fin24.com/Companies/Financial-Services/call-for-desperately-needed-probe-into-mckinseys-wrongdoing-20171005.

182  Bogdanich and Forsythe, "How McKinsey Has Helped."

183  Walt Bogdanich and Michael Forsythe, "How McKinsey Lost its Way in South Africa," *New York Times*, June 26, 2018, https://www.nytimes.com/2018/06/26/world/africa/mckinsey-south-africa-eskom.html.

184  "Call for 'Desperately Needed' Probe."

185  "Civil Society Joins Forces Calling McKinsey to Account," *Corruption Watch*, October 5, 2017, https://www.corruptionwatch.org.za/civil-society-joins-forces-calling-mckinsey-account; Joe Brock, "McKinsey Overhauls South Africa Office After Graft Scandal," *Reuters Africa*, July 8, 2018, https://www.reuters.com/article/uk-mckinsey-safrica/mckinseys-new-boss-apologises-to-south-africans-over-corruption-scandal-idUSKBN1JY0ZM.

186  Human Rights First, *A Campaign Against Dissent: Selective Enforcement of Antipiracy Laws in Russia* (New York: Human Rights First, 2011), 4, https://humanrightsfirst.org/wp-content/uploads/pdf/HRF-Msoft-Russia-report.pdf.

187  Florian Wettstein, "Silence as Complicity: Elements of a Corporate Duty to Speak Out Against the Violation of Human Rights." *Business Ethics Quarterly* 22, no. 1 (2012): 45–46.

188  Clifford J. Levy, "Russia Uses Microsoft to Suppress Dissent," *New York Times*, September 11, 2010, https://www.nytimes.com/2010/09/12/world/europe/12raids.html.

189  Bureau of Democracy, Human Rights, and Labor, *2010 Country Reports on Human Rights Practices: Russia* (Washington, DC: U.S. Department of State, 2011), 39, https://2009-2017.state.gov/documents/organization/160474.pdf.

190  Jeffrey Sonnenfeld and Roya Hakakian, "In Post-Khashoggi Saudi Arabia, Business Leaders Have a Chance to Fill a Moral Void," *Yale Insights*, October 24, 2018, https://insights.som.yale.edu/insights/in-post-khashoggi-saudi-arabia-business-leaders-have-chance-to-fill-moral-void; Aaron K Chatterji and Michael W. Toffel, "Assessing the Impact of CEO Activism," *Organization & Environment* 32, no. 2 (June 2019): 159–185.

191  Aaron K. Chatterji and Michael W. Toffel, "The New CEO Activists," *Harvard Business Review* 96, no. 1 (January 2018): 81.

192  Chatterji and Toffel, "Assessing the Impact."

193  Salah Husseini, Aron Cramer, Bennett Freeman, and Michelle Naboy, *Human Rights Policy Engagement: The Role of Companies* (New York: Business for Social Responsibility, 2019), 9, https://www.bsr.org/reports/BSR_HumanRightsPolicyEngagement_RoleOfCompanies.pdf.

194  "Nike Community Impact Fund," *Nike*, https://communityimpact.nike.com/ncif.

195  United Nations Global Compact, *Business for the Rule of Law Framework* (New York: United Nations Global Compact, 2016), https://www.unglobalcompact.org/docs/issues_doc/rule_of_law/B4ROL_Framework.pdf.

196  Thorsten Benner, "The German Car Industry Has to Stop Allowing Itself to be Used by Viktor Orbán," *Global Public Policy Institute*, April 5, 2018, https://www.gppi.net/2018/04/05/the-german-car-industry-has-to-stop-allowing-itself-to-be-used-by-viktor-orban.

197  "What is CSR?" *United Nations Industrial Development Organization*, https://www.unido.org/our-focus/advancing-economic-competitiveness/competitive-trade-capacities-and-corporate-responsibility/corporate-social-responsibility-market-integration/what-csr.

198  Moses L. Pava, "Why Corporations Should Not Abandon Social Responsibility," *Journal of Business Ethics* 83, no. 4 (2008): 812.

199  Devin Thorpe, "Why CSR? The Benefits of Corporate Social Responsibility Will Move You To Act," *Forbes*, May 18, 2013, https://www.forbes.com/sites/devinthorpe/2013/05/18/why-csr-the-benefits-of-corporate-social-responsibility-will-move-you-to-act/#6611aea765a3.

200  Husseini et al., "Human Rights Policy Engagement," 6.

201  Anthony Bebbington, "Extractive Industries and Stunted States: Conflict, Responsibility, and Institutional Change in the Andes," in *Corporate Social Responsibility: Comparative Critiques*, eds. K. Ravi Raman and Ronnie D. Lipschutz (London: Palgrave MacMillan UK, 2010), 97–115.

202  Susan Ariel Aaronson, "Corporate Strategy and Inadequate Governance: The Pitfalls of CSR," *World Bank Institute Business & Development Discussion Paper*, Summer 2009, http://siteresources.worldbank.org/CGCSRLP/Resources/pitfallsofcsr.pdf.

203  Michael Bossetta, "The Weaponization of Social Media: Spear Phishing and Cyberattacks on Democracy," *Journal of International Affairs* 71, no. 1.5 (2018): 98.

204  Anamitra Deb, Stacy Donohue, and Tom Glaisyer, "Is Social Media a Threat to Democracy?" *The Omidyar Group*, October 1, 2017, https://www.omidyargroup.com/wp-content/uploads/2017/10/Social-Media-and-Democracy-October-5-2017.pdf.

205  Samantha Bradshaw and Philip Howard, "Troops, Trolls and Troublemakers: A Global Inventory of Organized Social Media Manipulation," *University of Oxford Computational Propaganda Research Project Working Paper*, July 2017, http://blogs.oii.ox.ac.uk/politicalbots/wp-content/uploads/sites/89/2017/07/Troops-Trolls-and-Troublemakers.pdf.

206  Ibid.

207  Deb, Donohue, and Glaisyer, "Is Social Media a Threat to Democracy?"

208  Paul M. Barrett, *Tackling Domestic Disinformation: What the Social Media Companies Need to Do* (New York: NYU Stern Center for Business and Human Rights, 2019), https://issuu.com/nyusterncenterforbusinessandhumanri/docs/nyu_domestic_disinformation_digital?e=31640827/68184927.

209  Elizabeth Bodine-Baron, Todd C. Helmus, Andrew Radin, Elina Treyger, *Countering Russian Social Media Influence* (Arlington: RAND Corporation, 2018), https://www.rand.org/content/dam/rand/pubs/research_reports/RR2700/RR2740/RAND_RR2740.pdf.

210  Ibid.

211  Ibid.

212  "Code of Conduct on Countering Illegal Hate Speech Online," *European Commission*, May 2016, https://ec.europa.eu/newsroom/just/item-detail.cfm?item_id=31811.

213  Barrett, *Tackling Domestic Disinformation*, 2.

214  Ibid.

215  E.g., Mahatma Gandhi, *Hind Swaraj and Other Writings* (Cambridge; New York: Cambridge University Press, 1997); Martin Luther King, Jr., *Stride Toward Freedom: The Montgomery Story* (New York: Harper & Row, 1958); Václav Havel, "The Power of the Powerless," in *The Power of the Powerless: Citizens Against the State in Central-Eastern Europe*, ed. John Keane (New York: Routledge, 2015), 23–96; Sharp, *From Dictatorship to Democracy*; Sharp, *The Politics of Nonviolent Action* (Boston: Extending Horizons Books, 1973); Frances Fox Piven and Richard A. Cloward, *Poor People's Movements: Why They Succeed, How They Fail* (New York: Vintage Books, 1979); Saul Alinsky, *Rules for Radicals: A Pragmatic Primer for Realistic Radicals* (New York: Vintage Books, 1989); Mark Engler and Paul Engler, *This is an Uprising: How Nonviolent Revolt is Shaping the Twenty-First Century* (New York: Nation Books, 2016); and *Civil Resistance and Power Politics: The Experience of Non-Violent Action from Gandhi to the Present*, edited by Adam Roberts and Timothy Garton Ash (Oxford, UK: Oxford University Press, 2011).

216  Snyder, *On Tyranny*.

217  Ibid., 22.

218  Gene Sharp, *Waging Nonviolent Struggle: 20th Century Practice and 21st Century Potential* (Boston: Porter Sargent, 2005), 412.

219  Diamond, *In Search of Democracy*, 427–430. See also Chenoweth and Stephan, *Why Civil Resistance Works*, 180–191. For an example of the ineffectiveness of international actors in pressuring the Burmese regime to acquiesce to the pro-democracy movement's demands in the 1980s, likely due to the "insularity of the Burmese economy and its reliance on illicit trade and trafficking" (190).

220  Thomas Carothers, *Critical Mission: Essays on Democracy Promotion* (Washington, DC: Carnegie Endowment for International Peace, 2004), 116–117.

221  "NGOs and CSOs: A Note on Terminology," *United Nations Development Programme*, https://www.undp.org/content/dam/china/docs/Publications/UNDP-CH03%20Annexes.pdf. According to terminology used by the UN Development Programme, CSOs refer to "voluntary organizations with governance and direction coming from citizens or constituency members, without significant government-controlled participation or representation." CSOs can include faith-based groups, trade unions, professional associations, internationally affiliated organizations with branches in other countries, etc. NGOs are often considered a subset of CSOs and are generally defined as nonprofit and independent entities. Their activities include but are not limited to social, advocacy, and human rights work.

222  Carothers, *Aiding Democracy Abroad*, 200–205, 208.

223  Putnam, *Making Democracy Work*, 163–185.

224  Larry Diamond, *Developing Democracy: Towards Consolidation* (Baltimore: The Johns Hopkins University Press, 1999).

225  Carothers, *Aiding Democracy Abroad,* 207.

226  Sabine Lang, "The NGOization of Feminism," in *Transitions, Environments, Translations: Feminisms in International Politics*, eds. Joan W. Scott, Cora Kaplan and Deborah Keates (London: Routledge, 1997), 101–120.

227  United Nations, *Human Development Report 2002: Deepening Democracy in a Fragmented World* (New York: UN, 2002), 102, http://hdr.undp.org/sites/default/files/reports/263/hdr_2002_en_complete.pdf.

228   Carothers, *Aiding Democracy Abroad,* 215–216, 259–267; Sarah L. Henderson, *Building Democracy in Contemporary Russia: Western Support for Grassroots Organizations* (Ithaca, NY: Cornell University Press, 2003).

229   Carothers, *Aiding Democracy Abroad,* 264–265.

230   Sarah E. Mendelson, *From Assistance to Engagement: A Model for a New Era in U.S.-Russian Civil Society Relations* (Washington, DC: Center for Strategic and International Studies, 2009), 4, https://csis-prod.s3.amazonaws.com/s3fs-public/legacy_files/files/publication/090924_Mendelson_FromAssistEngage_Web.pdf.

231   Kristoffer Liden, Nona Mikhelidze, Elena B. Stavrevska, and Birte Vogel, "EU Support to Civil Society Organizations in Conflict-Ridden Countries: A Governance Perspective from Bosnia and Herzegovina, Cyprus and Georgia," *International Peacekeeping,* 23, no. 2 (2016): 284.

232   Ibid., 284–285.

233   Sarah Bush, *The Taming of Democracy Assistance: Why Democracy Promotion Does Not Confront Dictators* (New Haven: Yale University Press, 2015).

234   Ibid., 284.

235   Ibid., 285.

236   Carothers, *Aiding Democracy Abroad,* 227–231.

237   Ibid., 265–267.

238   Carothers, *Aiding Democracy Abroad,* 211; Carew Boulding, *NGOs, Political Protest, and Civil Society* (Cambridge, UK: Cambridge University Press, 2014), 34–37.

239   Carothers, *Aiding Democracy Abroad,* 259–274.

240   Adam Fagan, "Democracy Promotion in Kosovo: Mapping the Substance of Donor Assistance and a Comparative of Strategies," *Cambridge Review of International Affairs* 28, no. 1 (2015).

241   Ibid., 128.

242   Ibid.

243   Saskia Brechenmacher, *Civil Society Under Assault: Repression and Responses in Russia, Egypt, and Ethiopia* (Washington, DC: Carnegie Endowment for International Peace, 2017), 1, https://carnegieendowment.org/files/Civil_Society_Under_Assault_Final.pdf.

244   Thomas Carothers, "Closing Space for International Democracy and Human Rights Support," *Journal of Human Rights Practice* 8 (2016): 359.

245   Ibid., 363.

246   Ibid.

247   Ibid., 364–365.

248   Kendra Dupuy, James Ron, and Aseem Prakash, "Hands Off My Regime! Governments' Restrictions on Foreign Aid to Non-Governmental Organization in Poor and Middle-Income Countries," *World Development* 84 (2016): 300.

249   Carothers, "Closing Space for International Democracy and Human Rights Support," 359.

250   Dupuy et al., "Hands Off My Regime!" 300.

251   USAID, *2017 Civil Society Organization Sustainability Index for Central and Eastern Europe and Eurasia* (Washington, DC: USAID, 2018), 3, https://www.fhi360.org/sites/default/files/media/documents/resource-civil-society-organization-2017-regional-report.PDF.

252   Ibid., 4.

253   Ibid.

254   Ibid., 133.

255   Amanda Sloat, "Diplomacy Triumphs: Greece and Macedonia Resolve Name Dispute," *The Brookings Institution,* June 12, 2018, https://www.brookings.edu/blog/order-from-chaos/2018/06/12/diplomacy-triumphs-greece-and-macedonia-resolve-name-dispute.

256   Carothers, "Closing Space for International Democracy and Human Rights Support," 361.

257   Carothers, "Closing Space for International Democracy and Human Rights Support"; Brechenmacher, *Civil Society Under Assault*.

258   Chenoweth and Stephan, *Why Civil Resistance Works*, 55, 225.

259   Community of Democracies, *2018–2023 Community of Democracies' Strategic Plan* (Warsaw: Community of Democracies Permanent Secretariat, 2018), https://community-democracies.org/app/uploads/2018/06/CoD-Strategic-Plan-FINAL.pdf.

260   Carothers, *Aiding Democracy Abroad*, 338–339.

261   Jeremy Kinsman and Kurt Bassuener, *A Diplomat's Handbook for Democracy Development Support,* (Waterloo: Center for International Governance Innovation, 2013), 80–82, http://www.democratizationpolicy.org/diplomats-handbook.

262   Fagan, "Democracy Promotion in Kosovo," 119.

263   Ibid.

264   Phil Lynch, Tess McEvoy, Ben Leather and Amanda Lilliefeldt, *How to Create and Maintain the Space for Civil Society: What Works?* (New York: International Service for Human Rights, 2015), 24, https://www.ohchr.org/Documents/AboutUs/CivilSociety/ReportHC/16_ISHR021015.pdf.

265   See Peter Ackerman and Hardy Merriman, *Preventing Mass Atrocities: From a Responsibility to Protect (RtoP) to a Right to Assist (RtoA) Campaigns of Civil Resistance* (Washington, DC: International Center on Nonviolent Conflict Special Report Series Vol. 3, 2019), https://www.nonviolent-conflict.org/wp-content/uploads/2019/05/Right-to-Assist.pdf;

Michael J. Glennon and Peter Ackerman, "The Right Side of the Law," *The American Interest*, September 1, 2007, https://www.the-american-interest.com/2007/09/01/the-right-side-of-the-law.

266   Polyakova et al., *The Anatomy of Illiberal States,* 31.

267   Ackerman and Merriman, *Preventing Mass Atrocities*.

268   Chenoweth and Stephan, *Why Civil Resistance Works,* 54–55.

269   Gene Sharp, *How Nonviolent Struggle Works* (Boston: The Albert Einstein Institution, 2013), xv–xvi.

270   Jaime Jackson, "The Role of External Support in Violent and Nonviolent Civil Conflict Outcomes," Paper presented at the Western Political Science Association Annual Conference, April 4, 2015, 5.

271  For case studies, see Chenoweth and Stephan, *Why Civil Resistance Works,* and Kinsman and Bassuener, *A Diplomat's Handbook for Democracy Development Support.*

272  Hardy Merriman, "Democracy Insurance," International Center on Nonviolent Conflict, September 7, 2017, https://www.nonviolent-conflict.org/blog_post/democracy-insurance; Ackerman and Merriman, *Preventing Mass Atrocities*, 11–17; Hardy Merriman, "Supporting Civil Resistance Movements: Considerations for Human Rights Funders and Organizations," International Center on Nonviolent Conflict, September 11, 2018, https://www.nonviolent-conflict.org/blog_post/supporting-civil-resistance-movements.

273  Kinsman and Bassuener, *A Diplomat's Handbook for Democracy,* 25, 45–47, 73–76.

274  Ackerman and Merriman, *Preventing Mass Atrocities*, 20.

275  Cf. Kinsman and Bassuener, *A Diplomat's Handbook for Democracy Development Support*. Though it should be noted that one caveat to successful diplomatic engagement is that diplomats often rely on political contact of their predecessors, or even the same contacts as others in the embassy. This can create an echo chamber, when one contact's perspective is shared or promoted multiple times.

276  Kinsman and Bassuener, *A Diplomat's Handbook for Democracy Development Support*, 64–69.

277  Ackerman and Merriman, *Preventing Mass Atrocities*, 20–22.

278  Markus Bayer, Felix X. Bethke, and Matteo Dressler, "How Nonviolent Resistance Helps to Consolidate Gains for Civil Society after Democratization," International Center on Nonviolent Conflict, December 12, 2017, https://www.nonviolent-conflict.org/blog_post/how-nonviolent-resistance-helps-consolidate-gains-democratization.

279  Diamond, *In Search of Democracy*, 439–441; Jonathan Pinckney, *When Civil Resistance Succeeds: Building Democracy After Popular Nonviolent Uprisings* (Washington, DC: International Center on Nonviolent Conflict, 2018), https://www.nonviolent-conflict.org/wp-content/uploads/2018/10/When-Civil-Resistance-Succeeds-Pinckney-monograph.pdf.

280  Hardy Merriman, "Movement Building and Civil Resistance: Key Resources for Movement Organizers," Josef Korbel School of International Studies, December 2016, https://www.du.edu/korbel/sie/media/documents/quickfacts-and-policy-briefs/qf-resourcesformovementleaders.pdf.

281  Carothers, *Aiding Democracy Abroad*, 339.

282  Chenoweth and Stephan, *Why Civil Resistance Works,* 54.

283  Ibid., 55.

284  Mark Kramer, "The Collapse of East European Communism and the Repercussions Within the Soviet Union (Part 1)," *Journal of Cold War Studies* 5, no. 4 (fall 2003): 205.

285  Kristina Spohr Readman, "Between Political Rhetoric and Realpolitik Calculations: Western Diplomacy and the Baltic Independence Struggle in the Cold War Endgame," *Cold War History* 6, no. 1 (2006): 6–10.

286  Nils R. Muizneks, "The Influence of the Baltic Popular Movements on the Process of Soviet Disintegration," *Europe-Asia Studies* 47, no. 1 (1995): 3–25.

287  Muizneks, "The Influence of the Baltic Popular Movements on the Process of Soviet Disintegration," 12; Indra Ekmanis, "30 Years Later, the Human Chain that 'Unshackled' the Baltic Nations Still Matters," *Public Radio International*, August 22, 2019, https://www.pri.org/stories/2019-08-22/30-years-later-human-chain-unshackled-baltic-nations-still-matters.

288  Maria Stephan and Matthew Burrows, *Bolstering Democracy: Lessons Learned and the Path Forward* (Washington, DC: Atlantic Council, 2018), 220–221.

289  Joshua Paulson, "Case Study: Serbia, 1996–2000," in Gene Sharp, *Sharp's Dictionary of Power and Struggle: Language of Civil Resistance in Conflicts* (New York: Oxford University Press, 2012).

290  Ibid., 15. Both Otpor and Sharp are further discussed in sections 3A and 3C of this report.

291  Ivan Vejdova, "Civil Society versus Slobodan Milosevic: Serbia, 1991–2000," in *Civil Resistance and Power Politics*, eds. Adam Roberts and Timothy Garton Ash (Oxford, UK: Oxford University Press, 2009), 306.

292  Ibid., 311.

293  Ibid.

294  Stephen Jones, "Georgia's 'Rose Revolution' of 2003: A Forceful Peace," in *Civil Resistance and Power Politics*, 324.

295  Ibid., 329–330.

296  Ibid.

297  Ibid., 331; Lincoln A. Mitchell, *Uncertain Democracy: U.S. Foreign Policy and Georgia's Rose Revolution* (Philadelphia: University of Pennsylvania Press, 2009), 162.

298  Maria J. Stephan, "Checklist for External Assistance to Nonviolent Movements" in *Is Authoritarianism Staging a Comeback?*, 214.

299  Andrew Wilson, "Ukraine's 'Orange Revolution' of 2004: The Paradoxes of Negotiation" in *Civil Resistance and Power Politics*, 335.

300  Ibid., 347–348.

301  Ibid., 348.

302  Ibid.

303  Ibid.

304  Kinsman and Bassuener, *A Diplomat's Handbook for Democracy Development Support,* 316, 319.

305  Ibid., 321–322.

306  Ibid., 318.

307  Alina Polyakova, "US Efforts to Counter Russian Disinformation and Malign Influence," *The Brookings Institution*, July 10, 2019, https://www.brookings.edu/testimonies/u-s-efforts-to-counter-russian-disinformation-and-malign-influence.

308  Alina Polyakova, "How Russia Meddled in its Own Elections," *Atlantic*, March 18, 2018, https://www.theatlantic.com/international/archive/2018/03/russia-putin-election-disinformation-troll/555878.

309  Ibid.

310  Andrew Meier, "A Death in Moscow," *New York Times*, July 1, 2007, https://www.nytimes.com/2007/07/01/books/review/Meier-t.html.

311  Vladimir Kara-Murza, "It's Been Four Years Since the Murder of Boris Nemtsov. Russians Haven't Forgotten," *Washington Post*, March 6, 2019, https://www.washingtonpost.com/opinions/2019/03/06/its-been-four-years-since-murder-boris-nemtsov-russians-havent-forgotten.

312  Alfred Kueppers, "Russian Protesters Arrested in Moscow Rally," *Reuters*, December 31, 2011, https://www.reuters.com/article/us-russia-putin-protests-idUSTRE7BU0EV20111231.

313  Andrew Higgins, "Hundreds Arrested in Moscow as Criminal Case is Brought Against Opposition Leader," *New York Times*, August 3, 2019, https://www.nytimes.com/2019/08/03/world/europe/moscow-protest-navalny-corruption.html.

314  Marc Bennetts, "Russian Police Carry Out Mass Raids Against Opposition Activists," *Guardian,* September 12, 2019, https://www.theguardian.com/world/2019/sep/12/russian-police-raid-homes-and-offices-of-opposition-activists.

315  Alina Polyakova, "The Kremlin's Latest Crackdown on Independent Media," *Foreign Affairs,* December 5, 2017, https://www.foreignaffairs.com/articles/russia-fsu/2017-12-05/kremlins-latest-crackdown-independent-media.

316  Ibid.

317  "Putin Signs Russian Law to Shut 'Undesirable' Organizations," *Associated Press*, May 24, 2015, https://www.apnews.com/a8c2d4f8ec7c41539beefe985e4b3d9b.

318  Polyakova, "The Kremlin's Latest Crackdown."

319  Ibid.

320  Ibid.

321  Steve Rosenberg, "Russia Expels USAID Development Agency," *BBC News*, September 12, 2012, https://www.bbc.com/news/world-europe-19644897.

322  Polyakova, "The Kremlin's Latest Crackdown."

323  Brechenmacher, *Civil Society Under Assault*, 25–28.

324  Polyakova, "How Russia Meddled in its Own Elections."

325  Bill Bostock, "The Russian Government Demanded Access to Everybody's Tinder User Data in Case its Spies Want to Take a Look," *Business Insider*, June 3, 2019, https://www.businessinsider.com/russia-demands-access-tinder-fsb-2019-6.

326  James Andrew Lewis, "Reference Note on Russian Communications Surveillance," Center for Strategic and International Studies, April 18, 2014, https://www.csis.org/analysis/reference-note-russian-communications-surveillance.

327  Freedom House, *Freedom of the Net 2018: Russia* (Washington, DC: Freedom House, 2018), https://freedomhouse.org/report/freedom-net/2018/russia.

328  J. M. Berger, "Here's What Russia's Propaganda Network Wants You to Read," *Politico*, August 23, 2017, https://www.politico.com/magazine/story/2017/08/23/russia-propaganda-network-kremlin-bots-215520.

329  Gergely Szakacs and Jan Strupczewski, "EU Commission Rebukes Hungary's New Media Campaign as 'Fake News,'" *Reuters*, February 19, 2019, https://www.reuters.com/article/us-hungary-eu-election-campaign/eu-commission-rebukes-hungarys-new-media-campaign-as-fake-news-idUSKCN1Q81I0.

330  Alina Polyakova and Daniel Fried, *Democratic Defense Against Disinformation 2.0* (Washington, DC: Atlantic Council, 2019), 3, https://www.atlanticcouncil.org/in-depth-research-reports/report/democratic-defense-against-disinformation-2-0.

331  Polyakova et al., *The Anatomy of Illiberal States*.

332  Stephan and Burrows, *Bolstering Democracy,* viii.

333  E.g., Ronald Janse, "The Evolution of the Political Criteria for Accession to the European Community, 1957–1973," *European Law Journal* 24, no. 1 (January 2018): 57–76.

334  "Treaty on European Union, Belgium-Denmark-Germany-Greece-Spain-France-Ireland-Italy-Luxembourg-Netherlands-Portugal-United Kingdom," February 7, 1992, 4, https://europa.eu/european-union/sites/europaeu/files/docs/body/treaty_on_european_union_en.pdf.

335  Anna M. Meyerrose, "Democratic Backsliding in the European Union: The Unintended Consequences of European Integration for Democracy," working paper.

336  "Accession Criteria," *European Commission,* https://ec.europa.eu/neighbourhood-enlargement/policy/glossary/terms/accession-criteria_en.

337  Kevin Deegan-Krause, *Elected Affinities: Democracy and Party Competition in Slovakia and the Czech Republic* (Stanford: Stanford University Press, 2006), 122.

338  Maria Fletcher, "Article 7 Sanctions: A Legal Expert Explains the EU's 'Nuclear Option,'" *Conversation*, July 28, 2019, http://theconversation.com/article-7-sanctions-a-legal-expert-explains-the-eus-nuclear-option-81724.

339  Melissa Hooper, "Poland," in Polyakova et al., *The Anatomy of Illiberal States.*

340  Joanna Fomina and Jacek Kucharczyk, "The Specter Haunting Europe: Populism and Protest in Poland," *Journal of Democracy* 27, no. 4 (October 2016): 58.

341  Hooper, "Poland," in Polyakova et al., *The Anatomy of Illiberal States.*

342  "European Commission Presents a Framework to Safeguard the Rule of Law in the European Union," *European Commission*, March 11, 2014, http://europa.eu/rapid/press-release_IP-14-237_en.htm.

343  "Rule of Law: European Commission Acts to Defend Judicial Independence in Poland," *European Commission,* December 20, 2017, http://europa.eu/rapid/press-release_IP-17-5367_en.htm.

344  "Commission Refers Hungary to the European Court of Justice of the EU over the Higher Education Law," *European Commission,* December 7, 2017, http://europa.eu/rapid/press-release_IP-17-5004_en.htm.

345  Patrick Kingsley, "As West Fears the Rise of Autocrats, Hungary Shows What's Possible," *New York Times*, February 10, 2018, https://www.nytimes.com/2018/02/10/world/europe/hungary-orban-democracy-far-right.html.

346  Ulrich Sedelmeier, "Anchoring Democracy from Above? The European Union and Democratic Backsliding in Hungary and Romania after Accession," *Journal of Common Market Studies* 52, no. 1 (2014): 113.

347  Ingi Iusmen, "EU Leverage and Democratic Backsliding in Central and Eastern Europe: The Case of Romania," *Journal of Common Market Studies* 53, no. 3 (2015): 600–601.

348   Court of Justice of the European Union, "The Polish Legislation Concerning the Lowering of the Retirement Age of Judges of the Supreme Court is Contrary to EU Law," press release no. 81/19, June 24, 2019, https://curia.europa.eu/jcms/upload/docs/application/pdf/2019-06/cp190081en.pdf.

349   "Communication from the Commission: Further Strengthening the Rule of Law Within the Union," COM/2019/163, *European Commission*, April 3, 2019, https://eur-lex.europa.eu/legal-content/EN/ALL/?uri=CELEX:52019DC0163; Gábor Halmai, "The Possibility and Desirability of Economic Sanction: Rule of Law Conditionality Requirements Against Illiberal EU Member States," European University Institute Working Papers, June 2018, http://hdl.handle.net/1814/51644.

350   E.g., "Hungary - Joint Opinion on the Provisions of the so-called "Stop Soros" draft Legislative Package which directly affect NGOs (in particular Draft Article 353A of the Criminal Code on Facilitating Illegal Migration), adopted by the Venice Commission at its 115th Plenary Session (Venice, 22-23 June 2018)," European Commission for Democracy Through Law, https://www.venice.coe.int/webforms/documents/?pdf=CDL-AD(2018)013-e; "Poland - Opinion on the Draft Act amending the Act on the National Council of the Judiciary; on the Draft Act amending the Act on the Supreme Court, proposed by the President of Poland, and on the Act on the Organisation of Ordinary Courts, adopted by the Commission at its 113th Plenary Session (Venice, 8-9 December 2017)," *European Commission for Democracy Through Law,* https://www.venice.coe.int/webforms/documents/?pdf=CDL-AD(2017)031-e.

351   Janne Haaland Matláry, *Intervention for Human Rights in Europe* (New York: Palgrave, 2002), 127–134, 138–151.

352   "Kazakhstan Takes Over OSCE Chair, Seeks to Strengthen Organization and Advance Dialogue on Future European Security Architecture," *OSCE Secretariat*, January 1, 2010, https://www.osce.org/cio/51810.

353   "Participating States," *Organization for Security and Co-operation in Europe*, https://www.osce.org/participating-states.

354   "Kazakhstan Takes Over OSCE Chair."

355   "OSCE Office for Democratic Institutions and Human Rights," *Organization for Security and Co-operation in Europe*, https://www.osce.org/odihr.

356   "The European Convention on Human Rights," *Council of Europe,* https://www.coe.int/en/web/human-rights-convention.

357   "For Democracy Through Law: The Venice Commission of the Council of Europe," *Council of Europe*, https://www.venice.coe.int/WebForms/pages/?p=01_Presentation&lang=EN.

358   E.g., Mark C. Toner, "Hungary Media Freedom," *U.S. Department of State*, October 20, 2016, https://2009-2017.state.gov/r/pa/prs/ps/2016/10/263362.htm.

359   "Donald Trump's Administration is Promoting Democracy and Human Rights," *Economist*, December 6, 2017, https://www.economist.com/news/united-states/21732074-fortunate-ly-he-has-yet-notice-donald-trumps-administration-promoting-democracy-and.

360   Michael Birnbaum, "Obama Slammed Polish Democracy on Friday. Here's How Polish TV Proved Him Right," *Washington Post*, July 9, 2016, https://www.washingtonpost.com/news/worldviews/wp/2016/07/09/obama-slammed-polish-democracy-on-friday-heres-how-polish-tv-proved-him-right.

361  Barack Obama, "Remarks by President Obama at 25th Anniversary of Freedom Day," *The White House*, June 4, 2014, https://obamawhitehouse.archives.gov/the-press-office/2014/06/04/remarks-president-obama-25th-anniversary-freedom-day; Donald Trump, "Remarks by President Trump to the People of Poland," *The White House*, July 6, 2017, https://www.whitehouse.gov/briefings-statements/remarks-president-trump-people-poland.

362  "Senior State Department Official Previewing the Secretary's Trip to Europe via Teleconference," *U.S. State Department,* January 19, 2018, https://translations.state.gov/2018/01/19/senior-state-department-official-previewing-the-secretarys-trip-to-europe-via-teleconference.

363  See Heather Nauert, "Poland: Independence of the Judiciary," *U.S. State Department*, July 21, 2017, https://www.state.gov/poland-independence-of-the-judiciary/; Heather Nauert, "Poland: National Broadcasting Council's Fine on TVN24," *U.S. Embassy and Consulate in Poland*, December 12, 2017, https://pl.usembassy.gov/tvn.

364  James Kirchick, "Trump Should be Isolating Viktor Orbán, Not Feting Him at the White House," *Brookings Institution,* May 13, 2019, https://www.brookings.edu/blog/order-from-chaos/2019/05/13/trump-should-be-isolating-viktor-orban-not-feting-him-at-the-white-house.

365  Patrick Kingsley, "Hungary's Leader Was Shunned by Obama, but Has a Friend in Trump," *New York Times*, August 15, 2018, https://www.nytimes.com/2018/08/15/world/europe/hungary-us-orban-trump.html.

366  Polyakova et al, *The Anatomy of Illiberal States*, 35.

367  Stephan and Burrows, *Bolstering Democracy*, 156–157.

368  Polyakova et al., *The Anatomy of Illiberal States*, 31.

369  Polyakova and Fried, *Democratic Defense against Disinformation 2.0*, 18.

370  Polyakova et al., *The Anatomy of Illiberal States*, 31.

371  North Atlantic Treaty Organization, "The North Atlantic Treaty," *NATO*, April 4, 1949, https://www.nato.int/cps/en/natolive/official_texts_17120.htm.

372  Václav Havel, "New Year's Address to the Nation," (speech, Prague, January 1, 1990), http://chnm.gmu.edu/1989/archive/files/havel-speech-1-1-90_0c7cd97e58.pdf.

# About the Authors

Ambassador (ret.) **Norman Eisen** is a senior fellow in Governance Studies at Brookings and the founder and former chair of the government watchdog group Citizens for Responsibility and Ethics in Washington (CREW). Eisen previously served in the White House as Special Assistant and Special Counsel to President Obama and as U.S. Ambassador to the Czech Republic. Eisen's writing has appeared in the *New York Times*, the *Washington Post*, *USA Today*, and many other publications, and he has been a commentator for CNN. He has been profiled in the *Washington Post*, *New York Magazine*, *Politico*, the *Wall Street Journal*, and *Tablet*. Eisen was named to the Politico 50 list of thinkers shaping American politics, and to the Forward 50 list of leading American Jews. Eisen's book, *The Last Palace: Europe's Turbulent Century in Five Lives and One Legendary House*, was published by Crown in 2018.

**Andrew Kenealy** is a PhD candidate in political science at Duke University, where he focuses on issues of security, peace, and conflict. From 2016 to 2019, Kenealy worked as a research analyst in Governance Studies at the Brookings Institution. He holds a bachelor's degree in government from Dartmouth College.

**Susan Corke** is a senior fellow and director of the bipartisan Transatlantic Democracy Working Group (TDWG) with the German Marshall Fund of the United States (GMF) based in the Washington, DC, office. In this role, she is building a bipartisan and transatlantic platform for discourse and coordination to address democratic backsliding in Europe. Corke has been a skilled expert and practitioner for 15 years in protecting human rights, promoting tolerance, and supporting democratic reform on the ground in Europe and Eurasia. Prior to joining GMF, she was director of Countering Antisemitism and Extremism at Human Rights First, where she worked to ensure that the United States led internationally on combating antisemitism and extremism in partnership with European allies. She joined Human Rights First after five years at Freedom House, where she was director of programs for Europe, Eurasia, and Southeast Asia.  She has been a regular commentator in American and European media and has testified on Capitol Hill several times to bear witness to urgent human rights issues. Before joining Freedom House, Corke held senior positions at the U.S. Department of State in Washington, DC, for which she received Superior and Meritorious Honor awards; most recently, she was the deputy director for European Affairs in the Bureau of Democracy, Human Rights, and Labor (DRL). She also served in stints at U.S. Embassy Moscow, U.S. Embassy Prague, the Bureau of European and Eurasian Affairs, and in the Bureau of Public Affairs as a Presidential Management Fellow. Prior to joining the State Department, Corke helped found and manage the U.S. Foreign Policy Institute at the Elliott School of International of Affairs at George Washington University. Corke has a Masters degree in International Affairs from George Washington University's Elliott School of International Affairs and a bachelor's degree from the College of William & Mary.

**The Democracy Playbook:** Preventing and Reversing Democratic Backsliding

**Torrey Taussig** is a research director in the Project on Europe and the Transatlantic Relationship at the Harvard Kennedy School's Belfer Center for Science and International Affairs. She is also a nonresident fellow at the Brookings Institution's Center on the United States and Europe and the head of strategy and operations for the North American Group of the Trilateral Commission. Taussig works on U.S.-EU relations, great power competition, and authoritarian challenges to democratic states and institutions. From 2018–2019, she was a Robert Bosch Foundation fellow based in Berlin, Germany. She has held pre-doctoral and post-doctoral fellowships at the Brookings Institution, where she led the Brookings Foreign Policy Program's Democracy Working Group and the "Democracy and Disorder" publication series launched in 2018. She also held a post-doctoral fellowship at the Harvard Kennedy School. Taussig received a master's and doctorate from the Fletcher School of Law and Diplomacy at Tufts University and a bachelor's degree from Williams College.

**Alina Polyakova** is the founding director of the Project on Global Democracy and Emerging Technology and a fellow in the Center on the United States and Europe at the Brookings Institution, where she leads the Foreign Policy Program's Democracy Working Group. She is also adjunct professor of European studies at the Paul H. Nitze School of Advanced International Studies (SAIS) at Johns Hopkins University. Polyakova's writing and research is regularly featured in major outlets, such as the *New York Times*, *Foreign Affairs*, and *Washington Post*, among others. Her book, *The Dark Side of European Integration*, examines the rise of far-right political parties in Europe. Prior to joining Brookings, Polyakova served as director of research and senior fellow for Europe and Eurasia at the Atlantic Council. Polyakova holds a doctorate from the University of California, Berkeley.

# Acknowledgments

The authors would like to thank:

• Daniel Berger and other donors for the generous support that made this project possible.

• Theodore Becker-Jacob, Agneska Bloch, Adrienne Epstein, David Fishman, Colby Galliher, Narrelle Gilchrist, Naz Gocek, Olivia Krawitt, Kelsey Landau, Olivia Leiwant, Filippos Letsas, Mark McKibbin, Ted Reinert, Kiersten Rhodes, Abigail Rochman, and Meilin Scanish for their research assistance.

• Hardy Merriman and Jan-Werner Müller for lending their expertise and experience in democracy support to conducting substantive reviews of this report.

• Our colleagues at the Transatlantic Democracy Working Group for providing helpful feedback throughout the drafting process.

• Alena Kudzko, Zuzana Navrátilová, and all attendees of the Brookings-Transatlantic Democracy Working Group workshop held at GLOBSEC in Bratislava in June 2019. Patrycja Chomika, Kararzyna Pisarska, Dominika Adamaszek and all attendees of the workshop held at the Warsaw Security Forum in October 2019.

• Our Brookings colleagues Jessica Harris, Louis Serino, and Leti Davalos for their work on the production and promotion of this report.

• Our Brookings colleagues Brigitte Brown, Sarah Chilton, Courtney Dunakin, Bruce Jones, Laura Mooney, Darrell West, and Thomas Wright for supporting this project in a myriad of ways.

## DISCLOSURE

The Brookings Institution is a nonprofit organization devoted to independent research and policy solutions. Its mission is to conduct high-quality, independent research and, based on that research, to provide innovative, practical recommendations for policymakers and the public. The conclusions and recommendations of any Brookings publication are solely those of its authors, and do not reflect the views of the Institution, its management, or its other scholars.

Facebook and Microsoft provide general, unrestricted support to The Brookings Institution. The findings, interpretations, and conclusions posted in this piece are not influenced by any donation. Brookings recognizes that the value it provides is in its absolute commitment to quality, independence, and impact. Activities supported by its donors reflect this commitment.

# BROOKINGS

The Brookings Institution
1775 Massachusetts Ave., NW
Washington, D.C. 20036
brookings.edu