UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISON

| | | |
|---|---|---|
| LATINOS FOR TRUMP, BLACKS FOR TRUMP, JOSHUA MACIAS, M.S., B.G., J.B., J.J., | § § § § | |
| Plaintiffs. | § § § | |
| v. | § § | NO. 6:21-CV-00043-ADA |
| PETE SESSIONS, MITCH McCONNELL, NANCY PELOSI, MARK ZUCKERBERG, CHUCK SCHUMER, ALEXANDRIA OCASIO-CORTEZ, BRAD RAFFENSPERGER, ALL MEMBERS OF THE 117TH U.S. CONGRESS, et al., | § § § § § § § § § | JURY TRIAL REQUESTED |
| Defendants. | | |

**Motion for Attorneys' Fees in Response to Motion for Extension of Time**
[Relates to Document 19]

1. For reasons that are difficult to fathom, after Mr. Davis donated over 450 hours of *pro bono time* to Plaintiff B.G. and her organization, "Latinos for Trump," B.G.—with no hint of preexisting animosity between B.G. and himself—suddenly sent Mr. Davis a scathing termination letter full of vindictive lies regarding concerns about non-existent "ethical issues."

2. Mr. Davis, shocked, but suspecting some sort of political gamesmanship, given the nature of this lawsuit, sent a diplomatic response, extending an olive branch over apparent differences in strategy that Ms. SoRelle had suddenly began pushing on Mr. Davis the week of February 15, 2021 despite previous and consistent

1

agreements among counsel, and even B.G. herself, not to pursue such frivolous strategies.

3. In addition, Mr. Davis, who has been working exclusively on a *pro bono basis* roughly 80 to 100 hours per week for Plaintiffs for the past 6 weeks and has even paid all filing fees out of his own pocket for Plaintiffs, not expecting reimbursement but also not knowing where money would come from to fund this lawsuit, was approached by an organization known as M90USA with an idea for a grassroots fundraising campaign to make sure the costs of the lawsuit would be covered.

**A. Davis's attempts to avoid even the appearance of an ethical issue with regard to grassroots fundraising for the lawsuit.**

4. Mr. Davis, not being a wealthy man by any means, is not able to work for free forever and would not being able to cover all costs out of his own pocket, not to mention his living expenses for long. In response to the offer from M90USA to help raise funds for the lawsuit and at the suggestion of the managers of M90USA, Mr. Davis proposed to Plaintiffs that an professional independent fund management team be appointed with no ties to any party in the case to avoid even the appearance of a conflict of interest or other ethical issue.

5. Mr. Davis set up multiple conference calls with Plaintiffs and former co-counsel, Kellye SoRelle, to get a group consensus for approval of the independent fund managers. Confident of a consensus that such a person and team would be appointed after the first very positive call, Mr. Davis set a follow up call the next day and send out several group texts to remind everyone with additional information about the

fund manager and his team. Mr. Davis called and texted Ms. SoRelle that night trying to make sure she agreed that the professional funds manager should be chosen but she did not respond.

6. To be clear, Mr. Davis did not even have an ethical obligation to make sure there was a group consensus of approval for a third party non-profit organization to appoint a professional fund manager, since Mr. Davis has no management oversight of M90USA. Mr. Davis simply prefers to be diplomatic and M90USA had asked. When none of the SoRelle Plaintiffs,[1] nor Ms. SoRelle herself returned any of Mr. Davis's group texts or calls and did not show up for the scheduled conference call, Mr. Davis thought it was very odd but was too busy working on the lawsuit to give it much more thought. It was *particularly* odd though that Plaintiff Joshua Macias did in fact join the scheduled conference call but then suddenly dropped the call and would not return calls to try and get him back on the line. Perhaps someone called or texted him and told him not to call back but, of course, that is mere speculation.

7. M90USA management had indicated a short window for approval of the fund management professionals, so Mr. Davis texted the group several more times and finally indicated he would tell M90USA to proceed unless someone in the group would call or text him back with a good reason for the management team not to be appointed, such as an alternative suggestion.

8. Mr. Davis did not hear back from anyone until, mere minutes after filing a request for issuance of summons for the Plaintiffs to the US Attorney, Mr. Davis

---

[1] "SoRelle Plaintiffs" and "Davis Plaintiffs" shall have the meanings ascribed to them in the Motion to Withdraw (Doc. 16).

3

received B.G.'s scathing email terminating him. Already having several good reasons to suspect some politically motivated attack going on behind the scenes, which will not be disclosed to protect confidential communications (the patently strange behavior of SoRelle and her Plaintiffs described herein was already highly suspect), Mr. Davis immediately went to work to find the correct procedure to sever the Davis Plaintiffs out of the case and go about re-tooling the complaint he had written to get the Davis Plaintiffs refiled and out of this case. These Plaintiffs had indicated they did not want to implement the ostensibly frivolous strategies suggested by Ms. SoRelle that week.

9. The consensus among the Davis Plaintiffs was that the SoRelle Plaintiffs' sudden departure from previously agreed-upon sound strategies appeared to be some scheme from outside actors with bad intent to intentionally sink this case and discredited the legitimate relief requested herein. This also seemed obvious from the fact that the SoRelle Plaintiffs suddenly began attacking Mr. Davis directly after Mr. Davis stood up to the demands of a non-client known as "Bob" or "Robert." Mr. Davis is unsure of the last name, but believes it is "Carone" or possible "Carnan." "Bob" had also been regularly attacking the Plaintiffs' expert, Mr. Vanderbol, with similarly absurd character attacks. The fact that Ms. SoRelle admitted to being in regular communication with Bob, who had been frivolously attacking the character of the key expert in the case, was highly concerning to Mr. Davis.

10. Wanting to stay out of the controversy, Mr. Davis repeatedly requested to be left out of group texts and group emails with "Bob," but to no avail. In a

particularly strange group text, which had been initiated by Ms. SoRelle herself despite Mr. Davis's requests to be left off such group messages, Bob accused Mr. Davis of (1) planning to unilaterally drop Plaintiffs from this Lawsuit without their consent, (2) adding Plaintiffs to the lawsuit without consent, and (3) disclosing confidential attorney client communications to "Steve," which is Mr. Vanderbol, the expert witness.

11. To be clear, Kellye SoRelle acted as the liason to B.G. and the other SoRelle Plaintiffs. Mr. Davis informed Ms. SoRelle that he was adding Plaintiffs with similar interests, and she approved, presumably with the approval of the SoRelle Plaintiffs with whom she had the responsibility to act as liason, as indicated in Exhibit 1 at p. 14. I did not disclose confidential communications to "Steve," but only information relevant to his expert reports, which did not include discussion about the Plaintiffs themselves, since Mr. Vanderbol's report does not deal with the Plaintiffs individual activities.

B. **Ms. SoRelle discloses confidential attorney-client communications to "Bob" and then claims "Bob" was "*monitoring our comms.*"[2]**

12. Upon reading this text chain, screenshots of which are attached hereto as Exhibit 1, Mr. Davis was extremely puzzled and wondered where this accusation regarding unilaterally dropping Plaintiffs had come from since he was planning no such thing and has never, and would never, act without apparent client consent in any matter. Not being an angry person by nature, Mr. Davis was justifiably irate with Bob in the group text after he scurrilously accused Mr. Davis of unethical

---

[2] "Comms" is short for "communications" and appears to be common in military parlance.

behavior, in front of clients for whom he had been working 80-100 hours a week, for free, and not getting much sleep.[3]

13. ***This is when things went from strange to downright bizarre.*** Mr. Davis remembered that he had a conversation about case strategy with Ms. SoRelle that was clearly protected by attorney-client confidentiality. Mr. Davis realized that Bob's accusation could only have come from a statement made in text and in a follow up call where Mr. Davis expressed concern to Mr. SoRelle that Bob seemed to be having some sort of undue influence over the Plaintiffs and was poisoning their thinking about the case strategy with suggestions of inclusion of what the whole team had previously agreed were frivolous legal claims (this has always been a case strictly about violations of election law and NOT a case about election fraud).

14. Concerned about the direction that Bob, a non-client,[4] seemed to be suggesting, which SoRelle herself had previously agreed was not a good strategy, Davis stated on the phone and in text that he would sever out the Davis Plaintiffs so they wouldn't be negatively affected if the SoRelle Plaintiffs truly wanted to go that direction, after a consultation giving the SoRelle Plaintiffs that choice, of course, to choose Mr. Davis's strategy or lose him as *pro bono* counsel—something not remotely unethical.

---

[3] And is now losing more sleep writing this response.
[4] Indeed it is unclear exactly what Bob's role was and why he was communicating with anyone related to the case at all. Mr. Davis previously thought Bob was some representative of or agent for Latinos for Trump or Blacks for Trump, but this turned out not to be the case. Mr. Davis assumed this from Ms. SoRelle's inclusion of Bob in client communications, Ms. SoRelle having a longstanding relationship with the clients.

6

15. Recognizing that Bob could only have gotten that bit of information from Ms. SoRelle, Mr. Davis confronted Ms. SoRelle to find out why she would disclose confidential attorney-client communications to Bob, a non-client, which he then turned around to try and use to discredit Mr. Davis to the clients.  Ms. SoRelle's excuse was that Bob was "listening in on our comms!"  Mr. Davis, now *extremely* concerned, began recording the rest of that conversation with Ms. SoRelle.[5]  To Mr. Davis's shock, Ms. SoRelle clarified that she did not mean merely that Bob was listening on a speaker phone or similar.  No, Ms. SoRelle *actually indicated several times that "Bob" was illegally listening in to the calls between Mr. Davis and Ms. SoRelle and monitoring our text messages.*

16. The craziest part might have been that Ms. SoRelle did not believe this was illegal—for a private individual to listen in to the calls of other private citizens.  To be clear, Mr. Davis does not for one second believe that Bob was actually listening in to counsel's calls in this manner.[6]

17. Mr. Davis, not being particularly tech-savvy about such matters supposes it is possible, in theory.  But, the simplest explanation is that Ms. SoRelle was directly feeding confidential information to Bob, a non-client, who appeared to be using that information to poison the SoRelle Plaintiffs against Mr. Davis on a group text started by Ms. SoRelle and that Ms. SoRelle was merely making a fantastical excuse for her behavior.  Ironically, the cover-up appears to be worse than the original

---

[5] To the extent the Court requests a copy of the call, Mr. Davis is happy to mail a flash drive to the Court's chambers for review.
[6] Though perhaps a federal agency should investigate this matter to be certain.

transgression since, Ms. SoRelle made no effort to hide the fact that she was in regular communication with Bob even after she claims Bob told her he was "monitoring our comms," likely a federal crime, and even after Bob's attack on Mr. Davis should have made it clear Bob had bad intentions toward the lawsuit.

19. Without divulging confidential communications, it is clear to Mr. Davis that his termination had a lot to do with his refusing to implement frivolous strategies advocated by Bob, a non-lawyer, and standing up to Bob's preposterous attacks on his own ethics and on the moral character of expert witness, John "Steve" Vanderbol. The timing also seems tied to Mr. Davis's suggestion of appointment of the independent funds management team, met mostly with silence, which raises further concerns as it seems apparent from non-confidential emails[7] that Bob intended to gain control of M90USA.

### C. Request for Attorneys' Fees: B.G. has no basis to attack the integrity and professionalism of Mr. Davis in the record.

19. Regardless, the point is that there is absolutely no basis for B.G. to now file a motion with the Court in which she publicly defames Mr. Davis's fitness and character to practice law before this Court by stating, "We have fired Paul Davis due to conflict of interest, irreconcilable differences, and his inability to represent us with the utmost high standard of ethics and professionalism."  Just like many other attacks Mr. Davis has received lately, this is likely just another aspect of the intimidation campaign that has been run against Mr. Davis since he first came into

---

[7] Mr. Davis can also provide these emails if needed, though he hasn't read most of them, since they are very long and, just like in the text, Mr. Davis kept stating he wished to be left out of it.

the public spotlight, after Roger Sollenberger made a misleading tweet about the nature of Mr. Davis's attendance at the January 6 protest, and then for filing this lawsuit.

20.     Since it appeared from the Motion that B.G. is now unrepresented, (for unknown reasons) since she filed a pro se motion, Mr. Davis reached out to B.G., asked her if she was represented and demanded that she withdraw the filing or face a motion for sanctions.  B.G. did not indicate if she had counsel but stated to Mr. Davis that she was "forwarding everything to Mr. David Gonzalez," who is the disciplinary chair of the Western District of Texas.  When Mr. Davis responded, "What exactly is the "ethics violation? I've done nothing wrong," B.G. did not respond further.

21.     Mr. Davis still has no idea of what possible "ethics violation" or breach of professionalism he could possibly be accused.  Because it is clear there are many individuals who do not appreciate the nature of this lawsuit, to put it mildly, and the one now filed as *Bravo, et al. v. Pelosi, et al.*, Case No. 6:21-cv-162, Mr. Davis is aware there are many people actively attempting to get him disbarred and/or disqualified. This is evidenced by the constant mail with "grievances" he receives from the Texas Bar, all of which have been dismissed, of course, in addition to a referral for his discipline from a judge within this district based solely on the fact that Mr. Davis was at the Capitol protest on January 6.[8]  Accordingly, Mr. Davis has worked hard to

---

[8] To be clear, Mr. Davis was peacefully exercising his First Amendment rights, which do not merit any form of discipline, as Mr. Davis has made clear to the disciplinary chair.  Mr. Davis has requested the referral be made public pursuant to the local rules, but still has not seen a copy made public.

avoid even the appearance of any ethical improprieties, refusing even to accept money for his efforts without some independent fund manager to provide unbiased impartiality in the distribution of funds in the best interests of Plaintiffs' Lawsuit.

22. Mr. Davis is not a vindictive person and forgives B.G. It is clear she has some motivation Mr. Davis cannot comprehend. Possibly she could be being blackmailed even because few other things would explain her behavior. Possibly Bob and Ms. SoRelle have merely spun a web of lies that B.G. has bought into. Maybe this is something the appropriate authorities should investigate. In any case, Mr. Davis, would merely like to be granted his own attorneys' fees from B.G. for the time he had to spend responding to her baseless and frivolous allegations of ethical improprieties and unprofessional behavior. To the extent B.G.'s behavior is the result of lies from Ms. SoRelle and her friend "Bob," possibly payment for these fees should be directed at Ms. SoRelle instead, or both together.

23. Mr. Davis spent 3.6 hours in drafting and preparing to draft this response, including reviewing various related communications and call recordings. Mr. Davis will use the rate of $500 per hour,[9] which is commensurate with an attorney of his experience and background in his area, for a total of $1,800. This amount of $1,800 in attorneys' fees doesn't seem to be too much to ask for in relief since. This reasonable $500/hour rate would mean he has donated over $250,000 in services to B.G. and Latinos for Trump over the past five weeks. The old adage is true, apparently: *no good deed goes unpunished*.

---

[9] This is close to Davis's former firm rate, which reached a high point of $490 per hour and Mr. Davis has gained even more experience and inflation has occurred since that point.

10

24. Anyone who has worked with Mr. Davis in the past at his various law firms would be able to testify to his integrity, character, and professionalism.[10] Mr. Davis suspects even colleagues at Goosehead Insurance would have to admit he did a pretty great job for them prior to January 6, 2021, since he was constantly showered with compliments on his work and attitude.

WHEREFORE, Mr. Davis requests that the Court grant him his attorneys' fees for having to respond to his character and professionalism being publicly defamed and his fitness to practice before this court being called into question in the amount of $1,800 against B.G. or any amount of sanctions or against any person to which and from which the court believes Mr. Davis to be justly entitled.

/s/ *Paul M. Davis*
Paul M. Davis
Texas Bar Number 24078401
paullovesamerica@protonmail.com
PAUL M. DAVIS & ASSOCIATES, P.C.[11]
3245 Main St., Suite 235-329
Frisco, TX 75034
Phone: 469-850-2930
Fax: 469-815-1178

---

[10] Unless, of course, any of these persons start receiving "outside influence" like other individuals apparently have.
[11] Certificate of Incorporation submitted to Texas Secretary of State, filing pending.

CERTIFICATE OF SERVICE

I certify the foregoing document has been served on B.G. via the court's ECF system and by email on February 23, 2021.

/s/ *Paul M. Davis*
Paul M. Davis

CERTIFICATE OF CONFERENCE

I certify that, on February 22, 2021, I reached out to B.G. to conference with her via text message, a method by which we have typically communicate, regarding the relief requested herein. B.G. did not respond.

s/ *Paul M. Davis*
Paul M. Davis